**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **THE ALIERA COMPANIES, INC.**<br>**d/b/a Aliera Healthcare, Inc.**, *et al.*, | **Case No. 21-11548 (TMH)** |
| **Debtors.** | **Pending in the United States Bankruptcy**<br>**Court for the District of Delaware** |
| **ALIERA LT, LLC, as Liquidating Trustee**<br>**of The Aliera Companies, Inc.**, *et al.*, | |
| **Plaintiff,** | **Adversary Proceeding No. 23-05204-jrs** |
| **v.** | |
| **JOHN BLENKE, THEODORE**<br>**STRICKLAND, ROGER SEVIGNY, and**<br>**JAMES WESTON QUINTRELL,** | |
| **Defendants.** | |

## DEFENDANTS' ANSWER TO PLAINTIFF'S ADVERSARY COMPLAINT

COME NOW, Defendants John Blenke, Theodore Strickland, and Roger Sevigny (collectively, "**Defendants**"), by and through their undersigned counsel, and submit their Answer to Plaintiff's Adversary Complaint, and state as follows:

### INTRODUCTION

1.      Defendants each served as directors of Debtor The Aliera Companies, Inc. ("**Aliera**"), which was associated with a failed healthcare sharing ministry ("**HCSM**") scheme.

Through their service as directors, the Defendants assisted the Debtors in perpetuating the scheme, and harming the Debtors' creditors, after it was evident that the associated HCSMs and Aliera did not comply with applicable law.  Accordingly, the Plaintiff files this action to hold the Defendants responsible for their part in the scheme undertaken by the Debtors under the guise of several HCSMs.

**ANSWER: Defendants deny the allegations in Paragraph 1.**

2.      Through this litigation, the Plaintiff seeks to recover funds on behalf of the Debtors' creditors, including more than 60,000 members (the "**Members**") of Sharity Ministries, Inc. f/k/a Trinity Healthshare Inc. ("**Sharity**") and a predecessor Unity Healthshare ("**Unity**")  and  the Debtor's arms' length creditors, including damages against the Defendants for their involvement in this scheme.

**ANSWER:  Defendants admit only that Plaintiff has filed this Adversary Proceeding, but deny that there is any merit to the same, that Defendants owed any duty to the "Members," or that there were any damages caused by the actions of these Defendants and therefore deny the remaining allegations in Paragraph 2.**

3.      The Debtors were established by a convicted felon, Timothy Moses ("**Moses**"), his spouse Shelley Steele ("**Steele**"), and their son Chase Moses ("**Chase**") to profit from an exception to the Affordable Care Act (the "**ACA**").  However, the Debtors failed to comply with applicable law since their inception, and when regulators and Members began taking legal action against the Debtors, instead of adjusting course or winding down, the Debtors' insiders decided to expand Aliera's board of directors to add an air of legitimacy to the enterprise.  At the request of Steele, the Defendants joined Aliera's board of directors and perpetuated the Debtors' scheme.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 3 and therefore deny the allegations in Paragraph 3.**

4.        As a result of the Debtors' insiders' conduct, Sharity has been enjoined from conducting business by regulators in at least 9 states; it became insolvent; and sought Chapter 11 bankruptcy protection.  Aliera has also been enjoined from conducting business in at least 6 states, became insolvent, and also filed Chapter 11.  The various creditors of Sharity and the Debtors have suffered hundreds of millions of dollars in losses as a result of this misconduct, and the Plaintiff files this litigation to hold the Defendants responsible for their part in continuing the Debtors' unlawful activity.

**ANSWER: Defendants admit only that Plaintiff has filed this action and that Aliera has been placed into bankruptcy, but deny the remaining allegations in Paragraph 4.**

## JURISDICTION AND VENUE

5.        This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

**ANSWER:  Defendants admit that this Court has jurisdiction and venue is provided for in the cited federal statutes.**

6.        This litigation relates to the jointly administered chapter 11 cases of *In re The Aliera Companies, Inc., et al.*, Case No. 21-11548-TMH (the "**Bankruptcy Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Delaware Court**").

**ANSWER:  Defendants admit the allegations in Paragraph 6 to the extent that that the afore-mentioned litigation matters are related to The Aliera Companies, but deny the remaining allegations contained in Paragraph 6.**

3

7.    The Plaintiff consents to entry of final orders or judgment by the Court.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief about the truth of an allegations in Paragraph 7 and therefore deny the allegations in Paragraph 7.**

## PARTIES

8.    This adversary proceeding relates to the Bankruptcy Cases, some of which were originally filed on December 21, 2021 in this Court, but were later transferred to the Delaware Court to align with an involuntary bankruptcy petition (the "**Involuntary Petition**") filed against Aliera on December 3, 2021 (the "**Petition Date**").  Subsequent to the transfer of venue of the Bankruptcy Cases to the Delaware Court, Aliera consented to entry of an order for relief under Chapter 11 in the Debtors' bankruptcy cases.  On February 16, 2022, the Order for Relief was entered, consolidating the two Aliera cases, with Case No. 21-11548 being the surviving case, and ordering that the cases be jointly administered [Bankruptcy Cases, Docket No. 75].

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8 and therefore deny the allegations in Paragraph 8.**

9.    The Trustee was appointed pursuant to an order entered by the Delaware Court [Bankruptcy Case, Docket No. 576] (the "**Confirmation Order**") confirming the *Modified First Amended Plan of Liquidation*, attached as Exhibit A to the Confirmation Order (together with all exhibits thereto, and as may be amended, modified or supplemented, the "**Plan**").  Pursuant to the Plan, the Trustee has standing to bring claims on behalf of the Debtors' bankruptcy estates.

**ANSWER: Defendants admit the allegations in Paragraph 9.**

10.    Defendant Blenke is an individual citizen of Illinois.  He can be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary

residence located at 1 Country Aire Drive, Saint Louis, MO 63131.

**ANSWER: Defendants deny Defendant Blenke is a citizen of Illinois. Defendants admit that Defendant Blenke's primary residence is at 1 Country Aire Drive, Saint Louis, MO 63131.**

11.    Defendant Strickland is an individual citizen of the state of Ohio. He can be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence located at 5561 Chowning Way, Columbus, OH 43213.

**ANSWER: Defendants admit Defendant Strickland is a citizen of Ohio. Defendants admit that Defendant Strickland's primary residence is at located at 5561 Chowning Way, Columbus, OH 43213.**

12.    Defendant Sevigny is an individual citizen of the state of New Hampshire. He can be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence located at 19 Melody Terrace, Dover, NH 03820.

**ANSWER: Defendants admit Defendant Sevigny is a citizen of the state of New Hampshire and that Defendant Sevigny's primary residence is at located at19 Melody Terrace, Dover, NH 03820.**

13.    Defendant Quintrell is an individual citizen of the state of Georgia and may be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence at 350 Minnehaha Trail, Blue Ridge, GA 30513.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 13 and therefore deny the allegations in Paragraph 13.**

## BACKGROUND

### I.    Introduction and Overview

14.    The Debtors were formed to provide services to HCSMs, including Sharity. After disputes with other HCSMs, Sharity became the Debtors' primary client and mechanism for the Debtors to extract cash from the Members.

**ANSWER: Defendants admit only that The Aliera Companies provided services to Healthcare Share Ministries, but deny the remaining allegations in Paragraph 14.**

15.    Aliera was incorporated in Delaware by Moses, Steele, and Chase in December 2015. Before forming Aliera, Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud (relating to a "pump and dump" scheme based on fraudulent statements) and perjury. As a result of the criminal case, titled *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over six years in prison and ordered to pay $1.65 million in restitution.

**ANSWER: Defendants admit Aliera was incorporated in Delaware, but lack knowledge or information sufficient to form a belief of the truth of the remaining allegations in Paragraph 15.**

16.    Aliera is a for-profit entity. Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders…." Aliera's formation documents do not include any discussion of religious or ethical purposes or missions.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 16 and therefore deny the allegations in Paragraph 16.**

17.    The Debtors began selling their health care products in late 2015.  At the time it was formed, it only sold "direct primary care medical home" ("**DPCMH**") plans.  DPCMH plans generally cover limited services such as some doctors' visits and basic lab services.  These plans provide no hospitalization or emergency room coverage and are not ACA-compliant.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 17 and therefore deny the allegations in Paragraph 17.**

18.    Aliera's insiders realized Aliera could greatly increase the sales of its health care products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSM coverage from the ACA's individual mandate.  They realized also that Aliera could avoid insurance laws in many states that also have an exemption from insurance regulations for entities that meet those states' HCSM requirements.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the allegations in Paragraph 18 and therefore deny the allegations in Paragraph 18.**

19.    Anabaptist Healthshare ("**Anabaptist**") was a small Mennonite entity located in Virginia.  Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services as an HCSM that had met the requirements under 26 U.S.C. § 5000A.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 19 and therefore deny the allegations in Paragraph 19.**

7

20.     In 2016, Moses convinced Anabaptist to permit Aliera to market its DPCMH plan "side by side" with Anabaptist's sharing program using Anabaptist's HCSM designation. Anabaptist created a wholly owned subsidiary, Unity, for that purpose.  Under the proposal, Aliera would market both its own plan and the Unity HCSM together as a health care product it claimed would be an HCSM.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 20 and therefore deny the allegations in Paragraph 20.**

21.     Aliera entered into a contract with Unity on or about February 1, 2017.  Under that contract, Aliera would offer to the public its own health care products that did not meet the insurance benefits and coverage requirements under the ACA, and that did not independently qualify for the HCSM exemption under 26 U.S.C. § 5000A.  In return, Aliera's customers would join the Unity HCSM, increasing the membership in Anabaptist's HCSM.  Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were supposed to be reserved for payment of benefits to Unity members.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 21 and therefore deny the allegations in Paragraph 21.**

22.     Although Aliera marketed the plans to consumers throughout the country as HCSM plans through Unity, Aliera marketed its own DPCMH plans as well.  Members made payments for both components of the plan directly to Aliera, and Aliera unilaterally determined how much of the payment was designated for the Aliera component, what portion was designated for the Unity component of the plan, and how much of the payment would be used

to actually pay members' medical expenses.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 22 and therefore deny the allegations in Paragraph 22.**

23.    In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits to Members.  It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 23 and therefore deny the allegations in Paragraph 23.**

24.    Unity terminated the relationship with Aliera in the summer of 2018.  A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County, Georgia in late 2018 styled *Aliera Healthcare v. Anabaptist Health Share, et al.,* No. 2018-cv- 308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.) ("**Georgia Lawsuit**").   The court found  that administrative fees paid to Aliera under its agreement with Unity amounted to millions of dollars. Indeed,  an  Aliera  employee  testified  in  the  Georgia  Lawsuit  that  Aliera  earned  more than $180,000,000 in revenue in 2018 alone.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 24 and therefore deny the allegations in Paragraph 24.**

II.    **Aliera Created Trinity as a Sham Health Care Sharing Ministry to Avoid ACA Requirements and State Insurance Regulation.**

25.    With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM through which to sell its health care plans.  Aliera and its principals therefore created Trinity Healthshare, Inc. ("**Trinity**") on June 27, 2018, as a purported Delaware nonprofit entity.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 25 and therefore deny the allegations in Paragraph 25.**

26.    William Rip Thead, III became the CEO of Trinity.  Mr. Thead was an Aliera employee at the time it created Trinity.  He is also a close family friend of the Moses family and officiated Chase's wedding.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 26 and therefore deny the allegations in Paragraph 26.**

27.    There were only two board members of Trinity at the time of its founding — Mr. Thead and his brother David R. Thead.  On information and belief, neither Mr. Thead nor his brother had any experience running a nonprofit organization.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 27 and therefore deny the allegations in Paragraph 27.**

28.    Aliera's law firm filed an application with the IRS for recognition of Trinity as a 501(c)(3) charitable organization and was authorized as power of attorney on behalf of Trinity in connection with that application.  The application, signed by Mr. Thead as Trinity's chairman,

failed to disclose the anticipated financial arrangement with Aliera, its employer.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 28 and therefore deny the allegations in Paragraph 28.**

29.    On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale, and administration of the purported HCSM plans they created (the "**2018 Agreement**"). The 2018 Agreement was drafted by Aliera and its agents and was not an arm's length transaction. It was signed by Chase on behalf of Aliera and by Mr. Thead on behalf of Trinity.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 29 and therefore deny the allegations in Paragraph 29.**

30.    The 2018 Agreement allowed Aliera to use Trinity's nonprofit status to sell health care plans purporting to be HCSM plans, and to maintain complete control over design of the plans, the money collected, the administration of the plans, the benefits paid, and the membership roster. Under the 2018 Agreement, Trinity delegated to Aliera authority to provide accounting staff, financial and membership reporting, and audit and tax filing support. It gave Aliera control over enrolling new members. It also gave Aliera the "exclusive ownership rights to the Membership Roster," and provided that Trinity was "not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera." Aliera was granted authority in its sole discretion to "substitute any component of a Plan." In other words, Trinity was just a front for Aliera.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of**

the truth of the allegations in Paragraph 30 and therefore deny the allegations in Paragraph 30.

31.    The payment scheme under the 2018 Agreement was especially prejudicial to the Members.  The Agreement provided that *all Member "contributions" payments were to be made directly to Aliera*, which then allocated 30-40% (depending on the plan) of every payment to commissions, and also provided that Aliera would be paid substantial additional administrative fees.  Only a small fraction of the amount of a member contribution (about 16% of the amount paid under most of the plans) was actually to be placed into a Trinity "Sharebox" account for payment of claims.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth   of the allegations in Paragraph 31 and therefore deny the allegations in Paragraph 31.**

32.    By contrast, under the ACA, health insurers may not spend more than 20% of premium payments on administrative costs, and 80% must be spent on benefits.  42 U.S.C. § 300gg-18.

**ANSWER:  Defendants deny the allegations in Paragraph 32, as stated and further deny that there is health insurance at issue in this matter.**

33.    Aliera subleased office space to Trinity, which became yet another means by which Aliera profited from member payments.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 33 and therefore deny the allegations in Paragraph 33.**

34.    Because Aliera had complete control over the Unity plans in 2018 at the time it created Trinity, it could easily recycle the marketing, enrollment, and plan materials it had

created and developed for Unity by replacing Unity's name and logo with the new Trinity name and logo.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the allegations in Paragraph 34 and therefore deny the allegations in Paragraph 34.**

35.    Because Aliera had sole access to Unity's member list, it attempted to automatically switch Members' plans from a Unity to a Trinity plan without requiring any action from the Members.  The court in the Georgia Lawsuit, however, entered a temporary restraining order preventing Aliera from doing so in December 2018.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 35 and therefore deny the allegations in Paragraph 35.**

36.    Aliera began selling the Trinity plans to new members in the fall of 2018.  Chase testified at length in the Georgia Lawsuit about his role in creating Trinity and developing all its health care plan materials.  By May 2019, the injunction preventing Aliera from soliciting Unity members was lifted, and it actively solicited the Unity members whose plans it controlled to authorize transfer to Trinity plans.

**ANSWER:** **Defendants admit only that Aliera was able to sell plans to Unity members, but lacks knowledge or information sufficient to form a belief of the truth of the remaining allegations in Paragraph 36 and therefore deny the remaining allegations in Paragraph 36.**

37.    Aliera created online enrollment forms or applications for Members to sign when they enrolled in the plans.  Those forms misrepresented that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to

successfully carry out the duties of administering these services."

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 37 and therefore deny the allegations in Paragraph 37.**

38.    In fact, up to 84% of the contributions went to administration and other costs or simply into the pockets of Aliera's insiders and the Defendants.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 38 and therefore deny the allegations in Paragraph 38.**

39.    At no time did Aliera disclose that the amount of a member's contributions that would remain, after payment of all administrative and other costs, for deposit into the Sharebox for payment of member claims would be woefully insufficient to pay the reasonably likely amount of member claims.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 39 and therefore deny the allegations in Paragraph 39.**

40.    Aliera was the claims administrator for the plans. Providers' bills were submitted to Aliera for payment, and Aliera decided whether and when claims would be paid. When Members had concerns about claims that were not paid, they called an Aliera representative.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 40 and therefore deny the allegations in Paragraph 40.**

41.     Due to the small percentage of the Members' payments eventually ending up in the Sharebox for payment of claims, there were insufficient funds to pay Members' claims. Aliera dealt with this problem by avoiding, delaying, or unreasonably denying payment of claims.  When Members complained, Aliera's practice was, *inter alia*, to make false promises of payment, demand that medical providers resubmit medical records multiple times, or advise that it would "reprocess" the requests for payment.  Aliera never advised the Members, however, that there were insufficient funds to pay the claims because Aliera was siphoning off as much as 84% of the Members' monthly contributions for "administrative" costs.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 41 and therefore deny the allegations in Paragraph 41.**

### III.     Aliera Designs, Markets, and Sells Health Care Plans that Function as Health Insurance and Draws Scrutiny from State Regulators.

42.     Aliera designed and created the Trinity health care plans to be sold to Members as "alternatives" to health insurance that mimicked traditional health insurance plans.  For example:

a.     It created "sell sheets" that laid out benefits and costs for various plans.  The more robust the plan and the lower the deductible (called a "Member Shared Responsibility Amount" or "MSRA"), the more a member paid.  Similarly, the cost of the plans increased as a Member aged and if the member smoked.

b.     It advertised the plans as "great for those who simply want to have peace of mind knowing that they will be able to receive the health care services they need when they need them," or as "allow[ing] members to achieve comparable cost assurances for catastrophic health care services (including preventative care and immediate access to doctors through office visits, urgent care, and telemedicine) at a much lower cost…."

c.     It identified health care expenses, such as in-patient and out-patient care, prescription benefits, preventive care, specialty care and hospitalization, that would be included after the MSRA or a copay was paid.

      d.     It misrepresented that payments to Aliera and its claims practices were similar to those used in health insurance by offering a standard "comparison" of the terms used by Aliera to those used in standard insurance policy. Hence, a premium was a "contribution," a deductible was a "Member Shared Responsibility Amount (MSRA)," and a co-pay was a "co-expense."

      e.     Aliera called certain plans "Gold," "Silver," or "Bronze" plans, just as ACA-compliant health insurance plans are called.

      f.     It created benefits booklets that outlined the benefits of the plan, the exclusion from coverage (described as "limits of sharing"), and the necessity of pre-authorization for certain medical expenses.

      g.     The monthly premium payments that Aliera described as "voluntary contributions" were, in fact, mandatory if a member wanted to be eligible for coverage of health care costs, just like insurance premiums.

      h.     The plans were sold by licensed insurance agents, who were offered outsized commissions for selling the Aliera/Trinity plans.

      i.     Like an insurance company, Aliera made payments for covered eligible medical expenses directly to medical providers after receiving standard health insurance claims. Members never sent payments directly to one another.

      j.     The plans promised coverage for an expansive network of "in network" providers, and Aliera represented that it was affiliated with "a growing nationwide PPO network of more than 1,000,000 health care professionals and more than 6,000 facilities."

    **ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 42 and therefore deny the allegations in Paragraph 42.**

    43.     Members received a card that mimicked a health insurance Card and were advised to keep it with them at all times to present to health care providers.

    **ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 43 and therefore deny the allegations in Paragraph 43.**

44.    Aliera marketed and represented these health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM under 26 U.S.C.§ 5000A(d)(2)(B)(IV) for the following reasons:

a.    Trinity was created 15 years after December 31, 1999 and, at the time of its creation in 2018, had no members.  Under the federal statute, an entity or a predecessor of the entity must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV). Trinity did not have members who had shared medical expenses "continuously and without interruption since at least December 31, 1999."  Nor did Trinity have any predecessor entity.  The application form submitted to the IRS by Aliera's attorney checked "No" to the question, "[a]re you a successor to another organization?"

b.    In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs…." 26 U.S.C.
§ 5000A(d)(2)(B)(III).  Although Trinity's original bylaws, attached to its application to the IRS for recognition as a 501(c)(3) entity, set forth a specific set of Protestant Christian religious beliefs, Trinity never restricted its membership to those individuals who affirmed specific common beliefs. Members were only asked to affirm a generic "Statement of Beliefs" that refers to no particular religion. As stated in "frequently asked questions" on Trinity's website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates." As a practical matter, the generic Statement of Beliefs allowed sale of the health care products to the general public.

c.    Although a CPA firm prepared an independent auditors' report of Trinity's finances for the six months it was in existence in the last half of 2018, it later withdrew that report.  Trinity never subsequently completed a financial audit, as required by the statute.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 44 and therefore deny the allegations in Paragraph 44.**

45.    Aliera further misrepresented to members that Trinity was "recognized" as a qualified HCSM.  It was, in fact, impossible for Trinity to have been "recognized" as such because

the rule that provided such recognition was eliminated years before Trinity was created.  Trinity

has never appeared on any list of recognized HCSMs developed by the U.S. Department of Health

and Human Services.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of**

**the truth of the allegations in Paragraph 45 and therefore deny the allegations in Paragraph**

**45.**

46.     The Trinity health care plans Aliera created and sold prompted increasing

complaints from consumers and attracted scrutiny from state regulators:

  a.     As early as April 8, 2019, the State of Washington's Office of the Insurance
         Commissioner issued a final investigative report concluding that Trinity was not
         a valid HCSM and was acting as an unauthorized insurer in Washington.  That
         Insurance Commissioner entered a Cease and Desist Order against Trinity and
         Aliera on May 13, 2019.

  b.     On June 13, 2019, the State of Texas filed suit against Aliera alleging that it was
         selling unauthorized insurance products in that state and seeking to enjoin its sale
         of those products in Texas.

  c.     Multiple other states have followed, including California, Colorado,
         Connecticut, District of Columbia, Iowa, Maryland, Michigan, New York, New
         Hampshire, New Jersey, New Mexico, Oregon, and Pennsylvania, all generally
         concluding that the plans were unauthorized insurance.

**ANSWER: Defendants admit only that prior to them joining Aliera as regulatory**

**consultants and advisory board members that there were multiple regulatory matters**

**initiated throughout the country. Defendants lack knowledge or information sufficient to**

**form a belief of the truth of the remaining allegations in Paragraph 46 and its subparts and**

**therefore deny the remaining allegations in Paragraph 46.**

47.     Several civil lawsuits were filed against Aliera claiming the health care plans

sold through Trinity were unauthorized insurance, including:

  a.     *Jackson, et al., v. The Aliera Companies, Inc., Aliera Healthcare Inc., Trinity
         Healthshare Inc*., No. 2:19-cv-1281 (J. Rothstein, W.D. Wash.);

18

b.   *Duncan v. The Aliera Companies, Inc., Trinity Healthshare Inc., OneShare Health LLC*, No. 2:20-cv-867-TLM-KJM (J. Nunley, E.D. Cal.);

c.   *Kelly, et al. v. The Aliera Companies, Inc, Trinity Healthshare Inc.*, No. 3:20-cv-05038-MDH (J. Harpool, W.D. Mo.);

d.   *Smith, et al., v. The Aliera Companies, Inc., Trinity Healthshare Inc, OneShare Health LLC*, No. 1:20-cv-02130-RBJ (J. Jackson, D. Colo.); and

e.   *Albina, et al. v. The Aliera Companies, Inc. Trinity Healthshare Inc., OneShare Health LLC*, No. 5:20-cv-496-JMH (J. Hood, E.D. Ky.).

**ANSWER:  Defendants admit only that these particular lawsuits were filed, but deny that Healthcare Share Ministry Plans are insurance.  Defendants lack knowledge or information sufficient to form a belief of the truth of the remaining remaining allegations in Paragraph 47 and therefore deny the remaining allegations in Paragraph 47.**

48.   Aliera claimed in these proceedings that the Trinity HCSM plans were not insurance because neither Aliera nor Trinity had any obligation to indemnify the Members for medical claims out of their own money, and instead, all medical expenses were to be "shared" from the Members' funds.  Nevertheless, it was Aliera who determined which part of the Members' payments would be siphoned off to pay itself and which part would be placed in a fund to pay the expenses.

**ANSWER: Defendants admit that HCSM plans are not insurance and that the members shared medical expenses. Defendants lack knowledge or information sufficient to form a belief of the truth of the remaining allegations in Paragraph 48 and therefore deny the remaining allegations in Paragraph 48.**

49.   To prolong the scheme, Aliera delayed resolution of the substantive issues in the lawsuits by claiming that an arbitration clause in the back of the Trinity member guides required a multi-step dispute resolution process culminating in binding arbitration in Georgia.  Even after courts found the arbitration clauses unenforceable, Aliera appealed the decisions to further delay substantive judicial scrutiny of its illegal practices.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 49** and therefore deny the allegations in Paragraph 49.

**IV.   Aliera Restructures Itself to Mask Its Control of Trinity but Maintains Control Over Trinity and Continues to Misrepresent the Plans it Sold.**

50.    Despite the cascade of regulatory actions and lawsuits against it, Aliera continued to aggressively sell the Trinity plans.  In addition, Aliera reacted by attempting to superficially distance itself from Trinity while still controlling Trinity.  Its protestations to courts and regulators that it was merely an administrator for Trinity, however, were misleading.

**ANSWER: Defendants admit only that multiple regulatory actions and lawsuits were filed, but deny the remaining allegations in Paragraph 50.**

51.    After the first regulatory actions commenced, the Aliera principals hand-picked another person to become a Trinity insider.  Chase, Moses, and Mr. Thead met William Guarino at an insurance legislators conference in June 2019.  They recruited him to serve as Trinity's president, only its second employee, and as a third board member.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 51** and therefore deny the allegations in Paragraph 51.

52.    Aliera created four subsidiary entities — Debtors Ensurian, Advevo, Tactic Edge, and USA Benefits (collectively, the "**Subsidiaries**" and each, a "**Subsidiary**") — and changed its name from Aliera Healthcare, Inc. to The Aliera Companies, Inc. in 2019.  Aliera divided the various tasks it was performing directly under the 2018 Agreement among these four Subsidiaries. All four Subsidiaries had their principal places of business at 990 Hammond Drive, Atlanta, Georgia, which was also Aliera's principal place of business.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 52 and therefore deny the allegations in Paragraph 52.**

53.      Mr. Thead signed, on behalf of Trinity, five agreements with the new Aliera Subsidiaries, all effective January 1, 2020 ("**Subsidiary Agreements**"). These Subsidiary Agreements divided the tasks delegated to Aliera in the 2018 Agreement as follows:

a.   Ensurian, which had obtained a license as an insurance agency, was granted the exclusive right to market and sell the Trinity health care plans. Trinity granted Ensurian the non-assignable right to purchase Trinity's membership list in the event there was a change in the majority of the Trinity board of directors.

b.   USA Benefits was to administer all claims, prepare and send member cards and other materials that were provided to members, provide explanations of benefits to members and providers, maintain a process for receipt of member complaints, handle accounting, and furnish Trinity with information it needed to prepare its annual audit and Form 990 tax returns.

c.   Tactic Edge developed and owned the software and IT platform and maintained the databases of member enrollment and payments. Under this agreement, it "licensed" access to its system to Trinity.

d.   Under an "Ancillary Agreement" with Tactic Edge, that entity would handle customer complaints and would provide coordination and communication with regulators.

e.   Advevo was to provide marketing and brand development services.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 53 and its subparts and therefore deny the allegations in Paragraph 53.**

54.      A fee schedule was attached to each of these Subsidiary Agreements that allowed the Subsidiaries to be paid an amount from each Member's monthly premium payment, with the amount dependent on the amount of the member's payments, such that the larger the Member's monthly payment, the larger the fee paid to the Subsidiary.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 54 and therefore deny the allegations in Paragraph 54.**

55.    The Members' payments continued to go directly to Aliera or a Subsidiary, and the fees were deducted before any of the Members' payments were deposited into Trinity's Sharebox account for payment of claims.  Under these contracts, the Subsidiaries paid themselves 58-60% of the Members' payments.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 55 and therefore deny the allegations in Paragraph 55.**

56.    From the time Trinity was created until early 2021, Aliera had sole control over all payments made by members, of the costs deducted from the payments, of the amounts deposited into the Trinity account for payment of medical claims, and of the amount paid out of the Sharebox account for Members' medical expenses.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 56 and therefore deny the allegations in Paragraph 56.**

57.    Aliera and its Subsidiaries rebranded the Member materials, including sell sheets, member guides, enrollment forms, member cards, web portals, and explanations of benefits, to remove its own name and replace it with the Trinity or, after Trinity changed its name, the Sharity name.  The materials nevertheless were all created by Aliera or one of its Subsidiaries.  The administration of all Member claims and handling of Member complaints continued to be by employees of Aliera or one of its Subsidiaries, even though telephone calls

and emails would be from accounts nominally in the Trinity/Sharity name.  Emails sent to Members under the "Trinity" or "Sharity" name were in fact sent by Aliera or one of its Subsidiaries.  Newsletters sent to Members under the Trinity/Sharity name were created and sent by an Aliera Subsidiary.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 57 and therefore deny the allegations in Paragraph 57.**

58.    By the time Sharity filed its bankruptcy petition, Aliera had enrolled over 98,000 Members in the Sharity health care plans.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 58 and therefore deny the allegations in Paragraph 58.**

59.    Although Members paid approximately **$363,000,000** in monthly member fees and application fees for their Trinity health care plans, Trinity never had more than three employees.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 59 and therefore deny the allegations in Paragraph 59.**

**V.    Aliera Created Trinity Knowing that It Could Not Pay the Health Care Expenses of Members and that It Would Fail.**

60.    Aliera created the Trinity health care plans and determined the amount of monthly payments Members would pay under each plan.  It set the prices at rates that were substantially less than traditional ACA-compliant health insurance plans in order to make the plans appear

attractive to purchasers, while advertising the plans as providing comparable benefits to those health insurance plans.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 60 and therefore deny the allegations in Paragraph 60.**

61.    Aliera's goal was to continually enroll as many members as possible in order to generate as much monthly revenue as possible.  Although the enrollment forms Aliera created asked potential Members whether they had any medical issues, upon information and belief, it had the policy of not denying membership to anyone who applied.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 61 and therefore deny the allegations in Paragraph 61.**

62.    At the time Sharity filed its petition for bankruptcy, Aliera or its Subsidiaries were retaining up to 60% of the Member fees but were providing little value in return.  Sharity also received approximately 10% of Member payments to cover expenses, consisting primarily of defense in lawsuits and regulatory actions.  As a result, only about 30% of the member payments were actually deposited into Sharity's Sharebox account for payment of claims.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 62 and therefore deny the allegations in Paragraph 62.**

63.    Health insurers are required to pay at least 80% of premiums received on Member claims for ACA-compliant plans under federal law, 42 U.S.C. § 300gg-18.  Aliera had the ratio upside down, setting aside at most 30% of Member premiums for payment of claims.

**ANSWER:  Defendants admit only as to the requirements of 42 U.S.C. § 300gg-18, but deny that provision is applicable to a HCSM, that Aliera was an insurer, or that Aliera collected "premiums."**

64.    To the extent there were any independent directors or officers of Aliera, they would have had an early warning of Trinity's inevitable demise when it received an independent auditors' report regarding Trinity's financial statements for the period June 27 – December 31, 2018, the first six months of Trinity's existence.  In that report, the auditors raised "substantial doubt about [Trinity's] ability to continue as a going concern."  The report noted that expenses would exceed revenues for the year ending December 31, 2019, as well.  Although the federal statute requires HCSMs to conduct an annual audit made available to the public under 26 U.S.C. § 5000A(d)(2)(B)(V), no further audits were conducted of Trinity's finances.  This 2018 audit was eventually retracted by the auditors, as well.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 64 and therefore deny the allegations in Paragraph 64.**

65.    Aliera, its officers and directors, and other insiders never advised Members that Sharity would be unable to pay all medical claims but instead continued to collect member payments and sell new plans.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 65 and therefore deny the allegations in Paragraph 65.**

66.    Even though the amount remaining for deposit into Sharity's Sharebox account, after payment of Aliera's and its Subsidiaries' fees, was woefully inadequate to pay Members'

Case 23-05204-jrs   Doc 13   Filed 03/06/24   Entered 03/06/24 18:40:15   Desc Main
Document      Page 26 of 57

medical claims, Aliera maintained its scheme to defraud members by continuing to aggressively sell the plans to new members, thus generating larger revenue, while at the same time continuing to arbitrarily deny or delay payment of claims.  At the time Sharity filed its petition for bankruptcy, Sharity Members learned for the first time from Aliera that there were claims totaling over $50 million from Members that had been approved for payment but had not yet been paid.  That figure, however, revealed only a small part of the problem, because it did not include claims that had been submitted but were not yet approved or that had been arbitrarily denied.  When those medical claims are added in, the total amount of the gross unpaid claims is in excess of $250,000,000.  Meanwhile, at the time of Sharity's bankruptcy filing, Sharity held only approximately $743,000 in its Sharebox account for payment of the Members' medical claims.

**ANSWER:  Defendants deny the allegations in Paragraph 67 as they pertain to them, but lack knowledge or information sufficient to form a belief of the truth of the remaining allegations in Paragraph 66.**

67.   The Aliera/Sharity scheme was essentially a Ponzi scheme, with the Members acting as investors.  Like all Ponzi schemes in which payments to earlier victims are paid from funds collected from newer victims, Aliera's scheme eventually failed.

**ANSWER:  Defendants deny the allegations in Paragraph 67.**

68.   Sharity filed its petition for bankruptcy, and thousands of Members were left without health insurance and with huge unpaid medical bills.  Many Members are now being, or have been, pursued by their health care providers for the unpaid bills.

**ANSWER: Defendants deny there was any loss of insurance, but Defendants lack knowledge or information sufficient to form a belief of the truth of the remaining allegations in Paragraph 68 and therefore deny the remaining allegations in Paragraph 68.**

69.     A judgment was entered against Aliera on November 11, 2021, in *Jackson, et al. v. The Aliera Companies, Inc., et al*., Case No. 2:19-cv-01281-BJR, in the U.S. District Court for the Western District of Washington, in favor of a plaintiff class, for $20,646,077.08, and in favor of the individual named plaintiffs in the aggregate amount of $22,631, plus exemplary damages in the amount of $706,750.  In entering the judgment, the court expressly found that Aliera had designed, marketed, and sold unauthorized and illegal health insurance, violated Washington's Consumer Protection Act, and that the plaintiffs had suffered damages as a result of illegal and fraudulent practices.  A judgment was entered against Aliera on November 17, 2021, in *Albina, et al. v. The Aliera Companies, et al.*, Case No. 5:20-CV-00496-JMH, in favor of one of the named plaintiffs in the amount $16,255.54 and in favor of the class in the amount of $4,679,868.46.  In entering the judgment, that court found that Aliera misled the Members into entering into contracts for a product that was not what it purported to be and did not comply with applicable federal or state law.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 69 and therefore deny the allegations in Paragraph 69.**

**VI.    The Corporate Governance of Aliera**

70.     Aliera's board of directors consisted of two classes of directors: Steele and Chase were Class A directors and, from 2019 through 2021, the Defendants were each Class B directors.

**ANSWER:  Defendants deny the allegations in Paragraph 70.**

71.     Steele served as Chief Executive Officer of Aliera from its inception through the Petition Date.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief of**

the truth of the allegations in Paragraph 71 and therefore deny the allegations in Paragraph 71.

72.    Chase served as President of Aliera from its inception through the Petition Date.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 72 and therefore deny the allegations in Paragraph 72.**

VII.    **Aliera's Insolvency**

73.    Aliera was insolvent since its inception.

**ANSWER: Defendants deny the allegations in Paragraph 73.**

74.    The Debtors were insolvent as, without limitation, the value of their liabilities exceeded the value of their assets and the Debtors did not have adequate capital.

**ANSWER: Defendants deny the allegations in Paragraph 74.**

75.    As of December 31, 2017, Aliera had assets valued at $16,348,278 and liabilities of $15,730,947 according to its 2017 audit.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 75 and therefore deny the allegations in Paragraph 75.**

76.    As of December 31, 2018, Aliera had assets valued at $65,369,378 and liabilities of $57,287,961 according to its 2018 audit.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 76 and therefore deny the allegations in Paragraph 76.**

77.     However, the liabilities reflected in these audits did not include liabilities owing to Sharity and the members as a result of the fraudulently obtained funds, which amounts far exceeded any stockholders' equity.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 77 and therefore deny the allegations in Paragraph 77.**

78.     As examples of these additional liabilities, the *Jackson* class received a judgment against Aliera in the amount of $20,646,077.08, which reflected liabilities not included in the 2017 or 2018 audit.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 78 and therefore deny the allegations in Paragraph 78.**

79.     Additionally, the *Albina* class received a judgment against Aliera in the amount of $4,679,868.46, which reflected liabilities not included in the 2017 or 2018 audit.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 79 and therefore deny the allegations in Paragraph 79.**

80.     Taking these, and additional liabilities (including, without limitation, those resulting from claims of Members) not accounted for in any of Aliera's audits, Aliera's liabilities far exceeded the value of its assets at a fair valuation.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 80 and therefore deny the allegations in Paragraph 80.**

81. All of Aliera's assets were obtained using funds derived from Unity, Sharity, and the Members on a fraudulent basis, thereby creating a claim against Aliera for each dollar it received. Accordingly, its liabilities far exceeded its assets.

**ANSWER:** **Defendants deny the allegations in Paragraph 81.**

**VIII.  The Debtors and their Insiders Reap the Benefits of the Fraudulent Scheme.**

82. As referenced above, the Debtors contracted with Sharity to provide various management and administrative services to support Sharity's program operations.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 82 and therefore deny the allegations in Paragraph 82.**

83. Sharity was a party to a contract with Debtor Aliera Healthcare Inc. n/k/a The Aliera Companies, Inc. to provide those services. Effective January 1, 2020, Sharity was a party to a series of vendor agreements with the Debtors (the "**Sharity Contracts**"), each with an initial 5-year term.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 83 and therefore deny the allegations in Paragraph 83.**

84. Under the Sharity Contracts, Sharity retained certain of the Debtors to, among other things, provide (i) administrative services, (ii) information technology related services, (iii) marketing, brand development, and sale services, and (iv) regulatory and compliance services.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 84 and therefore deny the allegations in Paragraph**

30

84.

85.     Sharity itself filed a Chapter 11 case which is being administered by the Delaware Court.  Before the bankruptcy, various governmental units and private parties brought investigations, claims, or lawsuits against the Debtors and Sharity, alleging, among other things, that Sharity's health plans were unauthorized health insurance and not HCSM plans.  Those cases alleged that the payments to the Debtors were in excess of amounts appropriately allowed for such services and, as such, left very little available to be used to pay Members' requests for sharing of medical expenses, *i.e.* Sharity's professed raison d'être.  A number of courts and/or agencies issued orders against the Debtors and/or Sharity requiring them to cease and desist from offering health care sharing programs and withdrawal from the health care markets in a number of states.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 85 and therefore deny the allegations in Paragraph 85.**

86.     Certain of the Members were deprived of the medical expense reimbursement that they believed Sharity, as an HCSM, would provide to them.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 86 and therefore deny the allegations in Paragraph 86.**

87.     Sharity was created merely as a shell that Aliera controlled.  Aliera created, marketed, and administered the health plans sold under the Trinity or Sharity name.  As the sole point of contact with Sharity's members, Aliera directly received the Members' monthly payments and decided how much, if anything, would be paid on Members' claims.

**ANSWER:** Defendants deny the allegations in Paragraph 87.

88.    Through a series of arrangements that were highly favorable to Aliera's insiders, but highly *un*favorable to the Members of Sharity, Aliera siphoned off as much as 84% of the Members' payments for its own use and to funnel to its insiders.  The amounts it siphoned off should have been used to pay the Members' medical expenses.  Instead, Aliera took that money and used it for its own benefit and that of its owners, while at the same time denying the health coverage for which the Members paid.

**ANSWER:** Defendants deny the allegations in Paragraph 88.

89.    The Defendants each looked the other way at illicit schemes to siphon cash from the Debtors' operations as described in more detail herein.

**ANSWER:** Defendants deny the allegations in Paragraph 89.

A.    **Transfers to Quintrell through Hilshaw Consulting, LLC**

90.    Quintrell received not less than $138,192.36 in transfers (collectively, with all other transfers from the Debtors to or for the benefit of Quintrell, the "**Quintrell Transfers**") from Aliera through a limited liability company that he was the sole member of, Hilshaw Consulting, LLC  ("**Hilshaw**"), between December 3, 2020 and the Petition Date.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 90** and therefore deny the allegations in Paragraph 90.

91.    The Quintrell Transfers included monthly fees for purported consulting services.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the allegations in Paragraph 91** and therefore deny the allegations in Paragraph 91.

92.     Quintrell, who was Steele's son in law at all times relevant to this Complaint, was employed by at least one other business at the time.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 92 and therefore deny the allegations in Paragraph 92.**

93.     Moreover, Quintrell was a full-time student during a portion of the time he was a) serving as a director of Aliera and b) receiving compensation from Aliera through Hilshaw.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 93 and therefore deny the allegations in Paragraph 93.**

94.     Neither Quintrell nor Hilshaw provided reasonably equivalent value for the Quintrell Transfers.

**ANSWER: Defendants deny the allegations in Paragraph 94.**

### B.     Excessive Compensation to the Moses/Steele Family

95.     The Debtors paid grossly excessive compensation to Steele and Chase.

**ANSWER:  Defendants deny the allegations in Paragraph 95.**

96.     Steele and Chase received the following compensation (the "**Excessive Compensation Transfers**"):

| Year | Steele | Chase |
|------|--------|-------|
| 2019 | $1,219,231 | $606,231 |
| 2020 | $519,231 | $513,462 |

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 96 and therefore deny the allegations in Paragraph 96.**

### C.     The First Call Transfers

97.     First Call was another entity established by Moses and Steele to profit at the expense of the Debtors.  Aliera made payments to First Call totaling not less than $6,205,921 (collectively, with all other transfers from the Debtors to First Call, the "**First Call Transfers**"). A listing of the First Call Transfers is attached hereto as **Exhibit A**.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 97 and therefore deny the allegations in Paragraph 97.**

98.     On the surface, First Call was supposed to provide telemedicine services to Members.  In reality, First Call provided no consideration, or inadequate consideration, to Aliera, Sharity, or the Members in exchange for the First Call Transfers.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 98 and therefore deny the allegations in Paragraph 98.**

### D.     The Defendants' Service as Directors

99.     The Defendants each joined Aliera's board of directors in 2019 as a part of a change in Aliera's corporate governance structure.

**ANSWER: Defendants deny the allegations in Paragraph 99.**

100.     This change was necessitated by the fact that numerous state regulators and Members had filed suit against Aliera.

**ANSWER:** Defendants deny the allegations in Paragraph 100.

101.    Due to the issues it was facing, Steele believed that Aliera needed additional board members rather than only her and her son, Chase.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 101 and therefore deny the allegations in Paragraph 101. Defendants deny that they were serving as Board Members.

102.    In 2019, Steele recruited Blenke, who had experience as a director for other companies, and Sevigny, a former insurance commissioner in New Hampshire.  Blenke and Sevigny each joined Aliera's board as a result of this effort.

**ANSWER:** Defendants admit only that Defendant Blenke has extensive experience in the insurance industry and that Defendant Sevigny was the former Insurance Commissioner for New Hampshire, but deny that they ever served on the board of directors for Aliera or its related entities and deny the remainder of the allegations of Paragraph 102.

103.    Steele also recruited Strickland, a former governor of Ohio, to give the impression that Aliera's business was legitimate due to Strickland's experience in public affairs.

**ANSWER:** Defendants admit that Defendant Strickland is the former governor of Ohio, but deny the remaining allegations in Paragraph 103.

104.    To round out the board, Moses added Quintrell as a director.

**ANSWER:** Defendants deny the allegations in Paragraph 104.

105.    Rather than steering the Debtors in a new direction, providing much needed oversight, or simply winding up the affairs of a very troubled company, the Defendants essentially permitted Aliera's business to go on as usual.

**ANSWER:** Defendants deny the allegations in Paragraph 105.

106.    Further, Quintrell had a conflict of interest as a director because of the purported consulting fees he was receiving through Hilshaw.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 106 and therefore deny the allegations in Paragraph 106.**

107.    The Defendants failed to keep themselves informed regarding the legal challenges faced by the Debtors.

**ANSWER: Defendants deny the allegations in Paragraph 107.**

108.    Rather than addressing these problems, the Defendants simply permitted the Debtors to continue with business as usual.

**ANSWER: Defendants deny the allegations in Paragraph 108.**

IX.    **Applicable Law**

109.    Under the internal affairs doctrine, the state where a corporation is organized has the authority to regulate a corporation's internal matters peculiar to the relationships among or between the corporation and its officers, directors, and shareholders.

**ANSWER:  Defendants admit only to the existence of the internal affairs doctrine and deny the remaining allegations in Paragraph 109.**

110.    Courts have long recognized that few, if any, claims are more central to a corporation's internal affairs than those relating to alleged breaches of fiduciary duties by a corporation's directors and officers.

**ANSWER: Defendants deny the allegations in Paragraph 110.**

111.    Given that Aliera was formed in Delaware, Delaware law applies to analyze the Defendants' breaches of fiduciary duties.

36

**ANSWER:** **Defendants admit that Aliera was formed in Delaware, but deny the remaining allegations in Paragraph 111.**

112.    All conditions precedent to the maintenance of this action, the filing of this Complaint, and to the following claims have been performed, been waived, satisfied, have occurred, or have otherwise been met.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief of the truth of the allegations in Paragraph 112 and therefore deny the allegations in Paragraph 112.**

## CLAIMS FOR RELIEF

113.    The following causes of action are asserted against the Defendants without prejudice to any rights the Plaintiff or the Debtors may have against the Defendants and any third parties, or which this Court may grant to the Plaintiff or the Debtors, to assert additional causes of action or allegations based on facts disclosed in documents or other information made available to the Plaintiff or the Debtors or developed as a result of discovery or otherwise.

**ANSWER:** **Defendants admit only that Plaintiff has levied the claims against them asserted in this Adversary Proceeding, but deny that there is any merit to such claims.**

### COUNT I:
### BREACH OF DUTY OF CARE
(Against the Defendants)

114.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

**ANSWER:** **Defendants restate their answers to Paragraphs 1-113 as fully set forth herein as their answer to Paragraph 114.**

115.   As Class B directors of Aliera, the Defendants owed fiduciary obligations to the Debtors.  By reason of their fiduciary relationships, the Defendants owed the Debtors the highest obligation of good faith, fair dealing, loyalty, and due care.

**ANSWER:  Defendants deny the allegations in Paragraph 115.**

116.   Additionally, because the actions at issue occurred while Aliera was insolvent or in the zone of insolvency, the Defendants owed fiduciary duties of due care, good faith, and loyalty to Aliera's creditors.

**ANSWER: Defendants deny the allegations in Paragraph 116.**

117.   The duty of care is breached: (a) when a fiduciary engages in an irrational decision- making process; and (b) when the conduct of a fiduciary rises to the level of "gross negligence."

**ANSWER: Defendants deny the allegations in Paragraph 117.**

118.   The Defendants were required to discharge their duties with the care of an ordinarily prudent person in a like position would exercise under similar circumstances.

**ANSWER: Defendants deny the allegations in Paragraph 118.**

119.   The following acts and omissions constitute breaches of duties owed by the Defendants to the Debtors:

a.   Permitting Trinity to serve as a front for Aliera;

b.   Marketing and representing Trinity health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM;

c.   Siphoning off as much as 84% of the Members' payments to Aliera in order to funnel those proceeds to its insiders, while at the same time denying the health coverage for which the Members paid;

d.   Misrepresenting to Members that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services;"

e.    Causing Trinity to have insufficient funds in the Sharebox to pay Members;

f.    Avoiding obligations to Members by permitting Aliera to make false promises of payment, demanding that medical providers resubmit medical records multiple times, or advising that it would "reprocess" the requests for payment;

g.    Paying excessive compensation to insiders while Aliera was insolvent;

h.    Obtaining assets by using funds derived from Sharity and the Members on a fraudulent basis;

i.    Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to (i) engage in representations, disclosures, and/or public announcements and releases of false or misleading information, and/or (ii) fail to disclose material and/or required information concerning the financial condition and business of the Debtors, all as a result of gross negligence and/or without the exercise of reasonable care and diligence, which damaged the Debtors and the Members.

j.    Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into preferential and fraudulent transfers;

k.    Allowing and/or causing the Debtors to fail to pay vendors and other creditors while incurring additional indebtedness with no reasonable prospect for repayment;

l.    Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into self-dealing transactions with or benefiting Chase, Steel and Moses and which were not in the best interests of the Debtors and damaged Debtors and its financial and business interest; and

m.    Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into insider or related party transactions with or benefiting other Defendants, insiders, affiliates which were not in the best interests of the Debtors and which damaged the Debtors and its financial and business interests.

**ANSWER: Defendants deny the allegations in Paragraph 119 and sub-parts a. through m.**

120.    The Defendants intentionally and/or recklessly disregarded and ignored the risks and consequences or did not consider the risks and consequences associated with the above acts or omissions.

**ANSWER: Defendants deny the allegations in Paragraph 120.**

121.    Nor did the Defendants consider or undertake available alternative transactions or other courses of action that would not have unduly risked or jeopardized the recovery of the Debtors' creditors or the financial viability of the Debtors.

**ANSWER: Defendants deny the allegations in Paragraph 121.**

122.    The actions or inactions of the Defendants were taken in bad faith, and constituted willful and wanton misconduct and/or gross mismanagement that caused the Debtors to suffer damages.

**ANSWER: Defendants deny the allegations in Paragraph 122.**

123.    Accordingly, the Plaintiff is entitled to a judgment against the Defendants for their breach of duty of care and damages in an amount to be proven at trial.

**ANSWER:  Defendants deny the allegations in Paragraph 123.**

**COUNT II:**
**BREACH OF DUTY OF LOYALTY**
(Against the Defendants)

124.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

**ANSWER: Defendants restate their answers to Paragraphs 1-123 as fully set forth herein as their answer to Paragraph 124.**

125.    As directors of Aliera, the Defendants owed fiduciary obligations to the Debtors. By reason of their fiduciary relationships, the Defendants owed the Debtors the highest obligation of good faith, fair dealing, loyalty, and due care.

**ANSWER: Defendants deny the allegations in Paragraph 125.**

126.    Additionally, because the actions at issue occurred while Aliera was insolvent or in the zone of insolvency, the Defendants owed fiduciary duties of due care, good faith, and

loyalty to Aliera's creditors.

**ANSWER:** **Defendants deny the allegations in Paragraph 126.**

127.    The duty of loyalty is breached: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities; (b) when a fiduciary "abdicates" his fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

**ANSWER:** **Defendants deny the allegations in Paragraph 127.**

128.    The Defendants owed a fiduciary duty of loyalty, which included, among other things, a duty to act honestly and in the best interest of the Debtors, to avoid conflicts between their personal interests and the Debtors' interests, to exercise their power for a proper purpose, and not to fetter their discretion.

**ANSWER:** **Defendants deny the allegations in Paragraph 128.**

129.    The Defendants breached their duty of loyalty to the Debtors by, among other things, misappropriating (or allowing the misappropriation of) the Debtors' scarce funds and assets for their own personal benefit or for the benefit of entities that Steele owned and controlled.  As part of this scheme, the Defendants permitted Aliera to defraud the creditors of Aliera and the Members by, among other things, maintaining a false HCSM that caused the Members' payments to be paid to the Debtors and then transferred some or all of those funds to Steele, Moses, and various side businesses controlled by Steele, rendering Aliera insolvent and unable to pay the Members' medical expenses and creditors' claims.

**ANSWER:** **Defendants deny the allegations in Paragraph 129.**

130.    The following acts and omissions constituting breaches of duties owed by the Defendants to the Debtors:

a.      Permitting Trinity to serve as a front for Aliera;

b.      Marketing and representing Trinity health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM;

c.      Siphoning off as much as 84% of the Members' payments to Aliera in order to funnel those proceeds to its insiders, while at the same time denying the health coverage for which the Members paid;

d.      Misrepresenting to Members that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services;"

e.      Causing Trinity to have insufficient funds in the Sharebox to pay Members;

f.      Avoiding obligations to Members by permitting Aliera to make false promises of payment, demanding that medical providers resubmit medical records multiple times, or advising that it would "reprocess" the requests for payment;

g.      Paying excessive compensation to insiders while Aliera was insolvent;

h.      Obtaining assets by using funds derived from Sharity and the Members on a fraudulent basis;

i.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to (i) engage in representations, disclosures, and/or public announcements and releases of false or misleading information, and/or (ii) fail to disclose material and/or required information concerning the financial condition and business of the Debtors, all as a result of gross negligence and/or without the exercise of reasonable care and diligence, which damaged the Debtors and the Members.

j.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into preferential and fraudulent transfers;

k.      Allowing and/or causing the Debtors to fail to pay vendors and other creditors while incurring additional indebtedness with no reasonable prospect for repayment;

l.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into self-dealing transactions with or benefiting Chase, Steel and Moses and which were not in the best interests of the Debtors and damaged the Debtors and its financial and business interest; and

m.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into insider or related party transactions with or benefiting other Defendants, insiders, or affiliates which were not in the best interests of the

Debtors and which damaged the Debtors and its financial and business interests.

**ANSWER: Defendants deny the allegations in Paragraph 130 and subparts a. through m.**

131.    The Defendants intentionally and/or recklessly disregarded and ignored the risks and consequences or did not consider the risks and consequences associated with the above acts or omissions.

**ANSWER: Defendants deny the allegations in Paragraph 131.**

132.    Nor did the Defendants consider or undertake available alternative transactions or other courses of action that would not have unduly risked or jeopardized the recovery of the Debtors' creditors or the financial viability of the Debtors.

**ANSWER: Defendants deny the allegations in Paragraph 132.**

133.    The Defendants acted in bad faith by permitting Aliera to defraud its creditors and the Members through the continuation of a false HCSM that caused the Members' payments to be paid to the Debtors and then transferred some or all of those funds to the Defendants or insiders of the Debtors, rendering Aliera insolvent and unable to pay the members' medical expenses and resulting in arm's length creditors not receiving payment on their claims.

**ANSWER: Defendants deny the allegations in Paragraph 133.**

134.    The actions or inactions of the Defendants were taken in bad faith and constituted willful and wanton misconduct and/or gross mismanagement that caused the Debtors to suffer damages.

**ANSWER: Defendants deny the allegations in Paragraph 134.**

135.    The Defendants' bad faith, negligence, gross negligence, or recklessness caused loss and damage to the Debtors and their creditors.

**ANSWER: Defendants deny the allegations in Paragraph 135.**

136.    Accordingly, the Plaintiff is entitled to a judgment against the Defendants for their breach of duty of loyalty and damages in an amount to be proven at trial.

**ANSWER: Defendants deny the allegations in Paragraph 136.**

### COUNT III:
### VOIDABLE TRANSFERS AND OBLIGATIONS – CONSTRUCTIVE FRAUD
(Against Quintrell)

137.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 136 above.

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

138.    Aliera has one or more creditors for whom the Plaintiff can act whose claim arose before or within a reasonable time after the obligation was incurred, including the Members.

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

139.    Under O.C.G.A. 18-2-75, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

140.    The Debtors made transfers or incurred obligations for the benefit of Quintrell, who was an insider of the Debtors.  These fraudulent transfers and obligations included, but are not limited to the Quintrell Transfers.[5]

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

141.    The Debtors (a) received less than a reasonably equivalent value in exchange for the Quintrell Transfers and any associated obligations, and (b)(i) were insolvent on the date of each of the Quintrell Transfers and any associated obligations, or became insolvent as a result of each of the Transfers and any associated obligations; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (iii) intended to incur, or believed that the Debtors would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

142.    All of the Quintrell Transfers and any associated obligations were concealed from the Debtors' creditors.

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

143.    The Debtors made the Quintrell Transfers and incurred any associated obligations within four (4) years of the Petition Date.

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

144.    The Quintrell Transfers and any associated obligations constitute transfers of interests of the Debtors in property.

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

145.    At the time the Quintrell Transfers were made, and any associated obligations were incurred, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

**ANSWER: Defendants provide no answers to Count III, as Count III has not been brought against them.  To the extent that an answer to Count III is required by these Defendants, they deny each and every allegation contained in Count III.**

## COUNT IV:
## VOIDABLE TRANSFERS AND OBLIGATIONS –
## ACTUAL FRAUD

(11 U.S.C. § 544(B) and O.C.G.A. § 18-2-74(a)(1) against Quintrell)

146.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.  To the extent that an answer to Count IV is required by these**

Defendants, they deny each and every allegation contained in Count IV.

147.    The Debtors made transfers for the benefit of Quintrell, who was an insider of the Debtors, and incurred obligations to Quintrell.  These fraudulent transfers include but are not limited to the Quintrell Transfers.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.  To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

148.    The Quintrell Transfers and the associated obligations were made with the actual intent to hinder, delay, or defraud entities to which the Debtors were obligated to, or became obligated, on or after the date of such transfers.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.  To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

149.    All of the Quintrell Transfers and the associated obligations were concealed from the Debtors' creditors.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.  To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

150.    The Quintrell Transfers and the associated obligations constitute transfers of interests of the Debtors in property.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.  To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

151.    The Quintrell Transfers and the associated obligations were made within four years before the Petition Date.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.   To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

152.    At or around the time that the Debtors made the Quintrell Transfers, and incurred the associated obligations, the Debtors were being sued or threatened with suits, including but not limited to the cease and desist complaints in multiple states and class action litigation.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.   To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

153.    Aliera did not receive reasonably equivalent value in exchange for the Quintrell Transfers and associated obligations.

**ANSWER:   Defendants provide no answers to Count IV, as Count IV has not been brought against them.   To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

154.    Aliera was insolvent as a result of and prior to the Quintrell Transfers and associated obligations.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.   To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

155.    The Plaintiff is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(1) and 18-2- 77(a), avoiding the Quintrell Transfers and associated obligations in an amount sufficient to

satisfy the Plaintiff's claims.

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.  To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

156.    At the time the Quintrell Transfers were made, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

**ANSWER: Defendants provide no answers to Count IV, as Count IV has not been brought against them.  To the extent that an answer to Count IV is required by these Defendants, they deny each and every allegation contained in Count IV.**

### COUNT V: VOIDABLE TRANSFERS AND OBLIGATIONS AS TO PRESENT OR FUTURE CREDITORS

(11 U.S.C. § 544(B) and O.C.G.A. § 18-2-74(a)(2) against Quintrell)

157.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

**ANSWER: Defendants provide no answers to Count V, as Count V has not been brought against them.  To the extent that an answer to Count V is required by these Defendants, they deny each and every allegation contained in Count V.**

158.    The Debtors made transfers or incurred obligations for the benefit of Quintrell, who was an insider of the Debtors.  These fraudulent transfers and obligations include but are not limited to the Quintrell Transfers and associated obligations.

**ANSWER: Defendants provide no answers to Count V, as Count V has not been brought against them.  To the extent that an answer to Count V is required by these Defendants, they deny each and every allegation contained in Count V.**

159. The Quintrell Transfers constitute transfers of interests of Aliera in property.

**ANSWER: Defendants provide no answers to Count V, as Count V has not been brought against them.  To the extent that an answer to Count V is required by these Defendants, they deny each and every allegation contained in Count V.**

160. At or around the time at which the Quintrell Transfers were made, and the associated obligations were incurred, Aliera was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

**ANSWER: Defendants provide no answers to Count V, as Count V has not been brought against them.  To the extent that an answer to Count V is required by these Defendants, they deny each and every allegation contained in Count V.**

161. At or around the time at which the Quintrell Transfers were made, and the associated obligations were incurred, the Debtors intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

**ANSWER: Defendants provide no answers to Count V, as Count V has not been brought against them.  To the extent that an answer to Count V is required by these Defendants, they deny each and every allegation contained in Count V.**

162. The Plaintiff is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2- 77(a), avoiding the Quintrell Transfers and the associated obligations in an amount sufficient to satisfy the Plaintiff's claims.

**ANSWER: Defendants provide no answers to Count V, as Count V has not been brought against them.  To the extent that an answer to Count V is required by these Defendants, they deny each and every allegation contained in Count V.**

163.    At the time the Quintrell Transfers were made, there existed one or more actual and/or future creditors of Aliera's holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

**ANSWER: Defendants provide no answers to Count V, as Count V has not been brought against them.   To the extent that an answer to Count V is required by these Defendants, they deny each and every allegation contained in Count V.**

### COUNT VI: VOIDABLE TRANSFERS MADE TO INSIDER FOR ANTECEDENT DEBT

(11 U.S.C. § 544(B) and O.C.G.A. § 18-2-75(b) against Quintrell)

164.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

**ANSWER: Defendants provide no answers to Count VI, as Count VI has not been brought against them.   To the extent that an answer to Count VI is required by these Defendants, they deny each and every allegation contained in Count VI.**

165.    Quintrell was an insider at the time of the Quintrell Transfers as he was a director of Aliera and a relative of Steele.

**ANSWER: Defendants provide no answers to Count VI, as Count VI has not been brought against them.   To the extent that an answer to Count VI is required by these Defendants, they deny each and every allegation contained in Count VI.**

166.    The Quintrell Transfers were made on behalf of antecedent debts, namely for consulting services provided by Quintrell.

**ANSWER: Defendants provide no answers to Count VI, as Count VI has not been brought against them.   To the extent that an answer to Count VI is required by these Defendants, they deny each and every allegation contained in Count VI.**

167. Aliera was insolvent at the time the Quintrell Transfers were made.

**ANSWER: Defendants provide no answers to Count VI, as Count VI has not been brought against them.  To the extent that an answer to Count VI is required by these Defendants, they deny each and every allegation contained in Count VI.**

168. At or around the time at which the Quintrell Transfers were made, Aliera was insolvent as the value of its assets were lower than the value of its liabilities.

**ANSWER: Defendants provide no answers to Count VI, as Count VI has not been brought against them.  To the extent that an answer to Count VI is required by these Defendants, they deny each and every allegation contained in Count VI.**

169. The Plaintiff is entitled to a judgment under O.C.G.A. §§ 18-2-75(b), avoiding the Quintrell Transfers in an amount sufficient to satisfy the Plaintiff's claims.

**ANSWER: Defendants provide no answers to Count VI, as Count VI has not been brought against them.  To the extent that an answer to Count VI is required by these Defendants, they deny each and every allegation contained in Count VI.**

170. At the time the Quintrell Transfers were made, there existed one or more actual creditors of Aliera's holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

**ANSWER: Defendants provide no answers to Count VI, as Count VI has not been brought against them.  To the extent that an answer to Count VI is required by these Defendants, they deny each and every allegation contained in Count VI.**

### COUNT VIII: RECOVERY OF TRANSFERS
(11 U.S.C. § 550 against Quintrell)

171. The Plaintiff restates and incorporates herein by reference the allegations

contained in paragraphs 1 through 113 above.

**ANSWER: Defendants provide no answers to Count VII, as Count VII has not been brought against them.  To the extent that an answer to Count VII is required by these Defendants, they deny each and every allegation contained in Count VII.**

172.    Pursuant to section 550 of the Bankruptcy Code, in an action commenced under section 544 of the Bankruptcy Code, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

**ANSWER: Defendants provide no answers to Count VII, as Count VII has not been brought against them.  To the extent that an answer to Count VII is required by these Defendants, they deny each and every allegation contained in Count VII.**

173.    The Quintrell Transfers are avoidable pursuant to section 544 of the Bankruptcy Code.

**ANSWER: Defendants provide no answers to Count VII, as Count VII has not been brought against them.  To the extent that an answer to Count VII is required by these Defendants, they deny each and every allegation contained in Count VII.**

174.    Quintrell was the initial transferee of the Avoidable Transfers or the immediate or mediate transferees of such initial transferee or the persons for whose benefit the Quintrell Transfers were made.

**ANSWER: Defendants provide no answers to Count VII, as Count VII has not been brought against them.  To the extent that an answer to Count VII is required by these Defendants, they deny each and every allegation contained in Count VII.**

175.    The Plaintiff is entitled to a judgment against Quintrell for the amount of the Quintrell Transfers pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

**ANSWER: Defendants provide no answers to Count VII, as Count VII has not been brought against them.   To the extent that an answer to Count VII is required by these Defendants, they deny each and every allegation contained in Count VII.**

**WHEREFORE,** Defendants John Blenke, Theodore Strickland, and Roger Sevigny respectfully request that the Court grant judgment in their favor and against Plaintiff for each count brought against them, award fees and costs in their favor and  any other relief that the Court deems just and proper.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants incorporate by reference herein the denials and admissions set forth above. Defendants assert the following affirmative defenses against Plaintiff's claims. Defendants expressly reserve the right to amend or supplement these defenses if additional defenses, counterclaims, or third-party claims become apparent through the course of this case. Defendants further reserve the right to assert additional defenses based on information learned or obtained through discovery or further investigation.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

The Complaint fails to state, and Plaintiff cannot prove, a claim upon which relief can be granted, including but not limited to: (1) that no Defendant was member of the Board of Directors of Aliera based on the agreements entered into with the Defendants by Aliera; (2) Defendants were only associated with Aliera as independent contractors for specific purposes and only during

a short period of time - July 2019 through April 2021 (the "**Relevant Time Period**") pursuant to their respective Advisory Agreements with Aliera and were not responsible for, or approved, any action alleged to have occurred by Aliera or any entity associated with Aliera during any period of time outside of the Relevant Time Period, including but not limited to the allegations set forth by the Plaintiff in in this Complaint, prior to the execution of their Advisory Agreements.

## SECOND AFFIRMATIVE DEFENSE

### (Damages Speculative)

Plaintiff's claims are barred, in whole or in part, because the alleged damages and injury, if any, are purely speculative, and occurred before these Defendants were alleged to have been involved.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Join Necessary Parties)

Plaintiff has failed to join all necessary parties to this action and therefore, this action should be dismissed until all necessary parties have been joined.

## FOURTH AFFIRMATIVE DEFENSE

### (No Fiduciary Duty)

Each Defendant agreed only to serve on an advisory board, via written Advisory Agreements, and thus, had no fiduciary duty to the shareholders of the Aliera Companies or any of the consumers who enrolled in any Healthcare Sharing Ministry.  At no time did these Defendants agree to serve on the Board of Directors and thus, any purported appointment failed for a lack of consideration and acceptance.

## RESERVATION OF ADDITIONAL DEFENSES

Defendants do not presently know all facts concerning Aliera's conduct and its claims sufficient to state all affirmative defenses at this time. Defendants will seek leave of the Court to amend should it later discover facts demonstrating the existence of additional affirmative defenses. Defendants reserve any and all additional affirmative defenses available to it.

## PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any of the relief requested from Defendants in its Complaint or any relief whatsoever from Defendants. Defendants deny all allegations not specifically admitted above.

Respectfully submitted, this 6th March 2024.

**PETERSON, JOHNSON & MURRAY, LLC**

*/s/ Dominick L. Lanzito*
Dominick L. Lanzito
200 W. Adams St., Suite 2125
Chicago, Illinois 60606
T: (312) 724-8035
dlanzito@pjmlaw.com
Attorneys for John Blenke, Theodore Strickland
and Roger Sevigny
***Admitted Pro Hac Vice***

**ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ William A. Rountree*
William A. Rountree, Georgia Bar No. 616503
Ceci Christy, Georgia Bar No. 370092
Century Plaza I
2987 Clairmont Rd., Suite 350
Atlanta, Georgia 30329
T: (404) 584-1244
wrountree@rlkglaw.com
cchristy@rlkglaw.com
Attorneys for John Blenke, Theodore Strickland
and Roger Sevigny
***Local Counsel***

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re: | **Chapter 11** |
| **THE ALIERA COMPANIES, INC. d/b/a Aliera Healthcare, Inc.,** *et al.,* | **Case No. 21-11548 (TMH)** |
| **Debtors.** | **Pending in the United States Bankruptcy Court for the District of Delaware** |
| **ALIERA LT, LLC, as Liquidating Trustee of The Aliera Companies, Inc.,** *et al.,* | |
| **Plaintiff,** | **Adversary Proceeding No. 23-05204-jrs** |
| **v.** | |
| **JOHN BLENKE, THEODORE STRICKLAND, ROGER SEVIGNY, and JAMES WESTON QUINTRELL,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, I filed the foregoing pleading using the Court's CM/ECF system, which generates an electronic notice thereof to all parties registered to receive notices thereby and to the following parties at the address listed below:

John Elrod
elrodj@gtlaw.com
Allison Jane McGregor
Allison.mcgregor@gtlaw.com

Dated: March 6, 2024                **ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ Ceci Christy*
Ceci Christy, Georgia Bar No. 370092
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238 Telephone
cchristy@rlkglaw.com