**EXHIBIT 3**

January 19, 2024

**Sent via Email and Fedex Overnight to:**

Nationwide Management Liability & Specialty
Attn: Claims Manager
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007
MLSReportALoss@nationwide.com

Darius Kandawalla
10 W. Broad Street, Ste 2100
Columbus, OH 43215-3422
DKandawalla@baileycav.com

E-Risk Services, LLC
Northwest Professional Center
227 US Hwy 206, Suite 302
Flanders, NJ 07836-9174

Scottsdale Insurance Company
8877 North Gainey Center Drive
Scottsdale, Arizona 85258

RE:      **NOTICE OF LAWSUIT/CLAIM AND DEMAND FOR DEFENSE AND INDEMNITY;**
Adversary Proceeding in United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case No. 21-11548 (TMH) against Roger Sevigny, et al. (the "Lawsuit") and related pending case in the United States Bankruptcy Court for the District of Delaware, Adversary Proceeding 23-05204 (JRS) In Re: The Aliera Companies Inc. d/b/a Aliera Healthcare, Inc., et al. (the "Bankruptcy Proceeding");
Business and Management Indemnity Policy No.: EKS3376033 (the "Policy")

Dear Mr. Kandawalla, Nationwide Management Liability & Specialty, E-Risk Services, LLC, and Scottsdale Insurance Company:

The purpose of this letter is to provide you each with notice regarding the above-referenced claim/Lawsuit which has been filed against myself, Roger Sevigny, as well as to request defense and indemnification under the above-referenced Policy.

As you likely know, on or about December 3, 2021, an involuntary Chapter 11 bankruptcy petition was filed relative to The Aliera Companies Inc. d/b/a Aliera Healthcare, Inc. ("Aliera") in Delaware Bankruptcy Court. Thereafter, Aliera and four of its subsidiaries[1] each filed a voluntary petition for Chapter 11 bankruptcy in Georgia Bankruptcy Court. In relation to the Bankruptcy Proceeding, the liquidating trustee, Aliera LT, LLC, then filed a Lawsuit against myself, Roger Sevigny, and others as Class B directors of Aliera which was instituted on December 20, 2023. *See* ¶ 70 of *Exh. A.* A copy of the Complaint in the Lawsuit is attached hereto and incorporated by reference as **Exhibit "A."**

---

[1] Specifically, those subsidiaries are Advevo LLC, Ensurian Agency LLC, Tactic Edge Solutions LLC, and USA Benefits & Administrators LLC.

By way of this Letter, I, Roger Sevigny, am putting Scottsdale Insurance Company, as carrier, and Nationwide Management Liability & Specialty, as administrator, on notice of the underlying Lawsuit and requesting indemnification and defense under the Policy. I contend that I was acting properly under my duty of care and/or the business judgment rule. Notwithstanding, under the Directors and Officers and Company Coverage Section of the Policy, which purports to be a claims-made policy, Scottsdale Insurance Company[2] agreed to both:

1. Provide defense to the Insureds, including myself.
    o Specifically, Scottsdale Insurance Company agreed in the Policy that: "[i]t shall be the duty of the Insurer [Scottsdale Insurance Company] and not the duty of the Insureds to defend any Claim. Such duty shall exist even if any of the allegations are groundless, false or fraudulent." *See* pg. 26 of the Policy (emphasis added).
2. Provide indemnification to the Insureds, including myself.
    o Specifically, Scottsdale Insurance Company agreed in the Policy that: "The Insurer [Scottsdale Insurance Company] shall pay the Loss of the Directors and Officers for which the Directors and Officers[3] are not indemnified by the Company and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period. . ."

A copy of the Policy is attached hereto and incorporated by reference as **Exhibit "B."**

As you know, the Policy contains liability limits of $1,000,000 in the aggregate relative to the Directors and Officers and Company Coverage Section. While the policy period under the Policy originally ran from April 21, 2021 to April 21, 2022, the Policy contained a mechanism for extending the length of the Policy.[4] Aliera elected to extend the Policy for an additional period of two years pursuant to the terms of the Policy and through payment of additional premium which Scottsdale Insurance Company accepted. The extension of the policy period is memorialized by Endorsement No. 54, a copy of which is attached hereto and incorporated by reference as **Exhibit "C."**

As explained above, I, Roger Sevigny, hereby request defense and indemnification from Scottsdale Insurance Company under the Policy. In addition, I request that Scottsdale Insurance Company/Nationwide Management Liability & Specialty please provide confirmation of acceptance of the claim, as well as the name of the adjuster who will be handling the claim, the claim number assigned, and insurance company appointed to handle the Lawsuit as soon as possible.

---

[2] Scottsdale Insurance Company is defined as "Insurer" under the D&O Coverage section of the Policy. *See* pg. 20 of *Exh. B.*

[3] Directors and Officers are defined as "any person who was, now is, or shall become:
   a. a duly elected or appointed director, officer, or similar executive of the Company, or any member of the management board of the Company;
   b. a person who was, is or shall become a full-time or part-time employee of the Company; and
   c. the functional equivalent of directors or officers of a Company incorporated or domiciled outside the United States of America."

[4] Referred to as the "Extended Period" which is defined as "the Discovery Period or the Run-Off Period, if such provision is elected and purchased pursuant to Sections H. or I. respectively, below."

Please feel free to reach out if you need any additional information or wish to discuss the claim further.

Sincerely yours,


Roger Sevigny

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re:<br><br>THE ALIERA COMPANIES, INC.<br>d/b/a Aliera Healthcare, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 21-11548 (TMH)<br><br>**Pending in the United States Bankruptcy Court for the District of Delaware** |
| ALIERA LT, LLC, as Liquidating Trustee of The Aliera Companies, Inc., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>JOHN BLENKE, THEODORE STRICKLAND, ROGER SEVIGNY, and JAMES WESTON QUINTRELL,<br><br>Defendants. | Adversary Proceeding No. 23-_____ |

## COMPLAINT

Plaintiff Aliera LT, LLC, as Liquidating Trustee (the "<u>Plaintiff</u>" or "<u>Trustee</u>") for The Aliera Companies, Inc., *et al.* (the "<u>Debtors</u>"), sets forth its complaint against the Defendants John Blenke ("<u>Blenke</u>"), Theodore Strickland ("<u>Strickland</u>"), Roger Sevigny ("<u>Sevigny</u>"), and James Weston Quintrell ("<u>Quintrell</u>," and collectively with Blenke, Strickland, and Sevigny, the "<u>Defendants</u>"), and allege as follows:

## INTRODUCTION

1.      The Defendants each served as directors of Debtor The Aliera Companies, Inc. ("<u>Aliera</u>"), which was associated with a failed healthcare sharing ministry ("<u>HCSM</u>") scheme.

---

[1] The jointly administered Debtors in these Chapter 11 cases along with the last four digits of their federal tax identification number include: The Aliera Companies Inc. (9555) (Case No. 21-11548), Advevo LLC (6736) (Case No. 22-10124), Ensurian Agency LLC (3244) (Case No. 22-10123), Tactic Edge Solutions LLC (2923) (Case No. 22-10122) and USA Benefits & Administrators LLC (5803) (Case No. 22-10121).

1

**EXHIBIT "A"**

Through their service as directors, the Defendants assisted the Debtors in perpetuating the scheme, and harming the Debtors' creditors, after it was evident that the associated HCSMs and Aliera did not comply with applicable law. Accordingly, the Plaintiff files this action to hold the Defendants responsible for their part in the scheme undertaken by the Debtors under the guise of several HCSMs.

2. Through this litigation, the Plaintiff seeks to recover funds on behalf of the Debtors' creditors, including more than 60,000 members (the "Members") of Sharity Ministries, Inc. f/k/a Trinity Healthshare Inc. ("Sharity") and a predecessor Unity Healthshare ("Unity") and the Debtors' arms' length creditors, including damages against the Defendants for their involvement in this scheme.

3. The Debtors were established by a convicted felon, Timothy Moses ("Moses"), his spouse Shelley Steele ("Steele"), and their son Chase Moses ("Chase") to profit from an exception to the Affordable Care Act (the "ACA"). However, the Debtors failed to comply with applicable law since their inception, and when regulators and Members began taking legal action against the Debtors, instead of adjusting course or winding down, the Debtors' insiders decided to expand Aliera's board of directors to add an air of legitimacy to the enterprise. At the request of Steele, the Defendants joined Aliera's board of directors and perpetuated the Debtors' scheme.

4. As a result of the Debtors' insiders' conduct, Sharity has been enjoined from conducting business by regulators in at least 9 states; it became insolvent; and sought Chapter 11 bankruptcy protection. Aliera has also been enjoined from conducting business in at least 6 states, became insolvent, and also filed Chapter 11. The various creditors of Sharity and the Debtors have suffered hundreds of millions of dollars in losses as a result of this misconduct, and the Plaintiff

files this litigation to hold the Defendants responsible for their part in continuing the Debtors'

unlawful activity.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

6.      This litigation relates to the jointly administered chapter 11 cases of *In re The Aliera*

*Companies, Inc., et al.*, Case No. 21-11548-TMH (the "Bankruptcy Cases") pending in the United

States Bankruptcy Court for the District of Delaware (the "Delaware Court").

7.      The Plaintiff consents to entry of final orders or judgment by the Court.

## PARTIES

8.      This adversary proceeding relates to the Bankruptcy Cases, some of which were

originally filed on December 21, 2021 in this Court, but were later transferred to the Delaware

Court to align with an involuntary bankruptcy petition (the "Involuntary Petition") filed against

Aliera on December 3, 2021 (the "Petition Date").  Subsequent to the transfer of venue of the

Bankruptcy Cases to the Delaware Court, Aliera consented to entry of an order for relief under

Chapter 11 in the Debtors' bankruptcy cases.  On February 16, 2022, the Order for Relief was

entered, consolidating the two Aliera cases, with Case No. 21-11548 being the surviving case, and

ordering that the cases be jointly administered [Bankruptcy Cases, Docket No. 75].

9.      The Trustee was appointed pursuant to an order entered by the Delaware Court

[Bankruptcy Case, Docket No. 576] (the "Confirmation Order") confirming the *Modified First*

*Amended Plan of Liquidation*, attached as Exhibit A to the Confirmation Order (together with all

exhibits thereto, and as may be amended, modified or supplemented, the "Plan").  Pursuant to the

Plan, the Trustee has standing to bring claims on behalf of the Debtors' bankruptcy estates.

10.     Defendant Blenke is an individual citizen of Illinois.  He can be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence located at 1 Country Aire Drive, Saint Louis, MO 63131.

11.     Defendant Strickland is an individual citizen of the state of Ohio.  He can be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence located at 5561 Chowning Way, Columbus, OH 43213.

12.     Defendant Sevigny is an individual citizen of the state of New Hampshire.  He can be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence located at 19 Melody Terrace, Dover, NH 03820.

13.     Defendant Quintrell is an individual citizen of the state of Georgia and may be served by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to his primary residence at 350 Minnehaha Trail, Blue Ridge, GA 30513.

## BACKGROUND

### I.     Introduction and Overview

14.     The Debtors were formed to provide services to HCSMs, including Sharity.  After disputes with other HCSMs, Sharity became the Debtors' primary client and mechanism for the Debtors to extract cash from the Members.

15.     Aliera was incorporated in Delaware by Moses, Steele, and Chase in December 2015.  Before forming Aliera, Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud (relating to a "pump and dump" scheme based on fraudulent statements) and perjury.  As a result of the criminal case, titled *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over six years in prison and ordered to pay $1.65 million in restitution.

16.     Aliera is a for-profit entity. Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders…." Aliera's formation documents do not include any discussion of religious or ethical purposes or missions.

17.     The Debtors began selling their health care products in late 2015. At the time it was formed, it only sold "direct primary care medical home" ("DPCMH") plans. DPCMH plans generally cover limited services such as some doctors' visits and basic lab services. These plans provide no hospitalization or emergency room coverage and are not ACA-compliant.

18.     Aliera's insiders realized Aliera could greatly increase the sales of its health care products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSM coverage from the ACA's individual mandate. They realized also that Aliera could avoid insurance laws in many states that also have an exemption from insurance regulations for entities that meet those states' HCSM requirements.

19.     Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity located in Virginia. Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services as an HCSM that had met the requirements under 26 U.S.C. § 5000A.[2]

---

[2] When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing HCSMs. In order to qualify as an HCSM under the ACA, an entity must meet the following rigid requirements:

> (1) it must be recognized as a 501(c)(3) tax exempt organization;
> (2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs";
> (3) its members must "retain membership even after they develop a medical condition";

20.     In 2016, Moses convinced Anabaptist to permit Aliera to market its DPCMH plan "side by side" with Anabaptist's sharing program using Anabaptist's HCSM designation. Anabaptist created a wholly owned subsidiary, Unity, for that purpose. Under the proposal, Aliera would market both its own plan and the Unity HCSM together as a health care product it claimed would be an HCSM.

21.     Aliera entered into a contract with Unity on or about February 1, 2017. Under that contract, Aliera would offer to the public its own health care products that did not meet the insurance benefits and coverage requirements under the ACA, and that did not independently qualify for the HCSM exemption under 26 U.S.C. § 5000A. In return, Aliera's customers would join the Unity HCSM, increasing the membership in Anabaptist's HCSM. Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were supposed to be reserved for payment of benefits to Unity members.

22.     Although Aliera marketed the plans to consumers throughout the country as HCSM plans through Unity, Aliera marketed its own DPCMH plans as well. Members made payments for both components of the plan directly to Aliera, and Aliera unilaterally determined how much of the payment was designated for the Aliera component, what portion was designated for the Unity component of the plan, and how much of the payment would be used to actually pay members' medical expenses.

---

(4) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999"; and
(5) it must be subject to an annual audit by an independent CPA and make that audit available to the public upon request.

26 U.S.C. § 5000A(d)(2)(B)(ii). The reason for the 1999 cutoff date was to ensure the reliability of care that comes with historical practice, and to prevent "opening the flood gate" to groups seeking to circumvent the requirements of the ACA. *Liberty Univ. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013).

23.     In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits to Members.  It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

24.     Unity terminated the relationship with Aliera in the summer of 2018.  A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County, Georgia in late 2018 styled *Aliera Healthcare v. Anabaptist Health Share, et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.) ("Georgia Lawsuit").  The court found that administrative fees paid to Aliera under its agreement with Unity amounted to millions of dollars.  Indeed, an Aliera employee testified in the Georgia Lawsuit that Aliera earned more than $180,000,000 in revenue in 2018 alone.

## II.     Aliera Created Trinity as a Sham Health Care Sharing Ministry to Avoid ACA Requirements and State Insurance Regulation.

25.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM through which to sell its health care plans.  Aliera and its principals therefore created Trinity Healthshare, Inc. ("Trinity") on June 27, 2018, as a purported Delaware nonprofit entity.

26.     William Rip Thead, III became the CEO of Trinity.  Mr. Thead was an Aliera employee at the time it created Trinity.  He is also a close family friend of the Moses family and officiated Chase's wedding.

27.     There were only two board members of Trinity at the time of its founding — Mr. Thead and his brother David R. Thead.  On information and belief, neither Mr. Thead nor his brother had any experience running a nonprofit organization.

28.     Aliera's law firm filed an application with the IRS for recognition of Trinity as a 501(c)(3) charitable organization and was authorized as power of attorney on behalf of Trinity in connection with that application.  The application, signed by Mr. Thead as Trinity's chairman, failed to disclose the anticipated financial arrangement with Aliera, its employer.

29.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale, and administration of the purported HCSM plans they created (the "2018 Agreement").  The 2018 Agreement was drafted by Aliera and its agents and was not an arm's length transaction.  It was signed by Chase on behalf of Aliera and by Mr. Thead on behalf of Trinity.

30.     The 2018 Agreement allowed Aliera to use Trinity's nonprofit status to sell health care plans purporting to be HCSM plans, and to maintain complete control over design of the plans, the money collected, the administration of the plans, the benefits paid, and the membership roster.  Under the 2018 Agreement, Trinity delegated to Aliera authority to provide accounting staff, financial and membership reporting, and audit and tax filing support.  It gave Aliera control over enrolling new members.  It also gave Aliera the "exclusive ownership rights to the Membership Roster," and provided that Trinity was "not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera."  Aliera was granted authority in its sole discretion to "substitute any component of a Plan."  In other words, Trinity was just a front for Aliera.

31.     The payment scheme under the 2018 Agreement was especially prejudicial to the Members.  The Agreement provided that *all Member "contributions" payments were to be made directly to Aliera*, which then allocated 30-40% (depending on the plan) of every payment to commissions, and also provided that Aliera would be paid substantial additional administrative

8

fees.  Only a small fraction of the amount of a member contribution (about 16% of the amount paid under most of the plans) was actually to be placed into a Trinity "Sharebox" account for payment of claims.

32.     By contrast, under the ACA, health insurers may not spend more than 20% of premium payments on administrative costs, and 80% must be spent on benefits.  42 U.S.C. § 300gg-18.

33.     Aliera subleased office space to Trinity, which became yet another means by which Aliera profited from member payments.

34.     Because Aliera had complete control over the Unity plans in 2018 at the time it created Trinity, it could easily recycle the marketing, enrollment, and plan materials it had created and developed for Unity by replacing Unity's name and logo with the new Trinity name and logo.

35.     Because Aliera had sole access to Unity's member list, it attempted to automatically switch Members' plans from a Unity to a Trinity plan without requiring any action from the Members.  The court in the Georgia Lawsuit, however, entered a temporary restraining order preventing Aliera from doing so in December 2018.

36.     Aliera began selling the Trinity plans to new members in the fall of 2018.  Chase testified at length in the Georgia Lawsuit about his role in creating Trinity and developing all its health care plan materials.  By May 2019, the injunction preventing Aliera from soliciting Unity members was lifted, and it actively solicited the Unity members whose plans it controlled to authorize transfer to Trinity plans.

37.     Aliera created online enrollment forms or applications for Members to sign when they enrolled in the plans.  Those forms misrepresented that "up to 40% of your member

contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services."

38.     In fact, up to 84% of the contributions went to administration and other costs or simply into the pockets of Aliera's insiders and the Defendants.

39.     At no time did Aliera disclose that the amount of a member's contributions that would remain, after payment of all administrative and other costs, for deposit into the Sharebox for payment of member claims would be woefully insufficient to pay the reasonably likely amount of member claims.

40.     Aliera was the claims administrator for the plans.  Providers' bills were submitted to Aliera for payment, and Aliera decided whether and when claims would be paid.  When Members had concerns about claims that were not paid, they called an Aliera representative.

41.     Due to the small percentage of the Members' payments eventually ending up in the Sharebox for payment of claims, there were insufficient funds to pay Members' claims.  Aliera dealt with this problem by avoiding, delaying, or unreasonably denying payment of claims.  When Members complained, Aliera's practice was, *inter alia*, to make false promises of payment, demand that medical providers resubmit medical records multiple times, or advise that it would "reprocess" the requests for payment.  Aliera never advised the Members, however, that there were insufficient funds to pay the claims because Aliera was siphoning off as much as 84% of the Members' monthly contributions for "administrative" costs.

## III.    Aliera Designs, Markets, and Sells Health Care Plans that Function as Health Insurance and Draws Scrutiny from State Regulators.

42.     Aliera designed and created the Trinity health care plans to be sold to Members as "alternatives" to health insurance that mimicked traditional health insurance plans.  For example:

a.      It created "sell sheets" that laid out benefits and costs for various plans.  The more robust the plan and the lower the deductible (called a "Member Shared Responsibility Amount" or "MSRA"), the more a member paid.  Similarly, the cost of the plans increased as a Member aged and if the member smoked.

b.      It advertised the plans as "great for those who simply want to have peace of mind knowing that they will be able to receive the health care services they need when they need them," or as "allow[ing] members to achieve comparable cost assurances for catastrophic health care services (including preventative care and immediate access to doctors through office visits, urgent care, and telemedicine) at a much lower cost…."

c.      It identified health care expenses, such as in-patient and out-patient care, prescription benefits, preventive care, specialty care and hospitalization, that would be included after the MSRA or a copay was paid.

d.      It misrepresented that payments to Aliera and its claims practices were similar to those used in health insurance by offering a standard "comparison" of the terms used by Aliera to those used in standard insurance policy.  Hence, a premium was a "contribution," a deductible was a "Member Shared Responsibility Amount (MSRA)," and a co-pay was a "co-expense."

e.      Aliera called certain plans "Gold," "Silver," or "Bronze" plans, just as ACA-compliant health insurance plans are called.

f.      It created benefits booklets that outlined the benefits of the plan, the exclusion from coverage (described as "limits of sharing"), and the necessity of pre-authorization for certain medical expenses.

g.      The monthly premium payments that Aliera described as "voluntary contributions" were, in fact, mandatory if a member wanted to be eligible for coverage of health care costs, just like insurance premiums.

h.      The plans were sold by licensed insurance agents, who were offered outsized commissions for selling the Aliera/Trinity plans.

i.      Like an insurance company, Aliera made payments for covered eligible medical expenses directly to medical providers after receiving standard health insurance claims.  Members never sent payments directly to one another.

j.      The plans promised coverage for an expansive network of "in network" providers, and Aliera represented that it was affiliated with "a growing nationwide PPO network of more than 1,000,000 health care professionals and more than 6,000 facilities."

43.     Members received a card that mimicked a health insurance card and were advised to keep it with them at all times to present to health care providers.

44.     Aliera marketed and represented these health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM under 26 U.S.C. § 5000A(d)(2)(B)(IV) for the following reasons:

a.      Trinity was created 15 years after December 31, 1999 and, at the time of its creation in 2018, had no members.  Under the federal statute, an entity or a predecessor of the entity must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999."  26 U.S.C. § 5000A(d)(2)(B)(IV). Trinity did not have members who had shared medical expenses "continuously and without interruption since at least December 31, 1999."  Nor did Trinity have any predecessor entity.  The application form submitted to the IRS by Aliera's attorney checked "No" to the question, "[a]re you a successor to another organization?"

b.      In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs…."  26 U.S.C. § 5000A(d)(2)(B)(III).  Although Trinity's original bylaws, attached to its application to the IRS for recognition as a 501(c)(3) entity, set forth a specific set of Protestant Christian religious beliefs, Trinity never restricted its membership to those individuals who affirmed specific common beliefs.  Members were only asked to affirm a generic "Statement of Beliefs" that refers to no particular religion.  As stated in "frequently asked questions" on Trinity's website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates."  As a practical matter, the generic Statement of Beliefs allowed sale of the health care products to the general public.

c.      Although a CPA firm prepared an independent auditors' report of Trinity's finances for the six months it was in existence in the last half of 2018, it later withdrew that report.  Trinity never subsequently completed a financial audit, as required by the statute.

45.     Aliera further misrepresented to members that Trinity was "recognized" as a qualified HCSM.  It was, in fact, impossible for Trinity to have been "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was created.  Trinity

has never appeared on any list of recognized HCSMs developed by the U.S. Department of Health

and Human Services.

46.     The Trinity health care plans Aliera created and sold prompted increasing

complaints from consumers and attracted scrutiny from state regulators:

a.      As early as April 8, 2019, the State of Washington's Office of the Insurance
Commissioner issued a final investigative report concluding that Trinity was not a
valid HCSM and was acting as an unauthorized insurer in Washington.  That
Insurance Commissioner entered a Cease and Desist Order against Trinity and
Aliera on May 13, 2019.

b.      On June 13, 2019, the State of Texas filed suit against Aliera alleging that it was
selling unauthorized insurance products in that state and seeking to enjoin its sale
of those products in Texas.

c.      Multiple other states have followed, including California, Colorado, Connecticut,
District of Columbia, Iowa, Maryland, Michigan, New York, New Hampshire, New
Jersey, New Mexico, Oregon, and Pennsylvania, all generally concluding that the
plans were unauthorized insurance.

47.     Several civil lawsuits were filed against Aliera claiming the health care plans sold

through Trinity were unauthorized insurance, including:

a.      *Jackson, et al., v. The Aliera Companies, Inc., Aliera Healthcare Inc., Trinity
Healthshare Inc.*, No. 2:19-cv-1281 (J. Rothstein, W.D. Wash.);

b.      *Duncan v. The Aliera Companies, Inc., Trinity Healthshare Inc., OneShare Health
LLC*, No. 2:20-cv-867-TLM-KJM (J. Nunley, E.D. Cal.);

c.      *Kelly, et al. v. The Aliera Companies, Inc, Trinity Healthshare Inc.*, No. 3:20-cv-
05038-MDH (J. Harpool, W.D. Mo.);

d.      *Smith, et al., v. The Aliera Companies, Inc., Trinity Healthshare Inc, OneShare
Health LLC*, No. 1:20-cv-02130-RBJ (J. Jackson, D. Colo.); and

e.      *Albina, et al. v. The Aliera Companies, Inc. Trinity Healthshare Inc., OneShare
Health LLC*, No. 5:20-cv-496-JMH (J. Hood, E.D. Ky.).

48.     Aliera claimed in these proceedings that the Trinity HCSM plans were not

insurance because neither Aliera nor Trinity had any obligation to indemnify the Members for

medical claims out of their own money, and instead, all medical expenses were to be "shared" from the Members' funds.  Nevertheless, it was Aliera who determined which part of the Members' payments would be siphoned off to pay itself and which part would be placed in a fund to pay the expenses.

49.     To prolong the scheme, Aliera delayed resolution of the substantive issues in the lawsuits by claiming that an arbitration clause in the back of the Trinity member guides required a multi-step dispute resolution process culminating in binding arbitration in Georgia.  Even after courts found the arbitration clauses unenforceable, Aliera appealed the decisions to further delay substantive judicial scrutiny of its illegal practices.

## IV.     Aliera Restructures Itself to Mask Its Control of Trinity but Maintains Control Over Trinity and Continues to Misrepresent the Plans it Sold.

50.     Despite the cascade of regulatory actions and lawsuits against it, Aliera continued to aggressively sell the Trinity plans.  In addition, Aliera reacted by attempting to superficially distance itself from Trinity while still controlling Trinity.  Its protestations to courts and regulators that it was merely an administrator for Trinity, however, were misleading.

51.     After the first regulatory actions commenced, the Aliera principals hand-picked another person to become a Trinity insider.  Chase, Moses, and Mr. Thead met William Guarino at an insurance legislators conference in June 2019.  They recruited him to serve as Trinity's president, only its second employee, and as a third board member.

52.     Aliera created four subsidiary entities — Debtors Ensurian, Advevo, Tactic Edge, and USA Benefits (collectively, the "Subsidiaries" and each, a "Subsidiary") — and changed its name from Aliera Healthcare, Inc. to The Aliera Companies, Inc. in 2019.  Aliera divided the various tasks it was performing directly under the 2018 Agreement among these four Subsidiaries.

All four Subsidiaries had their principal places of business at 990 Hammond Drive, Atlanta, Georgia, which was also Aliera's principal place of business.

53.    Mr. Thead signed, on behalf of Trinity, five agreements with the new Aliera Subsidiaries, all effective January 1, 2020 ("Subsidiary Agreements").    These Subsidiary Agreements divided the tasks delegated to Aliera in the 2018 Agreement as follows:

a.    Ensurian, which had obtained a license as an insurance agency, was granted the exclusive right to market and sell the Trinity health care plans.  Trinity granted Ensurian the non-assignable right to purchase Trinity's membership list in the event there was a change in the majority of the Trinity board of directors.

b.    USA Benefits was to administer all claims, prepare and send member cards and other materials that were provided to members, provide explanations of benefits to members and providers, maintain a process for receipt of member complaints, handle accounting, and furnish Trinity with information it needed to prepare its annual audit and Form 990 tax returns.

c.    Tactic Edge developed and owned the software and IT platform and maintained the databases of member enrollment and payments.  Under this agreement, it "licensed" access to its system to Trinity.

d.    Under an "Ancillary Agreement" with Tactic Edge, that entity would handle customer complaints and would provide coordination and communication with regulators.

e.    Advevo was to provide marketing and brand development services.

54.    A fee schedule was attached to each of these Subsidiary Agreements that allowed the Subsidiaries to be paid an amount from each Member's monthly premium payment, with the amount dependent on the amount of the member's payments, such that the larger the Member's monthly payment, the larger the fee paid to the Subsidiary.

55.    The Members' payments continued to go directly to Aliera or a Subsidiary, and the fees were deducted before any of the Members' payments were deposited into Trinity's Sharebox account for payment of claims.  Under these contracts, the Subsidiaries paid themselves 58-60% of the Members' payments.

15

56.     From the time Trinity was created until early 2021, Aliera had sole control over all payments made by members, of the costs deducted from the payments, of the amounts deposited into the Trinity account for payment of medical claims, and of the amount paid out of the Sharebox account for Members' medical expenses.

57.     Aliera and its Subsidiaries rebranded the Member materials, including sell sheets, member guides, enrollment forms, member cards, web portals, and explanations of benefits, to remove its own name and replace it with the Trinity or, after Trinity changed its name, the Sharity name.  The materials nevertheless were all created by Aliera or one of its Subsidiaries.  The administration of all Member claims and handling of Member complaints continued to be by employees of Aliera or one of its Subsidiaries, even though telephone calls and emails would be from accounts nominally in the Trinity/Sharity name.  Emails sent to Members under the "Trinity" or "Sharity" name were in fact sent by Aliera or one of its Subsidiaries.  Newsletters sent to Members under the Trinity/Sharity name were created and sent by an Aliera Subsidiary.

58.     By the time Sharity filed its bankruptcy petition, Aliera had enrolled over 98,000 Members[3] in the Sharity health care plans.

59.     Although Members paid approximately **$363,000,000** in monthly member fees and application fees for their Trinity health care plans, Trinity never had more than three employees.

## V.     Aliera Created Trinity Knowing that It Could Not Pay the Health Care Expenses of Members and that It Would Fail.

60.     Aliera created the Trinity health care plans and determined the amount of monthly payments Members would pay under each plan.  It set the prices at rates that were substantially less than traditional ACA-compliant health insurance plans in order to make the plans appear

---

[3] There were 98,892 unique households that purchased Sharity health care plans.  Many plans also had dependents in addition to the primary member enrolled in the plan, such that a total of 159,307 individuals were enrolled in the plans.

attractive to purchasers, while advertising the plans as providing comparable benefits to those health insurance plans.

61.     Aliera's goal was to continually enroll as many members as possible in order to generate as much monthly revenue as possible.  Although the enrollment forms Aliera created asked potential Members whether they had any medical issues, upon information and belief, it had the policy of not denying membership to anyone who applied.

62.     At the time Sharity filed its petition for bankruptcy, Aliera or its Subsidiaries were retaining up to 60% of the Member fees but were providing little value in return.  Sharity also received approximately 10% of Member payments to cover expenses, consisting primarily of defense in lawsuits and regulatory actions.  As a result, only about 30% of the member payments were actually deposited into Sharity's Sharebox account for payment of claims.

63.     Health insurers are required to pay at least 80% of premiums received on Member claims for ACA-compliant plans under federal law, 42 U.S.C. § 300gg-18.  Aliera had the ratio upside down, setting aside at most 30% of Member premiums for payment of claims.

64.     To the extent there were any independent directors or officers of Aliera, they would have had an early warning of Trinity's inevitable demise when it received an independent auditors' report regarding Trinity's financial statements for the period June 27 – December 31, 2018, the first six months of Trinity's existence.  In that report, the auditors raised "substantial doubt about [Trinity's] ability to continue as a going concern."  The report noted that expenses would exceed revenues for the year ending December 31, 2019, as well.  Although the federal statute requires HCSMs to conduct an annual audit made available to the public under 26 U.S.C. § 5000A(d)(2)(B)(V), no further audits were conducted of Trinity's finances.  This 2018 audit was eventually retracted by the auditors, as well.

65.     Aliera, its officers and directors, and other insiders never advised Members that Sharity would be unable to pay all medical claims but instead continued to collect member payments and sell new plans.

66.     Even though the amount remaining for deposit into Sharity's Sharebox account, after payment of Aliera's and its Subsidiaries' fees, was woefully inadequate to pay Members' medical claims, Aliera maintained its scheme to defraud members by continuing to aggressively sell the plans to new members, thus generating larger revenue, while at the same time continuing to arbitrarily deny or delay payment of claims.  At the time Sharity filed its petition for bankruptcy, Sharity Members learned for the first time from Aliera that there were claims totaling over $50 million from Members that had been approved for payment but had not yet been paid.  That figure, however, revealed only a small part of the problem, because it did not include claims that had been submitted but were not yet approved or that had been arbitrarily denied.  When those medical claims are added in, the total amount of the gross unpaid claims is in excess of $250,000,000.  Meanwhile, at the time of Sharity's bankruptcy filing, Sharity held only approximately $743,000 in its Sharebox account for payment of the Members' medical claims.

67.     The Aliera/Sharity scheme was essentially a Ponzi scheme, with the Members acting as investors.  Like all Ponzi schemes in which payments to earlier victims are paid from funds collected from newer victims, Aliera's scheme eventually failed.

68.     Sharity filed its petition for bankruptcy, and thousands of Members were left without health insurance and with huge unpaid medical bills.  Many Members are now being, or have been, pursued by their health care providers for the unpaid bills.

69.     A judgment was entered against Aliera on November 11, 2021, in *Jackson, et al. v. The Aliera Companies, Inc., et al*., Case No. 2:19-cv-01281-BJR, in the U.S. District Court for the

Western District of Washington, in favor of a plaintiff class, for $20,646,077.08, and in favor of

the individual named plaintiffs in the aggregate amount of $22,631, plus exemplary damages in

the amount of $706,750.  In entering the judgment, the court expressly found that Aliera had

designed, marketed, and sold unauthorized and illegal health insurance, violated Washington's

Consumer Protection Act, and that the plaintiffs had suffered damages as a result of illegal and

fraudulent practices.  A judgment was entered against Aliera on November 17, 2021, in *Albina, et*

*al. v. The Aliera Companies, et al.*, Case No. 5:20-CV-00496-JMH, in favor of one of the named

plaintiffs in the amount $16,255.54 and in favor of the class in the amount of $4,679,868.46.  In

entering the judgment, that court found that Aliera misled the Members into entering into contracts

for a product that was not what it purported to be and did not comply with applicable federal or

state law.

**VI.    The Corporate Governance of Aliera**

70.    Aliera's board of directors consisted of two classes of directors: Steele and Chase

were Class A directors and, from 2019 through 2021, the Defendants were each Class B directors.

71.    Steele served as Chief Executive Officer of Aliera from its inception through the

Petition Date.

72.    Chase served as President of Aliera from its inception through the Petition Date.

**VII.   Aliera's Insolvency**

73.    Aliera was insolvent since its inception.

74.    The Debtors were insolvent as, without limitation, the value of their liabilities

exceeded the value of their assets and the Debtors did not have adequate capital.

75.    As of December 31, 2017, Aliera had assets valued at $16,348,278 and liabilities

of $15,730,947 according to its 2017 audit.

19

76.     As of December 31, 2018, Aliera had assets valued at $65,369,378 and liabilities of $57,287,961 according to its 2018 audit.

77.     However, the liabilities reflected in these audits did not include liabilities owing to Sharity and the members as a result of the fraudulently obtained funds, which amounts far exceeded any stockholders' equity.

78.     As examples of these additional liabilities, the *Jackson* class received a judgment against Aliera in the amount of $20,646,077.08, which reflected liabilities not included in the 2017 or 2018 audit.

79.     Additionally, the *Albina* class received a judgment against Aliera in the amount of $4,679,868.46, which reflected liabilities not included in the 2017 or 2018 audit.

80.     Taking these, and additional liabilities (including, without limitation, those resulting from claims of Members) not accounted for in any of Aliera's audits, Aliera's liabilities far exceeded the value of its assets at a fair valuation.

81.     All of Aliera's assets were obtained using funds derived from Unity, Sharity, and the Members on a fraudulent basis, thereby creating a claim against Aliera for each dollar it received.  Accordingly, its liabilities far exceeded its assets.

**VIII.   The Debtors and their Insiders Reap the Benefits of the Fraudulent Scheme.**

82.     As referenced above, the Debtors contracted with Sharity to provide various management and administrative services to support Sharity's program operations.

83.     Sharity was a party to a contract with Debtor Aliera Healthcare Inc. n/k/a The Aliera Companies, Inc. to provide those services.  Effective January 1, 2020, Sharity was a party to a series of vendor agreements with the Debtors (the "Sharity Contracts"), each with an initial 5-year term.

84. Under the Sharity Contracts, Sharity retained certain of the Debtors to, among other things, provide (i) administrative services, (ii) information technology related services, (iii) marketing, brand development, and sale services, and (iv) regulatory and compliance services.

85. Sharity itself filed a Chapter 11 case which is being administered by the Delaware Court. Before the bankruptcy, various governmental units and private parties brought investigations, claims, or lawsuits against the Debtors and Sharity, alleging, among other things, that Sharity's health plans were unauthorized health insurance and not HCSM plans. Those cases alleged that the payments to the Debtors were in excess of amounts appropriately allowed for such services and, as such, left very little available to be used to pay Members' requests for sharing of medical expenses, *i.e.* Sharity's professed raison d'être. A number of courts and/or agencies issued orders against the Debtors and/or Sharity requiring them to cease and desist from offering health care sharing programs and withdrawal from the health care markets in a number of states.

86. Certain of the Members were deprived of the medical expense reimbursement that they believed Sharity, as an HCSM, would provide to them.

87. Sharity was created merely as a shell that Aliera controlled. Aliera created, marketed, and administered the health plans sold under the Trinity or Sharity name. As the sole point of contact with Sharity's members, Aliera directly received the Members' monthly payments and decided how much, if anything, would be paid on Members' claims.

88. Through a series of arrangements that were highly favorable to Aliera's insiders, but highly *un*favorable to the Members of Sharity, Aliera siphoned off as much as 84% of the Members' payments for its own use and to funnel to its insiders. The amounts it siphoned off should have been used to pay the Members' medical expenses. Instead, Aliera took that money

and used it for its own benefit and that of its owners, while at the same time denying the health coverage for which the Members paid.

89.     The Defendants each looked the other way at illicit schemes to siphon cash from the Debtors' operations as described in more detail herein.

### A.     Transfers to Quintrell through Hilshaw Consulting, LLC

90.     Quintrell received not less than $138,192.36 in transfers (collectively, with all other transfers from the Debtors to or for the benefit of Quintrell, the "Quintrell Transfers") from Aliera through a limited liability company that he was the sole member of, Hilshaw Consulting, LLC ("Hilshaw"), between December 3, 2020 and the Petition Date.[4]

91.     The Quintrell Transfers included monthly fees for purported consulting services.

92.     Quintrell, who was Steele's son in law at all times relevant to this Complaint, was employed by at least one other business at the time.

93.     Moreover, Quintrell was a full-time student during a portion of the time he was a) serving as a director of Aliera and b) receiving compensation from Aliera through Hilshaw.

94.     Neither Quintrell nor Hilshaw provided reasonably equivalent value for the Quintrell Transfers.

### B.     Excessive Compensation to the Moses/Steele Family

95.     The Debtors paid grossly excessive compensation to Steele and Chase.

96.     Steele and Chase received the following compensation (the "Excessive Compensation Transfers"):

| Year | Steele | Chase |
|------|--------|-------|
| 2019 | $1,219,231 | $606,231 |

---

[4] Hilshaw, which was a Georgia limited liability company, has been administratively dissolved by the Georgia Secretary of State.

| 2020 | $519,231 | $513,462 |
|---|---|---|

### C. The First Call Transfers

97.     First Call was another entity established by Moses and Steele to profit at the expense of the Debtors.  Aliera made payments to First Call totaling not less than $6,205,921 (collectively, with all other transfers from the Debtors to First Call, the "First Call Transfers").  A listing of the First Call Transfers is attached hereto as Exhibit A.

98.     On the surface, First Call was supposed to provide telemedicine services to Members.  In reality, First Call provided no consideration, or inadequate consideration, to Aliera, Sharity, or the Members in exchange for the First Call Transfers.

### D. The Defendants' Service as Directors

99.     The Defendants each joined Aliera's board of directors in 2019 as a part of a change in Aliera's corporate governance structure.

100.    This change was necessitated by the fact that numerous state regulators and Members had filed suit against Aliera.

101.    Due to the issues it was facing, Steele believed that Aliera needed additional board members rather than only her and her son, Chase.

102.    In 2019, Steele recruited Blenke, who had experience as a director for other companies, and Sevigny, a former insurance commissioner in New Hampshire.  Blenke and Sevigny each joined Aliera's board as a result of this effort.

103.    Steele also recruited Strickland, a former governor of Ohio, to give the impression that Aliera's business was legitimate due to Strickland's experience in public affairs.

104.    To round out the board, Moses added Quintrell as a director.

105.     Rather than steering the Debtors in a new direction, providing much needed oversight, or simply winding up the affairs of a very troubled company, the Defendants essentially permitted Aliera's business to go on as usual.

106.     Further, Quintrell had a conflict of interest as a director because of the purported consulting fees he was receiving through Hilshaw.

107.     The Defendants failed to keep themselves informed regarding the legal challenges faced by the Debtors.

108.     Rather than addressing these problems, the Defendants simply permitted the Debtors to continue with business as usual.

**IX.     Applicable Law**

109.     Under the internal affairs doctrine, the state where a corporation is organized has the authority to regulate a corporation's internal matters peculiar to the relationships among or between the corporation and its officers, directors, and shareholders.

110.     Courts have long recognized that few, if any, claims are more central to a corporation's internal affairs than those relating to alleged breaches of fiduciary duties by a corporation's directors and officers.

111.     Given that Aliera was formed in Delaware, Delaware law applies to analyze the Defendants' breaches of fiduciary duties.

112.     All conditions precedent to the maintenance of this action, the filing of this Complaint, and to the following claims have been performed, been waived, satisfied, have occurred, or have otherwise been met.

## <u>CLAIMS FOR RELIEF</u>

113.     The following causes of action are asserted against the Defendants without prejudice to any rights the Plaintiff or the Debtors may have against the Defendants and any third

24

parties, or which this Court may grant to the Plaintiff or the Debtors, to assert additional causes of action or allegations based on facts disclosed in documents or other information made available to the Plaintiff or the Debtors or developed as a result of discovery or otherwise.

## COUNT I:
## BREACH OF DUTY OF CARE
### (Against the Defendants)

114.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

115.    As Class B directors of Aliera, the Defendants owed fiduciary obligations to the Debtors.  By reason of their fiduciary relationships, the Defendants owed the Debtors the highest obligation of good faith, fair dealing, loyalty, and due care.

116.    Additionally, because the actions at issue occurred while Aliera was insolvent or in the zone of insolvency, the Defendants owed fiduciary duties of due care, good faith, and loyalty to Aliera's creditors.

117.    The duty of care is breached: (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of "gross negligence."

118.    The Defendants were required to discharge their duties with the care of an ordinarily prudent person in a like position would exercise under similar circumstances.

119.    The following acts and omissions constitute breaches of duties owed by the Defendants to the Debtors:

a.    Permitting Trinity to serve as a front for Aliera;

b.    Marketing and representing Trinity health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM;

c.    Siphoning off as much as 84% of the Members' payments to Aliera in order to funnel those proceeds to its insiders, while at the same time denying the health coverage for which the Members paid;

d. Misrepresenting to Members that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services;"

e. Causing Trinity to have insufficient funds in the Sharebox to pay Members;

f. Avoiding obligations to Members by permitting Aliera to make false promises of payment, demanding that medical providers resubmit medical records multiple times, or advising that it would "reprocess" the requests for payment;

g. Paying excessive compensation to insiders while Aliera was insolvent;

h. Obtaining assets by using funds derived from Sharity and the Members on a fraudulent basis;

i. Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to (i) engage in representations, disclosures, and/or public announcements and releases of false or misleading information, and/or (ii) fail to disclose material and/or required information concerning the financial condition and business of the Debtors, all as a result of gross negligence and/or without the exercise of reasonable care and diligence, which damaged the Debtors and the Members.

j. Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into preferential and fraudulent transfers;

k. Allowing and/or causing the Debtors to fail to pay vendors and other creditors while incurring additional indebtedness with no reasonable prospect for repayment;

l. Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into self-dealing transactions with or benefiting Chase, Steel and Moses and which were not in the best interests of the Debtors and damaged Debtors and its financial and business interest; and

m. Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into insider or related party transactions with or benefiting other Defendants, insiders, affiliates which were not in the best interests of the Debtors and which damaged the Debtors and its financial and business interests.

120. The Defendants intentionally and/or recklessly disregarded and ignored the risks and consequences or did not consider the risks and consequences associated with the above acts or omissions.

121.     Nor did the Defendants consider or undertake available alternative transactions or other courses of action that would not have unduly risked or jeopardized the recovery of the Debtors' creditors or the financial viability of the Debtors.

122.     The actions or inactions of the Defendants were taken in bad faith, and constituted willful and wanton misconduct and/or gross mismanagement that caused the Debtors to suffer damages.

123.     Accordingly, the Plaintiff is entitled to a judgment against the Defendants for their breach of duty of care and damages in an amount to be proven at trial.

**COUNT II:**
**BREACH OF DUTY OF LOYALTY**
(Against the Defendants)

124.     The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

125.     As directors of Aliera, the Defendants owed fiduciary obligations to the Debtors. By reason of their fiduciary relationships, the Defendants owed the Debtors the highest obligation of good faith, fair dealing, loyalty, and due care.

126.     Additionally, because the actions at issue occurred while Aliera was insolvent or in the zone of insolvency, the Defendants owed fiduciary duties of due care, good faith, and loyalty to Aliera's creditors.

127.     The duty of loyalty is breached: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities; (b) when a fiduciary "abdicates" his fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

128.    The Defendants owed a fiduciary duty of loyalty, which included, among other things, a duty to act honestly and in the best interest of the Debtors, to avoid conflicts between their personal interests and the Debtors' interests, to exercise their power for a proper purpose, and not to fetter their discretion.

129.    The Defendants breached their duty of loyalty to the Debtors by, among other things, misappropriating (or allowing the misappropriation of) the Debtors' scarce funds and assets for their own personal benefit or for the benefit of entities that Steele owned and controlled.  As part of this scheme, the Defendants permitted Aliera to defraud the creditors of Aliera and the Members by, among other things, maintaining a false HCSM that caused the Members' payments to be paid to the Debtors and then transferred some or all of those funds to Steele, Moses, and various side businesses controlled by Steele, rendering Aliera insolvent and unable to pay the Members' medical expenses and creditors' claims.

130.    The following acts and omissions constituting breaches of duties owed by the Defendants to the Debtors:

a.    Permitting Trinity to serve as a front for Aliera;

b.    Marketing and representing Trinity health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM;

c.    Siphoning off as much as 84% of the Members' payments to Aliera in order to funnel those proceeds to its insiders, while at the same time denying the health coverage for which the Members paid;

d.    Misrepresenting to Members that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services;"

e.    Causing Trinity to have insufficient funds in the Sharebox to pay Members;

f.    Avoiding obligations to Members by permitting Aliera to make false promises of payment, demanding that medical providers resubmit medical records multiple times, or advising that it would "reprocess" the requests for payment;

g.      Paying excessive compensation to insiders while Aliera was insolvent;

h.      Obtaining assets by using funds derived from Sharity and the Members on a fraudulent basis;

i.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to (i) engage in representations, disclosures, and/or public announcements and releases of false or misleading information, and/or (ii) fail to disclose material and/or required information concerning the financial condition and business of the Debtors, all as a result of gross negligence and/or without the exercise of reasonable care and diligence, which damaged the Debtors and the Members.

j.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into preferential and fraudulent transfers;

k.      Allowing and/or causing the Debtors to fail to pay vendors and other creditors while incurring additional indebtedness with no reasonable prospect for repayment;

l.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into self-dealing transactions with or benefiting Chase, Steel and Moses and which were not in the best interests of the Debtors and damaged the Debtors and its financial and business interest; and

m.      Causing, directing, advising, influencing, authorizing and/or allowing the Debtors to enter into insider or related party transactions with or benefiting other Defendants, insiders, or affiliates which were not in the best interests of the Debtors and which damaged the Debtors and its financial and business interests.

131.    The Defendants intentionally and/or recklessly disregarded and ignored the risks and consequences or did not consider the risks and consequences associated with the above acts or omissions.

132.    Nor did the Defendants consider or undertake available alternative transactions or other courses of action that would not have unduly risked or jeopardized the recovery of the Debtors' creditors or the financial viability of the Debtors.

133.    The Defendants acted in bad faith by permitting Aliera to defraud its creditors and the Members through the continuation of a false HCSM that caused the Members' payments to be paid to the Debtors and then transferred some or all of those funds to the Defendants or insiders of

the Debtors, rendering Aliera insolvent and unable to pay the members' medical expenses and resulting in arm's length creditors not receiving payment on their claims.

134.    The actions or inactions of the Defendants were taken in bad faith and constituted willful and wanton misconduct and/or gross mismanagement that caused the Debtors to suffer damages.

135.    The Defendants' bad faith, negligence, gross negligence, or recklessness caused loss and damage to the Debtors and their creditors.

136.    Accordingly, the Plaintiff is entitled to a judgment against the Defendants for their breach of duty of loyalty and damages in an amount to be proven at trial.

### COUNT III:
### VOIDABLE TRANSFERS AND OBLIGATIONS – CONSTRUCTIVE FRAUD
(Against Quintrell)

137.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

138.    Aliera has one or more creditors for whom the Plaintiff can act whose claim arose before or within a reasonable time after the obligation was incurred, including the Members.

139.    Under O.C.G.A. 18-2-75, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

140.    The Debtors made transfers or incurred obligations for the benefit of Quintrell, who was an insider of the Debtors.  These fraudulent transfers and obligations included, but are not limited to the Quintrell Transfers.[5]

141.    The Debtors (a) received less than a reasonably equivalent value in exchange for the Quintrell Transfers and any associated obligations, and (b)(i) were insolvent on the date of each of the Quintrell Transfers and any associated obligations, or became insolvent as a result of each of the Transfers and any associated obligations; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (iii) intended to incur, or believed that the Debtors would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

142.    All of the Quintrell Transfers and any associated obligations were concealed from the Debtors' creditors.

143.    The Debtors made the Quintrell Transfers and incurred any associated obligations within four (4) years of the Petition Date.

144.    The Quintrell Transfers and any associated obligations constitute transfers of interests of the Debtors in property.

145.    At the time the Quintrell Transfers were made, and any associated obligations were incurred, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

---

[5] For the avoidance of doubt, the Plaintiff seeks to avoid and recover all transfers made from the Debtors to or for the benefit of Quintrell.

**COUNT IV:**
**VOIDABLE TRANSFERS AND OBLIGATIONS –**
**ACTUAL FRAUD**
(11 U.S.C. § 544(B) and O.C.G.A. § 18-2-74(a)(1) against Quintrell)

146.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

147.    The Debtors made transfers for the benefit of Quintrell, who was an insider of the Debtors, and incurred obligations to Quintrell.  These fraudulent transfers include but are not limited to the Quintrell Transfers.

148.    The Quintrell Transfers and the associated obligations were made with the actual intent to hinder, delay, or defraud entities to which the Debtors were obligated to, or became obligated, on or after the date of such transfers.

149.    All of the Quintrell Transfers and the associated obligations were concealed from the Debtors' creditors.

150.    The Quintrell Transfers and the associated obligations constitute transfers of interests of the Debtors in property.

151.    The Quintrell Transfers and the associated obligations were made within four years before the Petition Date.

152.    At or around the time that the Debtors made the Quintrell Transfers, and incurred the associated obligations, the Debtors were being sued or threatened with suits, including but not limited to the cease and desist complaints in multiple states and class action litigation.

153.    Aliera did not receive reasonably equivalent value in exchange for the Quintrell Transfers and associated obligations.

154.    Aliera was insolvent as a result of and prior to the Quintrell Transfers and associated obligations.

155.    The Plaintiff is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(1) and 18-2-77(a), avoiding the Quintrell Transfers and associated obligations in an amount sufficient to satisfy the Plaintiff's claims.

156.    At the time the Quintrell Transfers were made, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

**COUNT V: VOIDABLE TRANSFERS AND OBLIGATIONS AS TO
PRESENT OR FUTURE CREDITORS**
(11 U.S.C. § 544(B) and O.C.G.A. § 18-2-74(a)(2) against Quintrell)

157.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

158.    The Debtors made transfers or incurred obligations for the benefit of Quintrell, who was an insider of the Debtors.  These fraudulent transfers and obligations include but are not limited to the Quintrell Transfers and associated obligations.

159.    The Quintrell Transfers constitute transfers of interests of Aliera in property.

160.    At or around the time at which the Quintrell Transfers were made, and the associated obligations were incurred, Aliera was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

161.    At or around the time at which the Quintrell Transfers were made, and the associated obligations were incurred, the Debtors intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

162.     The Plaintiff is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-77(a), avoiding the Quintrell Transfers and the associated obligations in an amount sufficient to satisfy the Plaintiff's claims.

163.     At the time the Quintrell Transfers were made, there existed one or more actual and/or future creditors of Aliera's holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

## COUNT VI: VOIDABLE TRANSFERS MADE TO INSIDER FOR ANTECEDENT DEBT
### (11 U.S.C. § 544(B) and O.C.G.A. § 18-2-75(b) against Quintrell)

164.     The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

165.     Quintrell was an insider at the time of the Quintrell Transfers as he was a director of Aliera and a relative of Steele.

166.     The Quintrell Transfers were made on behalf of antecedent debts, namely for consulting services provided by Quintrell.

167.     Aliera was insolvent at the time the Quintrell Transfers were made.

168.     At or around the time at which the Quintrell Transfers were made, Aliera was insolvent as the value of its assets were lower than the value of its liabilities.

169.     The Plaintiff is entitled to a judgment under O.C.G.A. §§ 18-2-75(b), avoiding the Quintrell Transfers in an amount sufficient to satisfy the Plaintiff's claims.

170.     At the time the Quintrell Transfers were made, there existed one or more actual creditors of Aliera's holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

## COUNT VIII: RECOVERY OF TRANSFERS
### (11 U.S.C. § 550 against Quintrell)

171.    The Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1 through 113 above.

172.    Pursuant to section 550 of the Bankruptcy Code, in an action commenced under section 544 of the Bankruptcy Code, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

173.    The Quintrell Transfers are avoidable pursuant to section 544 of the Bankruptcy Code.

174.    Quintrell was the initial transferee of the Avoidable Transfers or the immediate or mediate transferees of such initial transferee or the persons for whose benefit the Quintrell Transfers were made.

175.    The Plaintiff is entitled to a judgment against Quintrell for the amount of the Quintrell Transfers pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court grant judgment as follows:

(a)    Enter judgment against the Defendants for all actual and punitive damages;

(b)    Declare the Quintrell Transfers to be avoided, and award judgment against the Quintrell in the amounts indicated above;

(c)    Award pre-judgment and post-judgment interest;

(d)     Pursuant to 11 U.S.C. § 502(d), disallow, any claim of the Defendants against the

Debtors; and

(d)     Grant such other and further relief to the Plaintiff as may be just and proper.

Dated:  December 20, 2023

**GREENBERG TRAURIG, LLP**

*/s/ John D. Elrod*
John D. Elrod, Ga. Bar No. 246604
Allison J. McGregor, Ga. Bar No. 860865
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2259
Facsimile: (678) 553-2269
Email: ElrodJ@gtlaw.com
          Allison.McGregor@gtlaw.com

*Counsel for the Plaintiff Aliera LT, LLC*

Underwritten by: Scottsdale Insurance Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675 • A Stock Company

## BUSINESS AND MANAGEMENT INDEMNITY POLICY DECLARATIONS

**THE EMPLOYMENT PRACTICES, DIRECTORS AND OFFICERS AND COMPANY, FIDUCIARY, BUSINESSOWNERS, PRIVACY PLUS, TECHNOLOGY, MEDIA AND PROFESSIONAL SERVICES AND MISCELLANEOUS PROFESSIONAL SERVICES COVERAGE SECTIONS OF THIS POLICY, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS DISCOVERED DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES, UNLESS OTHERWISE PROVIDED HEREIN. AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AND DEDUCTIBLE AMOUNTS.**

**TERMS THAT APPEAR IN BOLDFACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO THE APPROPRIATE DEFINITIONS SECTIONS OF THIS POLICY.**

| Item 1. | **Parent Company** & Mailing Address: | The Aliera Companies, Inc | **Policy** No: | EKS3376033 |
| | | 990 Hammond Drive, Suites 600 & 700 | Agent No: | 29406 |
| | | Sandy Springs, GA 30328 | Renewal No: | EKS3328896 |
| | | | Agent Name & Mailing Address: | E-Risk Services, LLC |
| | | | | Northwest Professional Center |
| | | | | 227 US Hwy 206 |
| | | | | Suite 302 |
| | | | | Flanders, NJ 07836-9174 |

Principal Address, if different from mailing address:

This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5.

Cavaness, Joel D.

**Item 2.**  **Policy Period**: From 4/21/2021 to 4/21/2022
12:01 A.M. local time at Principal Address shown above.

**Item 3.**  Coverage Sections and Limit of Liability

Employment Practices Coverage Section

1. Limit of Liability:
   a.  $1,000,000   aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b.  $1,000,000   additional aggregate for all **Costs, Charges and Expenses**, subject to 1.c. immediately below.
   c.  $2,000,000   maximum aggregate for this Coverage Section
2. Retention:
   a.  $100,000   each **Employment Practices Claim**
   b.  $100,000   each **Third-Party Claim**
3. **Continuity Date:**   4/21/2020
4. **Third Party** Coverage: Yes __X__   No _____

To Report a Loss
• Dial toll-free #1 (844)777-8323 or visit our
• Website: https://my.rpsins.com/claimsfnol
• Contact Insurer directly (see policy section)

Directors and Officers and Company Coverage Section

1. Limit of Liability:
   a.  $1,000,000  aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b.  _____  additional aggregate for all **Loss** under Insuring Clause A.1., subject to 1.c, immediately below.
   c.  $1,000,000  maximum aggregate for this Coverage Section

EXHIBIT "B"

Nationwide

2. Retention:

    a.  $0    each **Claim** under Insuring Clause 1.

    b.  $100,000    each **Claim** under Insuring Clause 2.

    c.  $100,000    each **Claim** under Insuring Clause 3.

3. **Continuity Date:** 4/21/2020

Fiduciary Coverage Section

1. Limit of Liability   $1,000,000  maximum aggregate for this Coverage Section
2. Retention   $25,000  each **Claim**
3. **Continuity Date:** 4/21/2019

| | |
|---|---|
| Premium | $83,450.00 |
| Broker Fee - RPS | $250.00 |
| GA Surplus Lines Tax | $3,348.00 |
| Total Charges | $87,048.00 |

| | | | |
|---|---|---|---|
| Item 4. | Premium: | $83,450 | |

Item 5.   **Discovery Period** options:

1. One (1) year =   100%   of the premium
2. Two (2) years =   150%   of the premium
3. Three (3) years =   200%   of the premium

As provided in Section H. of the General Terms and Conditions, only one of the above **Discovery Period** options may be elected and purchased.

Item 6.   **Run-Off Period**:

1. One (1) year =   125%   of the premium
2. Two (2) years =   145%   of the premium
3. Three (3) years =   165%   of the premium
4. Four (4) years =   185%   of the premium
5. Five (5) years =   205%   of the premium
6. Six (6) years =   225%   of the premium

As provided in Section I. of the General Terms and Conditions, only one of the above **Run-Off Period** options may be elected and purchased.

Item 7.   Forms and Endorsements Effective at Inception of **Policy**:

EKS-D-1 (11/16), HLPDO (1-18), HLPEPL (1-18), NOTS01GA (01/09), EKS-1 (04/08), EKS-P-2 (04/08), EKS-P-1 (04/08), EKS-P-3 (04/08), EKS-1650 (8-16), EKS-56 (04/08), EKS-45 (04/08), EKS-782 (01/09), EKS-1137 (10/12), EKS-167 (04/08), EKS-1136 (10/12), EKS-787 (01/09), EKS-6 (04/08), EKS-7 (04/08), EKS-8 (04/08), EKS-9 (04/08), EKS-832 (05/09), EKS-810 (7-20), EKS-199 (04/08), EKS-200 (04/08), EKS-14 (01/09), EKS-846 (11/09), EKS-784 (01/09), EKS-15 (04/08), EKS-16 (04/09), EKS-202 (04/08), EKS-17 (03/10), EKS-845 (05/09), EKS-2193 (10-19), EKS-60 (04/08), EKS-351 (1-15), EKS-781 (01/09), EKS-62 (04/08), EKS-775 (01/09), EKS-21 (04/08), EKS-929 (02/11), EKS-788 (01/09), EKS-990 (09/11), EKS-1639 (2-16), EKS-785 (01/09), EKS-53 (04/08), EKS-1566 (7-14), EKS-66 (04/08), EKS-29 (04/08), EKS-1562 (6-14), EKS-87 (04/08), EKS-27 (04/08), EKS-33 (04/08), EKS-22 (04/08), EKS-1512 (08/13), EKS-37 (04/08), EKS-19 (04/08), EKS-950 (05/11), EKS-2135 (3-19), EKS-20 (4-08), EKS-1144 (12/12), UTS-9g (6-20), NOTS0601CW (11/18)

Item 8.   Notices to **Insurer**:

| Notice of Claims to: | Other Notices to: |
|---|---|
| Nationwide Management Liability & Specialty | Nationwide Management Liability & Specialty |
| Attention: Claims Manager | Attention: Claims Manager |
| 7 World Trade Center, 37th Floor | 7 World Trade Center, 37th Floor |
| 250 Greenwich Street | 250 Greenwich Street |
| New York, NY 10007 | New York, NY 10007 |
| MLSReportALoss@nationwide.com | MLSReportALoss@nationwide.com |

These Declarations, together with the **Application**, **Coverage Sections**, General Terms and Conditions, and any written endorsement(s) attached thereto, shall constitute the contract between the **Insured** and the **Insurer**.





Underwritten by: Scottsdale Insurance Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive •Scottsdale, Arizona 85258
1-800-423-7675 • A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                                        President

The information contained herein replaces any similar information contained elsewhere in the policy.



**E-RISK MANAGEMENT TOOLS CENTER**

**E-RISK SERVICES
MANAGEMENT RESOURCES**






**EMPLOYERS FACE CONTINUOUSLY CHANGING D&O-RELATED LAWS AND ONGOING CHALLENGING ISSUES.** The E-Risk Services Management Resources program is here to help with these challenges and deliver thousands of dollars of risk management value to your organization. These services have helped thousands of employers protect themselves from risk, and we encourage you to take full advantage.

Unlimited, specific, documented, and confidential advice from experienced D&O attorneys

**+**

Online training courses focused on information directors and officers need to know

**+**

Online tools include best practice guidelines, checklists, news and more

**=** **THOUSANDS OF DOLLARS**

IN ANNUAL EMPLOYER VALUE

## HOW DOES THE E-RISK SERVICES MANAGEMENT RESOURCES PROGRAM WORK?

*Employers are provided valuable services:*

**+** Direct access to D&O attorneys to receive confidential, document responses to specific questions

**+** Online risk management tools including D&O-focused training modules

**+** Proactive regulatory updates based on each user's selected preferences

**+** Dedicated relationship managers that can help you take full advantage of these benefits

Insureds can experience this complimentary D&O value by registering a valid policy number and billing ZIP code. Get started today.

eriskmgmtresources.com | 877.568.6655     © Copyright 2019 Enquiron

HLPDO (1-18)     4/28/2021 - Page 1 of 1



**E-RISK MANAGEMENT TOOLS CENTER**

# E-RISK SERVICES
# MANAGEMENT RESOURCES






**EMPLOYERS FACE CONTINUOUSLY CHANGING EMPLOYMENT LAWS AND ONGOING EMPLOYEE ISSUES.**

The E-Risk Services Management Resources program is here to help with these challenges and deliver thousands of dollars of risk management value to your organization. These services have helped thousands of employers protect themselves from risk, and we encourage you to take full advantage.

Unlimited, specific, documented, and confidential advice from employment law attorneys



Online training courses, including sexual harassment prevention, available for both supervisors and employees



Online tools: a state-specific employee handbook builder, forms, posters, news, and more

## THOUSANDS OF DOLLARS
### IN ANNUAL EMPLOYER VALUE

## HOW DOES THE E-RISK SERVICES MANAGEMENT RESOURCES PROGRAM WORK?

*Employers are provided valuable services:*

**+** Direct access to employment law attorneys to receive confidential, documented responses to your organization's specific questions

**+** A state-specific employee handbook and policy building tool and online training courses

**+** Live and recorded topical webinars, many with CE credits for HR personnel

**+** Proactive regulatory updates based on each user's selected preferences

Insureds can experience this complimentary EPL value by registering a valid policy number and billing ZIP code. Get started today.

eriskmgmtresources.com | 877.568.6655                © Copyright 2019 Enquiron



## Underwritten by Scottsdale Insurance Company

**GEORGIA SURPLUS LINES NOTICE**

**NOTICE TO INSURED:**

**This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5.**

_____

**Broker Name**

_____

**Broker Initials**



## Underwritten by Scottsdale Insurance Company

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## GENERAL TERMS AND CONDITIONS

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

A. **SEVERABILITY OF GENERAL TERMS AND CONDITIONS**

These General Terms and Conditions apply to each and every Coverage Section of this **Policy**. The terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

B. **DEFINITIONS**

Whenever used in this **Policy**, the terms that appear below in **boldface** type shall have the meanings set forth in this Definitions subsection of the General Terms and Conditions. However, if a term also appears in **boldface** type in a particular Coverage Section and is defined in that Coverage Section, that definition shall apply for purposes of that particular Coverage Section. Terms that appear in **boldface** in the General Terms and Conditions but are not defined in this Definitions subsection and are defined in other Coverage Sections of the **Policy** shall have the meanings ascribed to them in those Coverage Sections.

1. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a renewal or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

2. **Company** means:

   a. the **Parent Company**; and

   b. any **Subsidiary**,

   and includes any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

3. **Discovery Period** means one of the periods described in Item 5. of the Declarations which is elected and purchased pursuant to Section H. below.

4. **Domestic Partner** means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

5. **Extended Period** means the **Discovery Period** or the **Run-Off Period,** if such provision is elected and purchased pursuant to Sections H. or I. respectively, below.

6. **Insurer** means the insurance company providing this insurance.

7. **Parent Company** means the entity first named in Item 1. of the Declarations.



8. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.

9. **Policy Period** means the period from the effective date and hour of the inception of this **Policy** to the **Policy** expiration date and hour as set forth in Item 2. of the Declarations, or its earlier cancellation date and hour, if any.

10. **Run-Off Period** means one of the periods described in Item 6. of the Declarations, which is elected and purchased pursuant to Section I. below.

11. **Subsidiary** means:

   a. any entity of which more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company**, directly or indirectly, if such entity:

      i. was so owned on or prior to the inception date of this **Policy**; or

      ii. becomes so owned after the inception date of this **Policy**; and

   b. any joint venture entity in which the **Parent Company**, or an entity described in a. above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Company** or entity described in a. above solely controls the management and operations of such joint venture entity.

12. **Takeover** means:

   a. the acquisition by any person or entity of more than fifty percent (50%) of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

   b. the merger or consolidation of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

All definitions shall apply equally to the singular and plural forms of the respective words.

C. **LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES**

1. The Limits of Liability, Retentions and Deductibles for each Coverage Section are separate Limits of Liability, Retentions and Deductibles pertaining only to the Coverage Section for which they are shown. The application of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

2. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. The largest applicable Retention or Deductible shall apply only once to such **Claim**.

D. **WARRANTY**

It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy**, the **Insureds** agree that:

1. the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

2. in the event the **Application**, including materials submitted or required to be submitted therewith ,contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall be void ab initio with respect to any **Insureds** who had knowledge of such misrepresentation or omission.



E. **CANCELLATION**

1. By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Company** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Company** may cancel this **Policy** in its entirety or any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

2. This **Policy** may be cancelled by the **Insurer** only for nonpayment of premium, by mailing written notice to the **Parent Company** stating when such cancellation shall be effective, such date to be not less than ten (10) days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

3. If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

F. **ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES**

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of natural persons who are **Insureds** shall be considered **Insureds** under this **Policy**; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the natural person who is an **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retentions and Deductibles applicable to **Loss** incurred by natural persons who are **Insureds** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

G. **AUTHORIZATION CLAUSE**

By acceptance of this **Policy**, the **Parent Company** agrees to act on behalf of all **Insureds**, and the **Insureds** agree that the **Parent Company** will act on their behalf, with respect to the giving of all notices to **Insurer**, the receiving of notices from **Insurer**, the agreement to and acceptance of endorsements, the payment of the premium and the receipt of any return premium.

H. **DISCOVERY PERIOD**

1. If this **Policy** or any Coverage Section is cancelled or is not renewed by the **Insurer**, for reasons other than non-payment of premium or if the **Parent Company** elects to cancel or not to renew this **Policy** or a Coverage Section, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item 5. of the Declarations of the total premium for this **Policy,** or the total premium for the cancelled or not renewed Coverage Section, whichever is applicable, to purchase an extension of the coverage granted by this **Policy** or the applicable cancelled or not renewed Coverage Section with respect to any **Claim** first made during the period of time set forth in Item 5. of the Declarations after the effective date of such cancellation or, in the event of a refusal to renew, after the **Policy** expiration date, but only with respect to any **Wrongful Act** committed before such date. The **Parent Company** shall have the right to elect only one of the **Discovery Periods** set forth in Item 5. of the Declarations.

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within thirty (30) days after the effective date of cancellation, or, in the event of a refusal to renew, within thirty (30) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.



3. In the event of the purchase of the **Discovery Period**, the entire premium therefore shall be deemed earned at the commencement of the **Discovery Period**.

4. The exercise of the **Discovery Period** shall not in any way increase or reinstate the limit of **Insurer's** liability under any Coverage Section.

I. **RUN-OFF COVERAGE**

In the event of a **Takeover**:

1. The **Parent Company** shall have the right, upon payment of an additional premium calculated at the percentage of the total premium for this **Policy** set forth in Item 6. of the Declarations, to an extension of the coverage granted by this **Policy** with respect to any **Claim** first made during the **Run-Off Period**, as set forth in Item 6. of the Declarations, but only with respect to any **Wrongful Act** committed before the effective date of the **Takeover** (herein defined as "Run-Off Coverage"); provided, however, such additional premium shall be reduced by the amount of the unearned premium from the date of the **Takeover** or the date of notice of the election of the Run-Off Coverage, whichever is later, through the expiration date set forth in Item 2. of the Declarations.

2. The **Parent Company** shall have the right to elect only one of the periods designated in Item 6. of the Declarations. The election must be made prior to the expiration of the **Policy Period**. The right to purchase a **Run-Off Period** shall terminate on the expiration of the **Policy Period**.

3. If a **Run-off Period** is elected and purchased:

   a. Section E. above, is deleted in its entirety and neither the **Insureds** nor the **Insurer** may cancel this **Policy** or any Coverage Section thereof;

   b. Section H. above, is deleted in its entirety; and

   c. the maximum aggregate Limit of Liability of the **Insurer** for each Coverage Section purchased and set forth on the Declarations shall be twice the otherwise applicable maximum aggregate Limit of Liability set forth in Item 3. of the Declarations for such Coverage Section; provided, however, the maximum aggregate Limit of Liability of the **Insurer** in connection with any one **Claim** shall be amount originally shown as the maximum aggregate Limit of Liability for each Coverage Section purchased and set forth on the Declaration.

J. **ALTERNATIVE DISPUTE RESOLUTION**

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this subsection.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, and insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence arbitration in accordance with this section; provided, however, that no such arbitration shall be commenced until at least sixty (60) days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item 1. of the Declarations as the principal address of the **Parent Company**. The **Parent Company** shall act on behalf of each and every **Insured** in connection with any ADR process under this section.



K. **TERRITORY**

Coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.

L. **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy**, **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require.

M. **ACTION AGAINST INSURER, ALTERATION AND ASSIGNMENT**

Except as provided in Section J. above, Alternative Dispute Resolution, no action shall lie against **Insurer** unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this **Policy**. No person or organization shall have any right under this **Policy** to join **Insurer** as a party to any action against the **Insureds** to determine their liability, nor shall **Insurer** be impleaded by the **Insureds** or their legal representative. No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

N. **ENTIRE AGREEMENT**

By acceptance of this **Policy**, the **Insureds** agree that this **Policy** embodies all agreements existing between them and **Insurer** or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of **Insurer** shall not effect a waiver or a change in any part of this **Policy** or estop **Insurer** from asserting any right under the terms of this **Policy** or otherwise, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by **Insurer** to form part of this **Policy**.



## Underwritten by Scottsdale Insurance Company

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## EMPLOYMENT PRACTICES COVERAGE SECTION

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

A. **INSURING CLAUSES**

1. **Employee** Insuring Clause

**Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for an **Employment Practices Wrongful Act** taking place prior to the end of the **Policy Period**.

2. **Third-Party** Insuring Clause

In the event **Third-Party** Coverage is affirmatively designated in Item 3. of the Declarations relating to this Coverage Section, the **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Third-Party Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period,** and reported to the **Insurer** pursuant to Section E.1. herein, for a **Third-Party Wrongful Act** taking place prior to the end of the **Policy Period**.

B. **DEFINITIONS**

1. **Claim** means any:

   a. **Employment Practices Claim**; or

   b. **Third-Party Claim**.

2. **Continuity Date** means the Continuity Date set forth in Item 3. of the Declarations relating to this Coverage Section.

3. **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company**.

4. **Employee** means any person who was, now is or shall become:

   a. a full-time or part-time employee of the **Company**, including voluntary, seasonal, and temporary employees;

   b. any individual who applies for employment with the **Company**; and

   c. any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company.**



5. **Employment Practices Claim** means:

    a. a written demand against an **Insured** for damages or other relief;

    b. a civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

    c. a civil proceeding against an **Insured** before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, commenced by the filing of a notice of charges, investigative order or similar document; or

    d. a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured,** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of an **Employee** in their capacity as such. **Employment Practices Claim** does not include a labor or grievance proceeding, which is pursuant to a collective bargaining agreement.

6. **Employment Practices Wrongful Act** means any actual or alleged:

    a. violation of any common or statutory federal, state, or local law prohibiting any kind of employment-related discrimination;

    b. harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

    c. abusive or hostile work environment;

    d. wrongful discharge or termination of employment, whether actual or constructive;

    e. breach of an actual or implied employment contract;

    f. wrongful deprivation of a career opportunity, wrongful failure or refusal to employ or promote, or wrongful demotion;

    g. employment-related defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy;

    h. wrongful failure or refusal to adopt or enforce workplace or employment practices, policies or procedures, solely as respects employment-related discrimination or harassment;

    i. wrongful discipline;

    j. employment-related wrongful infliction of emotional distress, mental anguish, or humiliation;

    k. **Retaliation**;

    l. negligent evaluation; or

    m. negligent hiring or negligent supervision of others in connection with a. through l. above, but only if employment-related and claimed by or on behalf of any **Employee** and only if committed or allegedly committed by any of the **Insureds** in their capacity as such.

7. **Insured Persons** means all persons who were, now are or shall become:

    a. a director or officer of the **Company**;

    b. any **Employee**; and

    c. the functional equivalent of a director, officer or **Employee** in the event the **Company** is incorporated or domiciled outside the United States.



8. **Insureds** means the **Company** and any **Insured Persons**.

9. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

10. **Loss** means the damages, judgments, settlements, front pay and back pay, pre-judgment or post judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds**. **Loss** does not include:

    a. taxes, fines or penalties;

    b. matters uninsurable under the laws pursuant to which this **Policy** is construed;

    c. punitive or exemplary damages, liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act or the Family Medical Leave Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law, or the multiple portion of any multiplied damage award, except to the extent that such punitive, exemplary, or liquidated damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

    d. the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

    e. amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

    f. disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing benefit payments;

    g. the costs to modify or adapt any building or property to be accessible or accommodating, or to be more accessible or accommodating, to any disabled person;

    h. the cost of creating or reinstating employment;

    i. any amount owed as wages to any **Employee**, other than front pay or back pay; or

    j. any amount for which the **Insured** is not financially liable or legally obligated to pay.

11. **Retaliation** means any actual or alleged response of any of the **Insureds** to:

    a. the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by any of the **Insureds** where such act is alleged to be a violation of any federal, state local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder;

    b. the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

    c. the filing of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistleblower" provision of any law; or

    d. any legally-protected **Employee** work stoppage or slowdown.

12. **Third-Party** means any natural person who is a customer, vendor, service provider, client, or other business invitee of the **Company**; provided, however, **Third-Party** shall not include any **Employee**.

13. **Third-Party Claim** means:

    a. any written demand for damages or other relief against an **Insured**;



    b. a civil judicial, administrative or arbitration proceeding against an **Insured** seeking damages or other relief, including any appeal therefrom; or

    c. a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured,** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of a **Third-Party** in their capacity as such.

14. **Third-Party Wrongful Act** means any actual or alleged:

    a. harassment of a **Third-Party**, including but not limited to any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment; or

    b. discrimination against a **Third-Party**, including but not limited to any such discrimination on account of race, color, religion, age, disability or national origin.

15. **Wrongful Act** means:

    a. **Employment Practices Wrongful Act**; or

    b. **Third-Party Wrongful Act.**

## C. EXCLUSIONS

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

1. for actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured; provided, however, this exclusion shall not apply to mental anguish, emotional distress or humiliation;

2. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. any **Wrongful Act**, fact circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

    b. any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**;

3. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

    b. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

including without limitation any such **Claim** by or on behalf of the **Company**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion. Provided, however, this exclusion shall not apply to that part of any **Claim** under this Coverage Section where such **Claim** is for **Retaliation**.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste,



asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

4. for any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law; provided, however, this exclusion does not apply to any such **Claim** alleging violations of the Equal Pay Act or **Retaliation**;

5. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any dishonest, deliberately fraudulent or criminal act; provided however this exclusion shall not apply unless and until there is a final judgment against such **Insured** as to such conduct. If such excluded conduct is established through a final judgment, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges and Expenses**;

6. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

7. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including without limitation any investigation by the United States Department of Labor or the United States Equal Employment Opportunity Commission, filed or pending on or before the **Continuity Date**; or

    b. any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including any investigation by the United States Department of Labor or the United States Equal Employment Opportunity Commission;

8. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act**, fact, circumstance, or situation which any of the **Insured Persons** who were, now are, or shall be directors, officers, managers or supervisory employees, had knowledge of prior to the **Continuity Date** where such **Insured Persons** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

9. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged responsibility, obligation or duty of any **Insured** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or pension benefits or similar law; provided, however, this exclusion shall not apply to any such **Claim** alleging **Retaliation**; or

10. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

### D. LIMIT OF LIABILITY AND RETENTIONS

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retention shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item 3.1. of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

    a. The amount set forth in Item 3.1.a. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss**, subject to additional payments for **Costs, Charges and Expenses** as further described in subsection b. immediately below.



b. The amount set forth in Item 3.1.b. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Costs, Charges and Expenses** in addition to the limit described in subsection a. immediately above; provided, all payments for **Costs, Charges and Expenses** under the additional limits described in this subsection b. shall be excess of the limit described in subsection a. above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b.

c. The amount set forth in Item 3.1.c. of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability under this Coverage Section and the Limit of Liability set forth in 3.1.a. and 3.1.b. relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item 3.1.c. for this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim,** and such **Claim** shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

   a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

   b. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2. below.

4. Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limit(s) of Liability, and payment of **Costs, Charges and Expenses** reduce the Limit(s) of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

E. **NOTIFICATION**

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give to **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the **Insureds**, or the expiration of the **Policy Period**, whichever is later. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the **Insureds**, or the end of the **Extended Period**, whichever is later.

2. If, during the **Policy Period** or the **Discovery Period**, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a. a description of the **Wrongful Act** allegations anticipated;

   b. the identity of the potential claimants;

   c. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

   d. the identity of the **Insureds** allegedly involved;

   e. the consequences which have resulted or may result; and

   f. the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3. Notice to **Insurer** shall be given to the address specified in Item 8. of the Declarations for this **Policy**.



F. **SETTLEMENT AND DEFENSE**

1. It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

2. The **Insurer** may make any investigation it deems necessary and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3. Notwithstanding subsection 1. above, in the event that any **Claim** is brought as a class action, and all or any part of such **Claim** involves any actual or alleged violation of the Fair Labor Standards Act of 1938, as amended, or any similar state law, regulation or code, then it shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any such **Claim**.

4. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

5. If the **Insurer** does not have the duty to defend a **Claim**, then the **Insurer** shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

6. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

7. If the Insurer does not have the duty to defend a **Claim** , the **Insurer** shall, on a quarterly basis, advance on behalf of the **Insureds** covered **Costs, Charges and Expenses**, which the **Insureds** have incurred in connection with **Claims** made against them, prior to disposition of such **Claims**. Any advancement of **Costs, Charges and Expenses** shall be subject to the condition that such advanced amounts shall be repaid to the **Insurer** by the **Insureds** severally according to their respective interests if and to the extent the **Insureds** shall not be entitled to coverage for such **Costs, Charges and Expenses** under the terms and conditions of this **Policy**.

G. **OTHER INSURANCE**

1. For any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance; provided that with respect to that portion of an **Employment Practice Claim** made against any leased, temporary or independently contracted **Employee**, **Loss**, including **Costs, Charges and Expenses**, payable on behalf of such **Employee** under this Coverage Section will be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such insurance is specifically stated to be in excess over the Limit of Liability of this Coverage Section.

2. For any **Third-Party Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such other insurance is specifically stated to be excess over the Limit of Liability of this Coverage Section.

H. **ALLOCATION**

If the **Insurer** does not have the duty to defend a **Claim**, then the following subsections shall apply to such **Claim.**

1. If, in any **Claim** covered in whole or in part under this Coverage Section, the **Insureds** who are afforded coverage for such **Claim** incur **Loss** jointly with others, or incur an amount consisting of both **Loss** covered by this **Policy** and loss not covered by this **Policy** because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the **Insurer** shall allocate such amount between covered



**Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained by the parties to covered and uncovered matters.

2. If there can be an agreement between **Insureds** and the **Insurer** on an allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis covered **Costs, Charges and Expenses**. If there can be no agreement on allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis **Costs, Charges and Expenses** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated or arbitrated.

3. Any negotiated or arbitrated allocation of **Costs, Charges and Expenses** on account of a **Claim** shall be applied retroactively to all **Costs, Charges and Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Costs, Charges and Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim** or any other **Claim**.



## Underwritten by Scottsdale Insurance Company

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

### A. INSURING CLAUSES

1. The **Insurer** shall pay the **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

2. The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

3. The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim** first made against the **Company** during the **Policy Period** or, if applicable, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

### B. DEFINITIONS

1. **Claim** means:

   a. a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

   b. a written demand by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**;

   c. a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

   d. a criminal proceeding against any **Insured** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   e. an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief; or

   f. a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document.

2. **Continuity Date** means the date set forth in Item 3. of the Declarations relating to this Coverage Section.

3. **Costs, Charges and Expenses** means:

   a. reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such



judgment that is up to the applicable Limit of Liability; and

    b. reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company,** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**.

**Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company.**

4. **Directors and Officers** means any person who was, now is, or shall become:

    a. a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**;

    b. a person who was, is or shall become a full-time or part-time employee of the **Company**; and

    c. the functional equivalent of directors or officers of a **Company** incorporated or domiciled outside the United States of America.

5. **Insured** means the **Company** and the **Directors and Officers**.

6. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

7. **Loss** means damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Directors and Officers** under Insuring Clauses 1. or 2. or the **Company** under Insuring Clause 3. **Loss** does not include:

    a. taxes, fines or penalties;

    b. matters uninsurable under the laws pursuant to which this **Policy** is construed;

    c. punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

    d. the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

    e. any amount for which the **Insured** is not financially liable or legally obligated to pay;

    f. the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; or

    g. any amounts owed or paid to one or more securities holders of the **Company** under any written or express contract or agreement.

8. **Outside Entity** means:

    a. any non-profit company which is exempt from taxation under the Internal Revenue Code, as amended, in which any of the **Directors and Officers** is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

    b. any other company specifically identified by endorsement to this **Policy**.

9. **Wrongful Act** means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

    a. any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity;



b. any of the **Directors and Officers**, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

c. the **Company**, but only with respect to Insuring Clause 3. of this Coverage Section.

C. **EXCLUSIONS**

1. Exclusions Applicable to All Insuring Clauses

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

a. for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   i. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

   ii. any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

c. Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

   ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

d. for any actual or alleged violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

e. brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, any **Outside Entity** or any person or entity that is an owner of or joint venture participant in any **Subsidiary** in any respect and whether or not collusive, unless such **Claim**:

   i. is brought derivatively by a securities holder of the **Parent Company** and is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation of, or intervention of, any **Insured**;



ii. is brought or maintained by any **Insured** in the form of a cross-claim, third-party claim or other proceeding for contribution or indemnity which is part of, and directly results from a **Claim** that is covered by this Coverage Section;

iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**;

iv. is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**; or

v. is brought or maintained by any bankruptcy trustee or bankruptcy appointed representative of the **Company**;

f. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f.i. shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

ii. the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled; provided, however this exclusion f.ii. shall not apply unless and until there is a final judgment against such **Directors and Officers** as to such conduct.

When f.i. or ii. apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges or Expenses**;

g. for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company** or **Outside Entity**, which payment without such previous approval shall be held to be in violation of law;

h. against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Directors and Officers** thereof:

i. before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

ii. occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**;

i. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

j. for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**; provided, however, that this exclusion shall not apply to **Loss** resulting from any such **Claim** to the extent that:

i. such **Claim** is based on the service of any of the **Directors and Officers** as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

ii. such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**; and



      iii. such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

  k. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

      i. any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

      ii. any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

  l. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

  m. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters brought by or on behalf of or on the right of an applicant for employment with the **Company,** or any of the **Directors and Officers**, including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Company**;

  n. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

      i. any initial public offering of securities undertaken and consummated by the **Company**, including all activities in connection therewith;

      ii. the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto in connection with any **Wrongful Act** actually or allegedly committed subsequent to the consummation of an initial public offering of securities of the **Company**; or

      iii. any equity or debt offering, solicitation, sale, distribution or issuance of securities of the **Company** in excess of $50 million where such issuance takes place during the **Policy Period** and is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3.b. of the Securities Act of 1933 and rules and regulations promulgated thereunder, or any activities or transactions dealing in any way with such issuance of securities of the **Company**; provided, however, this exclusion shall not apply if the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in connection with such issuance of securities and the **Insureds** have paid the premium required by the **Insurer** for such coverage extension; or

  o. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

2. Exclusions Applicable Only to Insuring Clause A.3.

    **Insurer** shall not be liable for **Loss** on account of any **Claim**:

  a. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the **Company** would have been liable in the absence of such contract or agreement; or

  b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

      i. any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trademarks, trade secrets, title or other proprietary or licensing rights or



intellectual property of any products, technologies or services; or

    ii. any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Company**.

Provided, however, the exclusions in 2.a. and 2.b. above shall not apply to any such **Claim** brought or maintained, directly or indirectly, by one or more securities holders of the **Company** in their capacity as such.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

## D. LIMIT OF LIABILITY AND RETENTIONS

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amounts applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retentions shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item 3. of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

    a. The amount set forth in Item 3.1.a. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section, subject to additional payments for **Loss** under Insuring Clause A.1. as further described in subsection b. immediately below.

    b. The amount set forth in Item 3.1.b. relating to this Coverage Section shall be an aggregate limit of liability for the payment of **Loss** under Insuring Clause A.1. in addition to the limit described in subsection a. immediately above; provided, all payments for **Loss** under the additional limits described in this subsection b. shall be excess of the limit described in subsection a. above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b.

    c. The amount set forth in Item 3.1.c. of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section. The Limit of Liability set forth in Items 3.1.a. and 3.1.b. relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item 3.1.c. for this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

    a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

    b. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2. below.

4. The Retention applicable to Insuring Clause 2. shall apply to **Loss** resulting from any **Claim** if indemnification for the **Claim** by the **Company** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Company** is made, except and to the extent such indemnification is not made by the **Company** solely by reason of the **Company's** financial insolvency.

5. Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limits of Liability and payment of **Costs, Charges and Expenses** reduce the Limits of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and



extinguished.

E. **NOTIFICATION**

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period.** If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period.**

2. If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy,** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a. a description of the **Wrongful Act** allegations anticipated;

   b. the identity of the potential claimants;

   c. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

   d. the identity of the **Insureds** allegedly involved;

   e. the consequences which have resulted or may result; and

   f. the nature of the potential monetary damages and non-monetary relief;

   then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3. Notice to **Insurer** shall be given to the address shown under Item 8. of the Declarations for this **Policy**.

F. **SETTLEMENT AND DEFENSE**

1. It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

2. The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim,** the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

G. **OTHER INSURANCE**

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.



H. **PAYMENT PRIORITY**

1. If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then remaining Limit of Liability applicable to the **Loss**, the **Insurer** shall pay the **Loss,** subject to such Limit of Liability, in the following priority:

    a. First, the **Insurer** shall pay any **Loss** covered under Insuring Clause A.1. in excess of any applicable Retention shown in Item 3. of the Declarations; and

    b. Second, only if and to the extent the payment under subsection 1. above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item 3. of the Declarations covered under any other applicable Insuring Clause.

    c. Subject to the foregoing subsection, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Parent Company**, delay any payment of **Loss** otherwise due and owing to or on behalf of the **Company** until such time as the Chief Executive Officer of the **Parent Company** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.



## Underwritten by Scottsdale Insurance Company

A Stock Insurance Company, herein called the **Insurer**

## BUSINESS AND MANAGEMENT INDEMNITY POLICY

## FIDUCIARY COVERAGE SECTION

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

A. **INSURING CLAUSE**

**Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

B. **DEFINITIONS**

1. **Administration** means:

   a. counseling employees, beneficiaries or **Plan** participants with respect to any **Plan**;

   b. providing interpretations with respect to any **Plan**;

   c. handling records in connection with any **Plan**; or

   d. enrolling, terminating, or canceling employees under any **Plan.**

2. **Claim** means:

   a. a written demand for damages or other relief against an **Insured**;

   b. a civil, administrative, regulatory or arbitration proceeding against any **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom; or

   c. a civil proceeding or formal investigation brought by the United States Department of Labor, the United States Pension Benefit Guaranty Corporation or any similar federal, state or local governmental body, including any appeal therefrom.

3. **Continuity Date** means the date set forth in Item 3. of the Declarations relating to this Coverage Section.

4. **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, overhead or benefit expenses associated with officers or employees of any of the **Insureds**.

5. **Employee Benefit Plan** means any plan so defined by the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, or any rules and regulations promulgated thereunder.

6. **Insured Persons** means:

   a. any natural persons who were, now are, or shall become a trustee, director, officer or employee of the **Sponsor Company** or **Plan**;



b. any natural persons who were, now are, or shall become a fiduciary of any **Plan**; and

c. any natural persons for whose **Wrongful Acts** any of the **Insureds** are legally responsible.

7. **Insured Plan** means any government-mandated insurance for workers' compensation, unemployment, social security or disability benefits for employees of the **Sponsor Company.**

8. **Insureds** means:

a. the **Sponsor Company**,

b. any **Plan**,

c. any **Insured Persons**; and

d. any other natural person or entity who was, now are, or shall be acting as a plan administrator of any of the **Plans** at the written request and consent of the **Sponsor Company**.

9. **Interrelated Wrongful Acts** means all **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, cause, transaction or series of facts, circumstances, situations, causes, events or transactions.

10. **Loss** means monetary damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds. Loss** does not include:

a. taxes, fines or penalties;

b. matters uninsurable under the laws pursuant to which this **Policy** is construed; or

c. punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

11. **Pension Benefit Plan** means any plan so defined in the Employee Retirement Income Security Act of 1974, as amended.

12. **Plan** means:

a. any **Sponsored Plan**, and

b. any **Insured Plan**,

established before or after the inception of this **Policy**.

13. **Plan Termination** means the termination, suspension, merger or dissolution of any **Plan**.

14. **Sponsor Company** means the **Company**.

15. **Sponsored Plan** means:

a. any **Employee Benefit Plan**, **Pension Benefit Plan**, or **Welfare Benefit Plan** which is operated by the **Sponsor Company** for the benefit of the employees of the **Sponsor Company**;

b. any other plan, fund or program specifically included as a **Sponsored Plan** by endorsement to this **Policy**; and

c. any other employee benefit plan or program not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder, sponsored by the **Sponsor Company** for the benefit of the employees of the **Sponsor Company**, including any employee stock ownership plan;



provided, however, that the **Sponsored Plan** shall not include any multi-employer plan, as defined in the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder.

16. **Welfare Benefit Plan** means any employee welfare benefit plan so defined in the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder.

17. **Wrongful Act** means:

    a. with respect to a **Sponsored Plan**:

        i. any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of the **Sponsored Plan** by the Employee Retirement Income Security Act of 1974, as amended, or by the Health Insurance Portability and Accountability Act of 1996, or any similar state or local common or statutory law, and any rules and regulations promulgated under either of these Acts;

        ii. any other matter claimed against the **Sponsor Company** or any of the **Insured Persons** solely because of the service of the **Sponsor Company** or any of the **Insured Persons** as a fiduciary of any **Sponsored Plan**, including any actual or alleged violation of the Health Insurance Portability and Accountability Act of 1996 or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder; or

        iii. any actual or alleged act, error or omission in the **Administration** of any **Sponsored Plan**, including any actual or alleged violation of the Health Insurance Portability and Accountability Act of 1996 or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder; and

    b. with respect to an **Insured Plan**, any actual or alleged act, error or omission in the **Administration** of such **Insured Plan**.

## C. EXCLUSIONS

1. **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

    a. for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

    b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

        ii. any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

    c. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

        ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

including without limitation any **Claim** by or on behalf of the **Company**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United



States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

d. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, the failure to comply with any statutory or common law governing workers' compensation, unemployment, social security or disability benefits or any similar law; provided, however, this exclusion shall not apply to any actual or alleged obligation of any **Insured** pursuant to the:

    i. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

    ii. Health Insurance Portability and Accountability Act of 1996, as amended;

e. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i. any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion e.i. shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

    ii. the gaining of any profit, remuneration or financial advantage to which any **Insured Person** was not legally entitled; provided, however this exclusion e.ii. shall not apply unless and until there is a final judgment against such **Insured Person** as to such conduct;

When e.i. or ii. apply, the **Insured** shall reimburse the Insurer for any **Costs, Charges or Expenses**;

f. against any **Subsidiary** or any of the **Insured Persons** of a **Subsidiary** alleging**,** based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or any of the **Insured Persons** of a **Subsidiary:**

    i. before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

    ii. occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary,** would constitute **Interrelated Wrongful Acts**;

g. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

h. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i. any prior or pending litigation, arbitration, or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before of the **Continuity Date**; or

    ii. any fact, circumstance, situation, transaction, cause or event underlying or alleged in such litigation, arbitration, administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

i. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Plan Termination**; provided, however, that this exclusion shall only apply to those **Plans** which were the subjects of the **Plan Termination**;



j. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters; provided, however, this exclusion shall not apply to any **Claim** where such employment or employment-related matters involve actual or alleged violations of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder;

k. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**; or

l. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

2. **Insurer** shall not be liable to make any payment under this Coverage Section, other than **Costs, Charges and Expenses**, on account of any **Claim**:

a. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except to the extent that liability would have attached to the **Sponsor Company** in the absence of such contract or agreement, or where the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which any of the **Plans** was established;

b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or attempted reversion or payment of assets of any of the **Plans** to the **Sponsor Company**, or to any successor or assign of the **Sponsor Company**;

c. for or which seeks or constitutes fines or penalties or the multiple portion of any multiplied damage award, other than the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed upon any of the **Insureds** as a fiduciary under Section 502 i. or l. , respectively, of the Employee Retirement Income Security Act of 1974, as amended;

d. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, the failure to collect from the **Sponsor Company** contributions owed to any of the **Plans**, or the failure to fund a **Plan** in accordance with the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder, unless the failure is solely due to the negligence of any of the **Insureds**; or

e. which constitutes benefits due to or to become due under the terms of any **Plan** if such **Plan** complied with all applicable law, unless and to the extent that:

i. the **Insured** is a natural person and the benefits are payable by such **Insured** as a personal obligation; and

ii. recovery for the benefits is based upon a covered **Wrongful Act**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D. **LIMIT OF LIABILITY AND RETENTION**

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retention shall be borne uninsured by the **Insureds** and at their own risk.

2. The amount shown in Item 3. of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of **Insurer** under this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:



      a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

      b. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to subsection E.2. below.

   4. Payments of **Loss**, other than **Costs, Charges and Expenses**, by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are not part of, and are in addition to, the Limit(s) of Liability and payment of **Costs, Charges and Expenses** shall not reduce the Limit(s) of Liability. If such Limit(s) of Liability are exhausted**,** the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

E. **NOTIFICATION**

   1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period.** If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period.**

   2. If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy,** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

      a. a description of the **Wrongful Act** allegations anticipated;

      b. the identity of the potential claimants;

      c. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

      d. the identity of the **Insureds** allegedly involved;

      e. the consequences which have resulted or may result; and

      f. the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim.**

   3. Notice to **Insurer** shall be given to the address shown under Item 8. of the Declarations for this **Policy**.

F. **SETTLEMENT AND DEFENSE**

   1. It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted**.**

   2. The **Insurer** may make any investigation it deems necessary and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

   3. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

   4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim,** the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.



G. **OTHER INSURANCE**

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

H. **WAIVER OF RECOURSE**

**Insurer** shall have no right of recourse, including but not limited to rights of contribution and subrogation, against any **Insureds** with respect to any **Claim** if this Coverage Section has been purchased by that **Insured,** with the exception of any of the **Plans**.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 1 |
|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**502(C) AND 507 CIVIL MONEY PENALTIES EXTENSION**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

It is agreed that the Fiduciary Coverage Section is amended as follows

1. Section B., **DEFINITIONS**, subsection 10.a. is deleted and replaced by the following:

   a. taxes, fines or penalties, other than civil money penalties imposed upon **Insureds** as a fiduciary pursuant to Section 502(c) of the Employee Retirement Income Security Act of 1974, including any amendments thereto pursuant to the Pension Protection Act of 2006, Title V. Section 507;

2. Section D., **LIMIT OF LIABILITY AND RETENTION**, subsection 2. is amended to include the following:

   ▪ The amount set forth in Item 3.1. relating to this coverage section shall be amended to include the below listed sub-limit amounts. Such sub-limit amounts shall be a part of and not in addition to the limit of liability set forth in Item 3.1.of the Declarations.

     $250,000 sub-limit aggregate for all 502(c) and Section 507 **Claims**.

3. No Retention shall apply to 502(c) and Section 507 **Claims**.

All other terms and conditions of this **Policy** remain unchanged.



| | ENDORSEMENT NO. 2 |
|---|---|
| Underwritten by Scottsdale Insurance Company | |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ABSOLUTE CONTRACT EXCLUSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions applicable to All Insuring Clauses:

> **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any oral, written, express or implied contract or agreement.

Under Section **C. EXCLUSIONS**, paragraph **2.a.** is deleted in its entirety.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 3 | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ADDITIONAL PARENT COMPANY

The following **Parent Company** is added to Item 1. of the Declarations:

Advevo, LLC
USA Benefits & Administrators, LLC
Tactic Edge Solutions, LLC
Ensurian Agency, LLC

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 4 | |
|---|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ALLOCATION PROVISION

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

The following Section O., **ALLOCATION**, is added to the General Terms and Conditions Section.

### O. ALLOCATION

1. In the event the **Insurer** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then:

   a. this **Policy** shall pay one hundred percent (100%) of **Costs, Charges and Expenses** incurred by such **Insured** on account of such **Claim**; and

   b. there shall be a fair and equitable allocation of any remaining loss incurred by such **Insured** on account of such **Claim** between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained.

2. In the event the **Insured** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then the **Insured** and the **Insurer** shall use their best efforts to determine a fair and proper allocation as between such insured and uninsured loss, taking into account the relative legal and financial exposures and the relative benefits obtained.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 5 |
|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND DEFINITION OF EMPLOYEE TO INCLUDE INTERNS

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

Section B., **DEFINITIONS**, subsection 4. is replaced by:

4. **Employees** means any person who was, now is or shall become:

    a. a full-time or part-time employee of the **Company**, including interns, voluntary, seasonal and temporary employees,

    b. any individual who applies for employment with the **Company**, and

    c. any natural person who is a leased employee or is contracted to perform work for the **Company**, or are independent contractors for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**,

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 6 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DEFINITION OF INSURED PERSONS**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Under Section **B. DEFINITIONS**, paragraph 7.a. **(Insured Persons)** is replaced by:

a. a director, officer, member of the management board, or management committee member of the **Company**;

All other terms and conditions of this **Policy** remain unchanged.



| | | | |
|---|---|---|---|
| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 7 | |
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DEFINITION OF WRONGFUL ACT**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

It is agreed that Section B., **DEFINITIONS**, Subsection 6., is amended by adding the following:

- Wrongful failure to grant tenure;

- Failure to provide adequate training;

- Defamatory statements in conjunction with an employee reference;

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 8 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND DISCOVERY ELECTION-90 DAYS

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section H., **DISCOVERY PERIOD**, subsection 2., is replaced by:

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within ninety (90) days after the effective date of cancellation, or, in the event of a refusal to renew, within ninety (90) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 9 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE OF CIRCUMSTANCES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section **E. NOTIFICATION**, subsection **2.** is replaced by:

2. If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a. a description of the facts, circumstances, or allegations anticipated;

    b. the identity of potential claimants;

    c. the circumstances by which the **Insureds** first became aware of the facts or circumstances;

    d. the identity of the **Insureds** allegedly involved;

    e. the consequences which have resulted or may result; and

    f. the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notices was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

**All other terms and conditions of this Policy remain unchanged.**

EKS-6 (04/08)                                    4/28/2021 - Page 1 of 1



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 10 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND NOTICE OF CIRCUMSTANCES

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

Section **E. NOTIFICATION**, subsection **2.** is replaced by:

2. If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a. a description of the facts, circumstances, or allegations anticipated;

    b. the identity of the potential claimants;

    c. the circumstances by which the **Insureds** first became aware of the facts or circumstances;

    d. the identity of the **Insureds** allegedly involved;

    e. the consequences which have resulted or may result; and

    f. the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

**All other terms and conditions of this Policy remain unchanged.**

EKS-7 (04/08)                    4/28/2021 - Page 1 of 1



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 11 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE PROVISION - D&O**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section E. **NOTIFICATION**, subsection 1.:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 12 |
| --- | --- | --- |
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE PROVISION - EPL**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

The following is added to Section E. **NOTIFICATION**, subsection 1.:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 13 | | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND NOTICE PROVISION 60 DAYS - EPL

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

Section E., **NOTIFICATION**, subsection 1. is replaced by:

The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period**. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 14 |
| --- | --- |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| --- | --- | --- | --- |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND OTHER INSURANCE - EPL

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

Section G., **OTHER INSURANCE**, subsection 1. is replaced by the following:

1. For any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 15 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND OTHER INSURANCE TO BE PRIMARY - D&O**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section G., **OTHER INSURANCE**, is replaced by:

G. **OTHER INSURANCE**

For any **Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance, unless expressly written to be excess over other applicable insurance.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 16 |
|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc |

| AGENT NO. |
|---|
| 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND OTHER INSURANCE TO BE PRIMARY - FIDUCIARY**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

Section G., **OTHER INSURANCE**, is replaced by:

G. **OTHER INSURANCE**

For any **Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance, unless expressly written to be excess over other applicable insurance.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 17 | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND OUTSIDE SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section C., **EXCLUSIONS**, subsection 1., paragraph j., subparagraph ii. is replaced by:

ii. such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**, or is unable to indemnify such **Directors and Officers** as a result of **Financial Impairment**; and

For the purposes of this endorsement **Financial Impairment** means the status of the **Outside Entity** resulting from (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Outside Entity**, or (2) in the event a bankruptcy proceeding shall be instituted by or against the **Outside Entity**, the **Outside Entity** becoming a debtor-in-possession.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 18 |
| --- | --- | --- | --- |
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND POLLUTION EXCLUSION - SIDE A

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

It is agreed that Section C., **EXCLUSIONS**, subsection 1.c., is deleted in its entirety and replaced by the following:

c. Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

    ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to:

- **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company**; or

- any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 19 | | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND SUBROGATION PROVISION - FINAL JUDGMENT

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section L., **ASSISTANCE, COOPERATION AND SUBROGATION**, is deleted in its entirety and replaced by the following:

### L. ASSISTANCE, COOPERATION AND SUBROGATION

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy, Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require. In no event, however, shall the **Insurer** exercise its right of subrogation against an **Insured** under this **Policy** unless such **Insured** has been convicted of a deliberate criminal act; or has committed a deliberate fraudulent act, if a final judgment establishes that such deliberate fraudulent act was committed; or has obtained any profit or advantage to which a final judgment establishes the **Insured** was not legally entitled.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 20 |
|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND THIRD PARTY**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

Section **B. DEFINITIONS**, subsection **12**, is replaced by:

12. **Third Party** means any customer, client, or other group or natural person other than an **Employee** or applicant for employment with the **Company**.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 21 |
|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND WARRANTY PROVISION NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

Section D., **WARRANTY**, subsection 2. is replaced by:

2. In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:

    a. any **Insured** who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**;

    b. any **Company** or **Sponsor Company** to the extent it indemnifies any **Insured** referred to in subsection a. above; and

    c. any **Company**, **Sponsor Company**, **Plan**, **Employee Benefit Plan**, or any other entity that is an **Insured**, if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the **Parent Company** knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**.

With respect to any statement, representation or information contained in the **Application**, or in the materials submitted or required to be submitted therewith, and solely with respect to the above exclusion, no knowledge possessed by any **Insured** who is a natural person shall be imputed to any other **Insured** who is a natural person.

The following condition is added:

### NON-RESCINDABLE

The **Insurer** shall not be entitled under any circumstances to rescind any Coverage Section of the **Policy** with respect to any **Insured**. Nothing contained in this section shall limit or waive any other rights or remedies available to the **Insurer**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 22 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED DEFINITION OF DIRECTORS & OFFICERS - LEASED / CONTRACTED EMPLOYEES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**.

**All other terms and conditions of this Policy remain unchanged.**

EKS-202 (04/08)                    4/28/2021 - Page 1 of 1



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 23 | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDED INSURED VERSUS INSURED EXCLUSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

Section C., **EXCLUSIONS**, subsection 1., paragraph e., subparagraph iii. is replaced by:

iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**, including any such **Claim** brought or maintained under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistle-blower" provision of any law.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 24 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED INSURED VERSUS INSURED EXCLUSION - FOREIGN JURISDICTION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1. is amended by adding the following to paragraph e.:

is brought or maintained in a jurisdiction outside the United States of America, Canada or Australia by any **Insured** of the **Company** solely where such **Company** is domiciled or chartered in such foreign jurisdiction;

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 25 |
| --- | --- |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| --- | --- | --- | --- |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED LIMIT OF LIABILITY AND RETENTIONS**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section B., **DEFINITIONS**, is amended to include the following:

- **Financial Impairment Situation** means the financial condition, viability and resources of the **Company** or an **Outside Entity** as the result of or in connection with:

   a. the **Company** or **Outside Entity** becoming a debtor-in-possession;

   b. the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Company** or **Outside Entity**; or

   c. the filing of a bankruptcy petition by or against the **Company** or **Outside Entity** under the bankruptcy laws of the United States of America or any equivalent event outside of the United States of America.

Section D., **LIMIT OF LIABILITY AND RETENTIONS**, subsection 4. is deleted in its entirety and replaced with the following:

4. Insuring Clause A.2. and the applicable retention thereto shall apply to **Loss** resulting from any **Claim** if indemnification by the **Company** for such **Claim** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Company** is made, except and to the extent such indemnification is not made by the **Company** solely by reason of a **Financial Impairment Situation**.

All other terms and conditions of this **Policy** remain unchanged



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 26 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**BANKRUPTCY INSOLVENCY EXCLUSIONS**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the bankruptcy or insolvency of the **Company**, including but not limited to:

   i. any such claim brought by any creditors, banks, lending institutions or bankruptcy trustee; or

   ii. any securities holder, direct or derivative suits and/or representative class action suits.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 27 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

It is agreed that the Limit(s) of Liability section is amended by adding the following:

- Notwithstanding anything in this policy to the contrary, if aggregate **Insured** losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met its deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

- **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

  1. The act resulted in **Insured** losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

  2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions of this policy remain unchanged



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 28 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### COST OF INVESTIGATIONS COVERAGE

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

It is agreed that:

The following is added to Section B., **DEFINITIONS**:

**Cost of Investigation** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company**, to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company**.

Section B., **DEFINITIONS**, subsection 1., paragraph b. is deleted in its entirety and is replaced by:

b. a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company**, to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company**;

Section B., **DEFINITIONS**, subsection 3., paragraph b. is deleted in its entirety and is replaced by:

b. **Cost of Investigation**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 29 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**CREDITOR EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** brought, or maintained by, on behalf of, in the right of, at the direction of, at the behest of, or for the benefit of any:

    i. person;

    ii. partnership or any of its partners, directors, officers, or employees; or

    iii. corporation, or any of its directors, officers or employees

who is a secured or unsecured creditor of the **Company**.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 30 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**DELETE PARAGRAPH III. FROM EXCLUSION N.**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section C., **EXCLUSIONS**, subsection 1., paragraph n. iii. is deleted in its entirety.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 31 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EMPLOYED LAWYERS EXTENSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B.4.:

**Employed Lawyers** of the **Company**

The following definition is added to Section **B.**:

**Employed Lawyers** means:

employees of the **Company** who:

1. are admitted to practice law in one or more jurisdictions in the United States of America; and

2. are employed within the **Company's** office of the general counsel or its functional equivalent; and

3. acting solely in the capacity of providing professional legal services to the **Company**.

An individual shall not be deemed to be an **Employed Lawyer** to the extent such individual renders or rendered professional legal services to persons or entities other than the **Insureds**.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 32 | | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EMPLOYEE PRIVACY COVERAGE WITH SUB-LIMIT**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

It is agreed that the Employment Practices Coverage Section is amended as follows:

1. Section A., **INSURING CLAUSES**, is amended by adding the following:

    **Employee Privacy** Insuring Clause

    **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Employee Privacy Claim** first made against the **Insureds** during the **Policy Period** and reported to the **Insurer** pursuant to subsection E.1. herein, for a **Privacy Wrongful Act** taking place prior to the end of the **Policy Period**.

    **Cost of Employee Notification** Insuring Clause

    **Insurer** shall pay the **Cost of Employee Notification** of the **Insureds** resulting from an **Employee Personal Information Breach** first discovered during the **Policy Period** and reported to the **Insurer** pursuant to subsection E.4. added below.

2. Section B., **DEFINITIONS**, subsection 1. is amended by adding the following:

    **Employee Privacy Claim**

3. Section B., **DEFINITIONS**, subsection 10. is amended by adding the following:

    ○ **Loss** also includes **Cost of Employee Notification**

4. Section B., **DEFINITIONS**, subsection 15. is amended by adding the following:

    **Privacy Wrongful Act**.

5. Section B., **DEFINITIONS**, is amended by adding the following:

    **Cost of Employee Notification** means:

    a. any reasonable and necessary cost or expense of the **Company** to notify any **Employee** of any **Employee Personal Information Breach** as required under any **Privacy Act**; and



b. the cost to notify and monitor the credit reports of any **Employee** who has been the subject of an **Employee Personal Information Breach** for the length of time as set forth under any **Privacy Act**.

**Employee Personal Information** means any personal information not available to the general public of any **Employee** where such non-public personal information can be used to identify such natural person and where such non-public information is solely in the custody, care or control of the **Company** or another entity at the direction and consent of the **Company**. Such **Personal Information** shall include, but not be limited to a natural person's name, address, telephone number, date of birth, social security number, account number, history of account transactions, account balance, account relationships, credit card number, medical records, medical history and any other non-public personal information as set forth in any **Privacy Act**.

**Employee Personal Information Breach** means:

a. the unauthorized acquisition, access, use, physical taking, identity theft, mysterious disappearance, release, distribution or disclosure of **Employee Personal Information** which compromises the security or privacy of such **Employee Personal Information**, including, but not limited to:

   i. the unauthorized and fraudulent taking of **Employee Personal Information** by reason of a breach or failure of any hardware, software, or firmware the **Company** owns, leases or controls on premises or elsewhere or the similar technology of another entity that controls, maintains or stores **Employee Personal Information** at the direction and consent of the **Company**; or

   ii. the actual unauthorized taking of physical **Employee Personal Information** by any person, employee or entity.

**Employee Privacy Claim** means:

a. a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

b. a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

c. an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief;

d. a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document; or

e. a written request to toll or waive any statute of limitations

brought by or on behalf of an **Employee** in their capacity as such and solely alleging a **Privacy Wrongful Act**.

**Privacy Act** means any federal, state or local statutory or common law relating solely to **Employee Personal Information** or any rules or regulations promulgated thereunder, including, but not limited to The Financial Modernization Act of 1999 ("Gramm-Leach-Bliley Act"), the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and Section 1798 of the California Civil Code.



**Privacy Policy** means the internal or publicly accessible written documents that set forth the policies, standards and procedures of the **Company** for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to, **Employee Personal Information**.

**Privacy Wrongful Act** means:

    a. the failure of the **Company** to timely disclose an incident or event triggering a violation of a **Privacy Act**; or

    b. failure by the **Insureds** to comply with that part of a **Privacy Policy** that specifically:

        i. prohibits or restricts the disclosure, sharing or selling of an **Employee's Personal Information**;

        ii. requires the **Company** to provide access to **Employee Personal Information** or to correct incomplete or inaccurate **Employee Personal Information** after a request is made by an **Employee**; or

        iii. mandates procedures and requirements to prevent the loss of **Employee Personal Information**.

6. Section E., **NOTIFICATION**, is amended by adding the following subsection:

    ○ The **Insureds** shall, as a condition precedent to their rights to payment for the **Cost of Employee Notification** under this endorsement, give the **Insurer** written notice of any **Employee Personal Information Breach** as soon as practicable after the **Insured** discovers such **Employee Personal Information Breach**, but in no event later than sixty (60) days after such discovery. The **Insurer** will pay for the **Cost of Employee Notification** sustained by the **Insured** resulting from an **Employee Personal Information Breach** occurring at any time and discovered by the **Insured** during the **Policy Period**. Discovery of the **Employee Personal Information Breach** occurs when an officer, director, Insurance Manager or Risk Manager first becomes aware of facts which would cause a reasonable person to assume that an **Employee Personal Information Breach** covered by this Coverage Section has occurred, even though the exact amount or details of any **Cost of Employee Notification** may not then be known. Discovery also occurs when the **Insured** receives notice of an actual or a potential **Claim** against it alleging facts that, if true, would constitute a covered **Employee Privacy Claim** for a **Privacy Wrongful Act**.

7. The following Section is added to the Employment Practices Coverage Section:

    I. **DUTIES IN THE EVENT OF AN EMPLOYEE PERSONAL INFORMATION BREACH**

    After the **Insured** discovers an **Employee Personal Information Breach** or a situation that may result in an **Employee Personal Information Breach** that may be covered under this Endorsement, the **Insured** must:

        1. submit to an examination under oath at the **Insurers** request and give the **Insurer** a sworn statement of the answers of the **Insured**;

        2. provide the **Insurer** with a sworn proof of loss within forty-five (45) days after discovery which shall provide, at a minimum:

            a. the date and circumstances surrounding discovery, including the name(s) of the person(s) making the discovery;



b. details of how the **Employee Personal Information Breach** occurred or will occur;

c. the amount of actual loss known and an estimate of the total loss expected to result; and

d. a description of all known sources of recovery to reduce the **Cost of Employee Notification**;

3. provide the **Insurer** with all information, assistance and cooperation as the **Insurer** may reasonably request in the investigation of the **Employee Personal Information Breach** and corresponding **Cost of Employee Notification**;

4. not incur any **Cost of Employee Notification** without the written consent of the **Insurer**; and

5. notify the police or other appropriate law enforcement authority(ies) if the **Insured** has reason to believe that the **Employee Personal Information Breach** involves a violation of law.

8. Notwithstanding, Section G., **OTHER INSURANCE**, If any coverage under this endorsement is also covered under any other valid and collectable insurance, then the coverage provided by this endorsement shall be specifically excess of, and will not contribute with, such other insurance, including but not limited to any such other insurance under which there is a duty to defend.

9. The maximum aggregate Limit of Liability as a result of coverage provided by this endorsement for all **Loss** as a result of all **Employee Privacy Claims** and **Cost of Employee Notification** shall be $10,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and Item 3.1.b., additional aggregate for **Costs, Charges and Expenses**, shall not be applicable to, nor available for, the coverage provided by this endorsement.

10. The Retention listed in Item 3.2.a. of the Declarations relating to the Employment Practices Coverage Section for **Employment Practices Claims** applies to each **Employee Privacy Claim** under this **Employee Privacy** Insuring Clause. The Retention amount applicable to the **Cost of Employee Notification** is an amount equal to twenty percent (20%) of the Retention listed in Item 3.2.a. of the Declarations relating to the Employment Practices Coverage Section for **Employment Practices Claims**. The Retention for the **Cost of Employee Notification** shall be applied only once for each discovery of an **Employee Personal Information Breach**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 33 | | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EXTRADITION COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Claim** means:

- an official request for **Extradition** of any of the **Directors and Officers**; or the execution of a warrant for the arrest of any of the **Directors and Officers** where such execution is an element of **Extradition**.

The following is added to Section B., **DEFINITIONS**, subsection 3.:

**Costs, Charges and Expenses** means:

- reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** resulting from any of the **Directors and Officers** lawfully:

    i. opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of any of such **Directors and Officers**; or

    ii. appealing any order or other grant of **Extradition** of any of such **Directors and Officers**.

The following is added to Section B., **DEFINITIONS**:

**Extradition** means any formal process by which any of the **Directors and Officers** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

All other terms and conditions of this **Policy** remain unchanged.

EKS-788 (01/09)    4/28/2021 - Page 1 of 1



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 34 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**FOREIGN CORRUPT PRACTICES ACT CIVIL PENALTIES COVERAGE**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section B., **DEFINITIONS**, subsection 7.a., is deleted in its entirety, and replaced with the following:

    a. taxes, fines or penalties, except civil penalties assessed against **Directors and Officers** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act;

All other terms and conditions of this **Policy** remain unchanged.



| | | | ENDORSEMENT NO. 35 |
|---|---|---|---|
| Underwritten by Scottsdale Insurance Company | | | |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### HIPAA EXPENSES ENDORSEMENT

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

### FIDUCIARY COVERAGE SECTION

I. Section B., **DEFINITIONS**, subsection 10., Loss, paragraph a. is deleted in its entirety and replaced with the following:

    a. taxes, fines or penalties, other than any **HIPAA Expenses**;

II. Section B., **DEFINITIONS**, is amended to include the following:

- **HIPAA Expenses** means civil fines or penalties assessed against an **Insured** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any violation of the Health Insurance Portability and Accountability Act (Public Law 104-191), including any amendments to or regulations promulgated under any such law.

III. Section D., **LIMIT OF LIABILITY AND RETENTIONS**, subsection 2. is deleted in its entirety and replaced with the following:

    2. The amount shown in Item 3. of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of **Insurer** under this Coverage Section; provided such maximum aggregate Limit of Liability shall include the below listed sub-limit amount for **HIPAA Expenses**. Such sub-limit amount for **HIPAA Expenses** shall be a part of and not in addition to the limit of liability set forth in Item 3. of the Declarations relating to this Coverage Section.

    $250,000 sub-limit aggregate for all **HIPAA Expenses**

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 36 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### IMMIGRATION CLAIM ENDORSEMENT

This endorsement modifies insurance provided under the following:

### EMPLOYMENT PRACTICES COVERAGE SECTION

I. It is agreed that the Employment Practices Coverage Section is amended as follows:

The following is added to Section A., **INSURING CLAUSES:**

**Immigration Claim** Insuring Clause

**Insurer** shall pay the **Costs, Charges and Expenses** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Immigration Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E.1. herein, for an **Immigration Wrongful Act** taking place prior to the end of the **Policy Period**.

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Immigration Claim**.

The following is added to Section B., **DEFINITIONS**, subsection 15.:

**Immigration Wrongful Act**.

The following is added to Section B., **DEFINITIONS**:

**Immigration Wrongful Act** means any actual or alleged violation(s) of the Immigration Control Act of 1986 or any other similar federal or state laws or regulations.

**Immigration Claim** means any criminal investigation of any of the **Insureds** by any governmental agency for actually or allegedly hiring or harboring illegal aliens.

The following is added to Section G., **OTHER INSURANCE:**

For any **Immigration Claim**, if any **Costs, Charges and Expenses** covered under this Coverage Section are covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

II. It is agreed that the DECLARATIONS is amended as follows:

The maximum aggregate Limit of Liability for all **Costs, Charges and Expenses** as a result of all **Immigration Claims** shall be $100,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and the Limit of Liability identified in Item 3.1.b. of the Declarations relating to the Employment Practices Coverage Section, additional aggregate for **Costs, Charges and Expenses**, shall not be applicable to or available for any **Immigration Claim**.

The following is added to Item 3., Employment Practices Coverage Section, section 2., **Retention**, of the Declarations:

$100,000 each **Immigration Claim**



All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 37 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### INSURANCE OPERATIONS EXCLUSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section **B. DEFINITIONS**:

**Insurance Contract** means any policy of insurance, policy of reinsurance, bond or indemnity including, but not limited to any annuity, endowment or pension contract or any risk management of any insurance program or pool, or any similar program.

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

a. the cancellation of any **Insurance Contract**;

b. the actual or alleged refusal to renew any **Insurance Contract**;

c. the actual or alleged failure or refusal to pay benefits due or alleged to be due under any **Insurance Contract**;

d. the actual or alleged delay in the payment of benefits due or alleged to be due under any **Insurance Contract;**

e. the actual or alleged breach of duty, lack of good faith or unfair dealing in the handling of any **Claim** or obligation arising out of or under any **Insurance Contract**, or the brokering or underwriting of insurance policies or risks;

f. the conduct of the **Insureds** or any of the **Directors and Officers** as insurance agents or insurance brokers in the negotiation, placement or maintenance of any **Insurance Contract**.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 38 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**IRS SECTION 4975 COVERAGE**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

Section B., **DEFINITIONS**, subsection 10. subsection a. of the Fiduciary Coverage Section is deleted and replaced by the following:

> a. taxes, fines or penalties other than penalties assessed against the **Insured** pursuant to Section 4975(a) of the internal Revenue Code of 1986; provided the **Company's** maximum limit of liability for all such tax penalties on account of all **Claims** first made during the **Policy Period** shall be $250,000, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability set forth in Item 3. of the Declarations available for all **Claims** under this Coverage Section.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 39 | | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**NAMED ENTITY EXCLUSION FOR PUBLIC COMPANIES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** brought or maintained by, on behalf of, in the right of, or at the direction of Trinity Healthshare , its directors, officers, employees, subsidiaries, affiliates, or shareholders thereof.

All other terms and conditions of this **Policy** remain unchanged.

EKS-66 (04/08)                              4/28/2021 - Page 1 of 1



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 40 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PATENT, COPYRIGHT, TRADEMARK EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Under Section **C. EXCLUSIONS**, subsection **2.** Exclusions Applicable Only to Insuring Clause **A.3.** is amended by the deletion of paragraph **b.i.** in its entirety.

The following is added to **C. EXCLUSIONS**, subsection **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** on account of any **Claim**:

alleging, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trade marks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services.

All other terms and conditions of this Policy remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 41 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PPACA CIVIL MONEY PENALTIES EXTENSION**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

It is agreed that the Fiduciary Coverage Section is amended as follows

1. Section B., **DEFINITIONS**, subsection 10.a. is deleted and replaced by the following:

   a. taxes, fines or penalties, other than civil money penalties imposed upon **Insureds** for a **PPACA Violation**;

2. Section B., **DEFINITIONS**, is amended to include the following:

   ○ **PPACA Violation** means an inadvertent violation of the Patient Protection and Affordable Care Act, as amended (PPACA), and any rules or regulations promulgated thereunder.

3. Section D., **LIMIT OF LIABILITY AND RETENTION**, subsection 2. is amended to include the following:

   ▪ The amount set forth in Item 3.1. relating to this coverage section shall be amended to include the below listed sub-limit amounts. Such sub-limit amounts shall be a part of and not in addition to the limit of liability set forth in Item 3.1.of the Declarations.

      $250,000 sub-limit aggregate for all **PPACA Violation Loss**

   ○ No Retention shall apply to a **PPACA Violation Loss**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 42 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### PRIOR & INTERRELATED WRONGFUL ACTS EXCLUSION

This endorsement modifies insurance provided under the following:

### FIDUCIARY COVERAGE SECTION

The following is added to Section **C. EXCLUSIONS**, paragraph **1.**:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

a. any **Wrongful Act** actually or allegedly committed prior to 4/21/2020, or

b. any **Wrongful Act** occurring on or subsequent to 4/21/2020 which, together with

a **Wrongful Act** occurring prior to such date, would constitute **Interrelated Wrongful Acts**.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 43 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### PRIOR AND INTERRELATED WRONGFUL ACTS EXCLUSION

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

The following is added to Section **C. EXCLUSIONS**, subsection **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

1. any **Wrongful Act** actually or allegedly committed prior to 4/21/2020, or

2. any **Wrongful Act** occurring on or subsequent to 4/21/2020 which, together with a **Wrongful Act** occurring prior to such date, would constitute **Interrelated Wrongful Acts**

**All other terms and conditions of this Policy remain unchanged**



| | | | ENDORSEMENT NO. 44 |
|---|---|---|---|
| Underwritten by Scottsdale Insurance Company | | | |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PRIOR AND INTERRELATED WRONGFUL ACTS EXCLUSION**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

The following is added to Section C., **EXCLUSIONS**:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

alleging, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

a. any **Wrongful Act** actually or allegedly committed prior to 4/21/2020; or

b. any **Wrongful Act** occurring on or subsequent to 4/21/2020 which, together with a **Wrongful Act** occurring prior to such date would constitute **Interrelated Wrongful Acts**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 45 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PROFESSIONAL SERVICES ERRORS AND OMISSIONS EXCLUSIONS**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **C. EXCLUSIONS**, subsection **1.**:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

alleging, based upon, arising out of, or attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failure to render professional services.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 46 | |
|---|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### REGULATORY AGENCY EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

### DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

It is agreed that the Directors and Officers and Company Coverage Section is amended as follows.

Section B., **DEFINITIONS**, is amended to include the following:

- **Regulatory Agency** means any federal, state or municipal agency, or other governmental or quasi-governmental authority, or the office of any state or federal Attorney General, including, but not limited to the U.S. Department of Justice or any other governmental department; provided, however, **Regulatory Agency** shall not include the U.S. Securities and Exchange Commission or any similar state or local agency or division.

Section C., **EXCLUSIONS**, is amended to include the following:

- brought or maintained by, on behalf of, in the right of, or at the direction of any **Regulatory Agency**, whether in the right of such **Regulatory Agency** on behalf of an individual or entity, or by an individual or entity on behalf of such **Regulatory Agency**.

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 47 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**REMOVAL OF ALTERNATIVE DISPUTE RESOLUTION PROVISION**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

Section **J. ALTERNATIVE DISPUTE RESOLUTION** is deleted in its entirety.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 48 | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**SCIENTIFIC AND ADVISORY BOARD EXTENSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

a natural person member of the Scientific or Advisory Board of the **Company** (collectively "**Advisory Board Members**") that is indemnified by the **Company** pursuant to a written indemnification agreement. The **Company** agrees to indemnify the **Advisory Board Members** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract. The **Company** further agrees to advance **Costs, Charges and Expenses** actually and reasonably incurred by any **Advisory Board Member** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Advisory Board Member** to indemnification, where permitted by law to do so. The financial ability of any **Advisory Board Member** to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Costs, Charges and Expenses** herein is a contractual right. The agreements contained in this paragraph are binding upon the **Company** and enforceable by the **Insurer** or the **Advisory Board Member**.

**All other terms and conditions of this Policy remain unchanged.**



| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 49 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**SINGLE AGGREGATE LIMIT OF LIABILITY FOR EPL, D&O AND FIDUCIARY COVERAGE SECTIONS**

Item 3. of the Declarations is amended to add the following:

$1,000,000 Maximum Aggregate Limit of Liability for Employment Practices Coverage Section Item 3.1.a., Directors and Officers and Company Coverage Section Item 3.1.a. and Fiduciary Coverage Section Item 3.1.

$1,000,000 Maximum Additional Aggregate Limit of Liability for Employment Practices and Directors and Officers and Company Coverage Sections for **Costs, Charges and Expenses** or **Loss** under their respective Item 3.1.b. Limit of Liability.

Section C. of the General Terms and Conditions is deleted in its entirety and replaced with the following:

1. The Maximum Aggregate Limit of Liability set forth above relating to the Employment Practices ("EPL"), Directors and Officers and Company ("D&O") and Fiduciary Coverage Sections is the single maximum aggregate limit of liability for those Coverage Sections under Limit of Liability, Item 3.1.a. of the Declarations for EPL and D&O and Item 3.1. for Fiduciary, subject to additional payments for **Loss** or **Costs, Charges and Expenses** under the Maximum Additional Aggregate Limit of Liability.

2. The Limits of Liability set forth in the Declarations under Item 3.1.a. for EPL and D&O and under Item 3.1. for Fiduciary shall be a part of and not in addition to the Maximum Aggregate Limit of Liability set forth above. Payments for **Loss** and **Costs Charges and Expenses** (where applicable), under the EPL, D&O and Fiduciary Coverage Sections shall act to reduce this Maximum Aggregate Limit of Liability accordingly.

3. The Maximum Additional Aggregate Limit of Liability set forth above relating to the EPL Coverage Section and D&O Coverage Section is the single maximum aggregate limit of liability for those Coverage Sections under Limit of Liability, Item 3.1.b. of the Declarations.

4. The Limit of Liability set forth in the Declarations under Item 3.1.b. for **Loss** under Insuring Clause A.1. of the D&O Coverage Section and **Costs, Charges and Expenses** under the EPL Coverage Section, shall be a part of and not in addition to the Maximum Additional Aggregate Limit of Liability set forth above. The Maximum Additional Limit of Liability is subject to the provisions set forth in Section D.2.b. of the D&O and EPL Coverage Sections and shall be applied accordingly. Payment of **Loss** under Item 3.1.b. of the Declarations for the D&O Coverage Section and payment of **Costs, Charges and Expenses** under Item 3.1.b. of the Declarations for the EPL Coverage Section shall act to reduce this Maximum Additional Aggregate Limit of Liability accordingly.

5. The Retentions and Deductibles for each Coverage Section are separate Retentions and Deductibles pertaining only to the Coverage Section for which they are shown and the applicability of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section.

6. In the event that any **Claim** or more than one **Claim** arising from **Interrelated Wrongful Acts** shall be covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable



Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. Such largest applicable Retention or Deductible shall apply only once to such **Claim**.



| | | | |
|---|---|---|---|
| **Underwritten by Scottsdale Insurance Company** | | | **ENDORSEMENT NO. 50** |
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**TRADE SECRET ENDORSEMENT WITH SUBLIMIT FOR PRIOR TRADE SECRET COSTS, CHARGES AND EXPENSES**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section B., **DEFINITIONS**, is amended to include the following:

- **Trade Secret** means any information or intellectual property, without regard to form, that may, or is alleged to, provide, actual or potential, independent economic value to any person or entity through such information or intellectual property not being generally known to or readily ascertainable by any other person or entity, including any **Insured**, who can obtain, actual or potential, economic value from the disclosure or use of such information or intellectual property. **Trade Secret** shall include, but not be limited to, any formula, pattern, business data, compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.

- **Prior Trade Secret** means any **Trade Secret** which was, actually or allegedly, in the care, custody, or control, in whole or in part, of any natural person or entity:

    a. prior to the date such natural person or entity became an **Insured**; or

    b. during any time where such natural person serves in a dual capacity of employee, director, officer or owner of any entity and the **Company**.

- **Prior Trade Secret Wrongful Act** means any:

    a. theft, misappropriation, misuse, disclosure, or inappropriate use of any **Prior Trade Secret**; or

    b. tortuous interference with contractual or business relations, breach of or the inducement to breach any contract, including any employment agreement or restrictive covenant with any entity, unfair business practices, or unfair competition based upon or arising out of a., above,

    actually or allegedly committed or attempted by any of the **Directors and Officers**, while acting in their capacity as such, or actually or allegedly committed or attempted by the **Company**.

- **Prior Trade Secret Costs, Charges and Expenses** means the **Costs, Charges and Expenses** incurred in the defense of a **Claim** based upon or arising out of any **Prior Trade Secret Wrongful Act**.



Section B., **DEFINITIONS**, subsection 9., **Wrongful Act**, is amended to include any **Prior Trade Secret Wrongful Act**.

Section C., **EXCLUSIONS**, subsection 2.b.i. is deleted in its entirety and replaced with the following:

> i. any actual or alleged infringement, misappropriation, or violation of any copyright, patent, service mark, trademark, **Trade Secret**, title or other proprietary or licensing rights of any products, technologies or services, including, but not limited to, any **Prior Trade Secret Wrongful Act**; or

Section C., **EXCLUSIONS**, subsection 1. is amended to include the following:

- alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Prior Trade Secret Wrongful Act**; provided, however, this exclusion shall not apply to any such **Claim** brought or maintained, directly or indirectly, by one or more securities holders of the **Company** in their capacity as such;

Provided further, the above exclusion and the exclusion set forth in Section C., **EXCLUSIONS**, subsection 2.b.i. shall not apply to **Prior Trade Secret Costs, Charges and Expenses** subject to the sublimit set forth below.

Section D., **LIMIT OF LIABILITY AND RETENTIONS**, subsection 2. is amended to include the following:

- The amount set forth in Item 3.1. relating to this Coverage Section shall be amended to include the below listed sublimit amount. Such sublimit amount shall be a part of and not in addition to the limit of liability set forth in Item 3.1. of the Declarations.

  **Prior Trade Secret Costs, Charges and Expenses** SubLimit:

  $100,000 sublimit maximum aggregate for all **Prior Trade Secret Costs, Charges and Expenses**

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 51 |
|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### VOLUNTARY COMPLIANCE PROGRAM EXTENSION

This endorsement modifies insurance provided under the following:

### FIDUCIARY COVERAGE SECTION

Fiduciary Coverage Section of Item 3. of the Declarations is replaced by:

Fiduciary Coverage Section

1. Limit of Liability

   a. Limit of Liability $2,000,000 maximum aggregate for this Coverage Section

   b. Voluntary Compliance Loss and Delinquent Filers Penalties Sublimit of Liability $250,000

2. Retention: $25,000 each **Claim**

3. **Continuity Date**: 4/21/2020

4. Voluntary Compliance Program and Delinquent Filer Penalties Coverage Purchased: YES.

Section A., **INSURING CLAUSE,** of the Fiduciary Coverage Section is replaced by:

A. **INSURING CLAUSE**

1. **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

2. If **Voluntary Compliance Program** and **Delinquent Filer Penalties** coverage is purchased pursuant to Item 3., Fiduciary Coverage Section, section 4. of the Declarations as amended in this endorsement, the **Insurer** shall pay **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Compliance Loss** of the **Insureds** relating to a **Voluntary Compliance Notice** first given to the **Insurer** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

Section B., **DEFINITIONS**, subsection 2. of the Fiduciary Coverage Section is replaced with:

2. **Claim** means:

   a. a written demand for damages or other relief against an **Insured**;

   b. a civil, administrative, regulatory or arbitration proceeding against any **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

   c. a civil proceeding or formal investigation brought by the United States Department of Labor, the United States Pension Benefit Guaranty Corporation or any similar federal, state or local governmental body, including any appeal therefrom; or



d. solely with respect to Insuring clause A.2, if purchased, a **Voluntary Compliance Notice**.

The following is added to Section B., **DEFINITIONS**:

**Delinquent Filer Penalties** means penalties assessed by the United States Department of Labor or the IRS under a Delinquent Filer **Voluntary Compliance Program** for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** or during the policy period of a policy issued by the **Insurer** of which this **Policy** is a continuous renewal thereof.

**Voluntary Compliance Loss** means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the United States Internal Revenue Service pursuant to a **Voluntary Compliance Program** for the actual or alleged inadvertent non-compliance by a **Plan** with any statute, rule or regulation if participation by the **Insured** in such **Voluntary Compliance Program** results in the **Insured** obtaining a "No Action" letter from the governmental authority; provided **Voluntary Compliance Loss** shall not include: (i) any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (ii) any fees, fines, penalties, sanctions or **Costs, Charges and Expenses** relating to a **Plan** which, as of the earlier of inception of this **Policy** or inception of the first policy in an uninterrupted series of policies issued by the **Insurer** of which this **Policy** is a direct or indirect renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

**Voluntary Compliance Notice** means prior written notice to the **Insurer** by the **Insured** of the **Insured's** intent to enter into a **Voluntary Compliance Program**.

**Voluntary Compliance Program** means a written agreement to correct an inadvertent **Plan** defect under a voluntary compliance resolution program or similar voluntary settlement program administered by the United States Internal Revenue Service, the United States Department of Labor or other similar governmental authority, including without limitation the Employee Plans Compliance Resolution System, the Audit Closing Agreement Program, the Voluntary Compliance Resolution Program, the Walk-in Closing Agreement Program, the Administrative Policy Regarding Self-Correction, the Tax Sheltered Annuity Voluntary Correction Program, the Delinquent Filer Voluntary Compliance Program, and the Voluntary Fiduciary Correction Program, provided that such agreement to correct such **Plan** defect was entered into in writing by the **Insured** with the United States Internal Revenue Service during the **Policy Period**, or during the policy period of a policy issued by the **Insurer** of which this **Policy** is a continuous renewal.

Section B., **DEFINITIONS**, subsection 10. of the Fiduciary Coverage Section is replaced with:

10. **Loss** means monetary damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds** and, solely with respect to Insuring Clause A.2., if purchased, **Voluntary Compliance Loss**, which the **Insured** becomes legally obligated to pay on account of any covered **Claim** for **Wrongful Acts** to which this **Policy** applies. **Loss** does not include:

    a. taxes, fines or penalties;

    b. matters uninsurable under the laws pursuant to which this **Policy** is construed; or

    c. punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages.

Section D., **LIMIT OF LIABILITY AND RETENTION**, subsection 2. is replaced by:

2. The amount shown in Item 3., Fiduciary Coverage Section, section 1., subsection a. of the Declarations as amended in this endorsement shall be the maximum aggregate Limit of Liability of the **Insurer** under this Coverage Section. However, if **Voluntary Compliance Program** coverage is purchased pursuant to Item 3., Fiduciary Coverage Section, section 4. of the Declarations as amended in this endorsement, the **Voluntary Compliance Loss** Sublimit of Liability set forth in Item 3., Fiduciary Coverage Section, section 1., subsection b. of the Declarations as amended in this endorsement is the maximum liability of the **Insurer** for all **Voluntary Compliance Loss** resulting from all **Voluntary Compliance Notices** first given to the **Insurer** in the **Policy Period**. Such **Voluntary Compliance Loss** Sublimit of Liability is part of, and not in addition to, the Aggregate Limit of Liability set forth in Item 3., Fiduciary Coverage Section, section 1., subsection a. of the Declarations as amended in this endorsement and in no way shall be deemed to increase the Aggregate Limit of Liability as set forth therein.

All other terms and conditions of this **Policy** remain unchanged.





| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 52 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**WAGE AND HOUR CLAIM COSTS, CHARGES AND EXPENSES ONLY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES COVERAGE SECTION**

I. It is agreed that the Employment Practices Coverage Section is amended as follows:

Section A., **INSURING CLAUSES**, is amended by adding the following:

3. **Wage and Hour Claim** Insuring Clause

**Insurer** shall pay the **Costs, Charges and Expenses** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Wage and Hour Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for a **Wage and Hour Wrongful Act** taking place prior to the end of the **Policy Period**.

Section B., **DEFINITIONS**, subsection 1. is amended by adding the following:

c. **Wage and Hour Claim**.

Section B., **DEFINITIONS**, subsection 15. is amended by adding the following:

c. **Wage and Hour Wrongful Act**.

Section B., **DEFINITIONS**, is amended by adding the following:

**Wage and Hour Wrongful Act** means any actual or alleged violation(s) of:

a. the Fair Labor Standards Act or any other federal, state or local laws, rules or regulations governing or relating to:

i. the classification of **Employees** for the purpose of determining **Employees'** eligibility for compensation; or

ii. the payment of wages, including but not limited to the payment of overtime, minimum wages, on-call time, the donning and doffing of uniforms, rest and meal periods, reimbursement of expenses, and any other earnings, tips, reimbursement or compensation of **Employees**;

b. unfair business practices, unfair competition, conversion or public policy concerning, relating or arising out of any actual or alleged violations of those matters referenced in paragraph a.i. or a.ii. above.

However, **Wage and Hour Wrongful Act** shall not include actual or alleged violations of the Equal

EKS-1144 (12/12)                          4/28/2021 - Page 1 of 2



Pay Act of 1963, and any amendments thereto.

**Wage and Hour Claim** means:

    a. a written demand against an **Insured** for damages or other relief; or

    b. a civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

brought by or on behalf of one or more **Employees** solely alleging any **Wage and Hour Wrongful Act**.

Solely as respects any **Wage and Hour Claim**, Section C., **EXCLUSIONS**, subsection 4. is amended by deleting the following words:

"provided, however, this exclusion does not apply to any such **Claim** alleging violations of the Equal Pay Act or **Retaliation**:"

Section F., **SETTLEMENT AND DEFENSE**, subsection 3. is deleted in its entirety solely as respects any **Wage and Hour Claim**.

Section G., **OTHER INSURANCE**, is amended by adding the following:

For any **Wage and Hour Claim**, if any **Costs, Charges and Expenses** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance.

Section O., **ALLOCATION**, in the General Terms and Conditions Section and Section H., **ALLOCATION**, are deleted in their entirety solely as respects any **Wage and Hour Claim**.

II. It is agreed that the DECLARATIONS is amended as follows:

The maximum aggregate Limit of Liability for all **Costs, Charges and Expenses** as a result of all **Wage and Hour Claims** shall be $100,000, which sum shall be part of and not in addition to the Limit of Liability identified in Item 3.1.a. of the Declarations relating to the Employment Practices Coverage Section, and the Limit of Liability identified in Item 3.1.b. of the Declarations relating to the Employment Practices Coverage Section, additional aggregate for **Costs, Charges and Expenses**, shall not be applicable to or available for any **Wage and Hour Claim.**

Item 3., Employment Practices Coverage Section, section 2., **RETENTION**, of the Declarations is amended by adding the following:

$100,000 each **Wage and Hour Claim**

All other terms and conditions of this **Policy** remain unchanged.



| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 53 | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3376033 | 4/21/2021 | The Aliera Companies, Inc | 29406 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due under this policy, the Company at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the Court jurisdiction. All matters which arise will be determined in accordance with the law and practice of the Court. In a suit instituted against any one of them under this contract, the Company agrees to abide by the final decision of the Court or of any Appellate Court in the event of an appeal. However, nothing in this endorsement constitutes a waiver of company's right to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision, the Company will designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured (or reinsured) or any beneficiary arising out of this contract of insurance (or reinsurance).

The person named below is authorized and directed to accept service of process on behalf of the Company:

Commissioner of Insurance
106 East 6th Avenue
Cheyenne, WY 82002

Having accepted service of process on behalf of the Company, the person designated above is authorized to mail the process or a true copy to:

Recipient Not Required



Underwritten by Scottsdale Insurance Company

A Stock Insurance Company

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

### PREMIUM CHARGE FOR TERRORISM COVERAGE

**TERRORISM RISK INSURANCE ACT**

You are hereby notified that the Terrorism Risk Insurance Act of 2002, as amended pursuant to the Terrorism Risk Insurance Program Reauthorization Act of 2015, effective January 1, 2015 (collectively referred to as "TRIA" or the "Act"), established a program within the Department of the Treasury under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. Under the Act, you have a right to purchase insurance coverage for losses arising out of acts of terrorism. As defined in Section 102(1) of the Act: The term "certified acts of terrorism" means any act that is certified by the Secretary of the Treasury -- in consultation with the Secretary of Homeland Security, and the Attorney General of the United States -- to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

**DISCLOSURE OF FEDERAL SHARE OF COMPENSATION**

You should know that where coverage is provided by this policy for losses resulting from "certified acts of terrorism", such losses may be partially reimbursed by the United States government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States government agrees to reimburse eighty-five percent (85%) of covered terrorism losses in calendar year 2015 that exceed the statutorily established deductible paid by the insurance company providing the coverage. This percentage of United States government reimbursement decreases by one percent (1%) every calendar year beginning in 2016 until it equals eighty percent (80%) in 2020. The premium charged for terrorism coverage is provided below and does not include any charges for the portion of loss that may be covered by the federal government under the Act.

**CAP ON LOSSES FROM "CERTIFIED ACTS OF TERRORISM"**

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits United States government reimbursement as well as insurers' liability for losses resulting from "certified acts of terrorism" when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

**CONDITIONAL TERRORISM COVERAGE**

The Terrorism Risk Insurance Program Reauthorization Act of 2015 is scheduled to terminate at the end of December 31, 2020 unless renewed, extended or otherwise continued by the federal government. Should the Act terminate on December 31, 2020, or be repealed, any terrorism coverage as defined by the Act provided in the policy will also terminate.

**DISCLOSURE OF PREMIUM**

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism that is certified under TRIA as an act of terrorism. The policy's other provisions will still apply to such an act. We are further



required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

Your premium for certified terrorism coverage is **$826.00**. This amount does not include any charges for the portion of losses covered by the United States government under the Act.

**If you choose to accept this offer, this form does not have to be returned.**

**You may choose to reject this offer by signing the statement below and returning to us.** Your policy will be changed to exclude the described coverage.

**NOTE**: In this state, a terrorism exclusion makes an exception for (and thereby provides coverage for) fire losses resulting from a certified act of terrorism. Therefore, if you reject the offer of terrorism coverage, that rejection does not apply to fire losses resulting from a certified act of terrorism and coverage for such fire losses will be provided in your policy.

### REJECTION OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM"

|  | I hereby reject the purchase of certified terrorism coverage on behalf of the Policyholder/Applicant. I understand that the policy will provide no coverage for losses resulting from "certified acts of terrorism" (with the exception of fire losses resulting from a "certified act of terrorism"), and an exclusion of certain terrorism losses will be made part of this policy. |
|---|---|

_____
Policyholder / Applicant's Signature*

The Aliera Companies, Inc
_____
Named Insured / Firm

_____
Print Name*

EKS3376033
_____
Policy Number, if available

_____
Date*

*If rejected, signature required & completed form must be returned to E-Risk Services. Please contact your broker with any questions.



| | | | ENDORSEMENT NO. 54 |
|---|---|---|---|
| | cottsdale Insu ance Company | | |

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3376033 | 4/21/2022 | The Aliera Companies, Inc | 29406 |

Additional    remium Amount: $125,174

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Discovery Period Election**

Having complied with the conditions of Section H., **DISCOVERY PERIOD** of the GENERAL TERMS AND CONDITIONS form, the **Parent Company** has elected and paid for the additional **Discovery Period** listed in Item 5.2 of the Declarations.

All other terms and conditions of this **Policy** remain unchanged.

Authorized Signature

<u>9/24/2021</u>
Date

**EXHIBIT "C"**