EXHIBIT 4

# BAILEY | CAVALIERI

**DARIUS N. KANDAWALLA**
E dkandawalla@baileycav.com
D 614.229.3255

February 2, 2024

<u>VIA E-MAIL (sevigny.rogera@gmail.com)</u>
<u>AND CERTIFIED MAIL</u>

Roger Sevigny
19 Melody Terrace
Dover, NH 03820

    Re:    Insurer:    Scottsdale Insurance Company
             Insured:    The Aliera Companies, Inc.
             Policy No.:    EKS3376033
             Matter:    *Aliera LT, LLC v. John Blenke, et al.*
             File No.:    02081320

Dear Mr. Sevigny:

       We have been retained to represent the interests of Scottsdale Insurance Company ("Scottsdale") in connection with the above-referenced matters. On behalf of Scottsdale, we are in receipt of a copy of your January 19, 2024 email, enclosing a copy of the Complaint filed in the following lawsuit (the "Lawsuit"):

    *Aliera LT, LLC v. John Blenke, et al.*, Adv. Proc. No. 23-05204-JRS, United States Bankruptcy Court, Northern District of Georgia.

       We are directing this letter to you as an Insured under the above-referenced policy (the "Policy").[1] If someone else is acting on your behalf for insurance coverage purposes, please forward a copy of this letter to them and let us know with whom we should communicate in the future regarding this matter.

       This letter sets forth Scottsdale's coverage position under the Policy with respect to the Lawsuit. As further discussed below, no coverage is available under the Policy for the Lawsuit. If, after reviewing this letter, you have any questions regarding Scottsdale's coverage position with respect to this matter, please do not hesitate to contact us. If you believe that Scottsdale's coverage analysis set forth in this letter is incorrect, we also invite you to submit any additional materials or information that you believe may support a contrary conclusion.

---

[1] Terms capitalized but not defined in this letter have the meanings assigned to them in the Policy.

Roger Sevigny
February 2, 2024
Page 2

A.    <u>The Lawsuit</u>

Plaintiff Aliera LT, LLC, as Liquidating Trustee (the "Trustee") for the Aliera Companies, Inc. ("Aliera" or the "Company") and affiliated companies (collectively, "Debtors"), filed the Lawsuit on or around December 20, 2023 against you, John Blenke, Theodore Strickland, and James Weston Quintrell (collectively, "Defendants") as directors of Aliera.

According to the Complaint, Debtors were established by a convicted felon, Timothy Moses, his spouse, Shelley Steele, and their son, Chase Moses, to sell health care products and allegedly profit from an exception to the Affordable Care Act ("ACA"). In late 2015, Debtors reportedly began selling direct primary care medical home ("DPCMH") health plans. By 2016, Moses allegedly convinced Anabaptist Healthcare ("Anabaptist"), a small Mennonite entity in Virginia, to permit Aliera to market its DPCMH plan "side by side" with Anabaptist's sharing program using Anabaptist's healthcare sharing ministry ("HCSM") designation, which allowed Aliera's plan to be excepted from certain ACA requirements. Anabaptist reportedly created a wholly-owned subsidiary, Unity Healthshare ("Unity"), for that purpose, and Aliera entered into a contract with Unity on or about February 1, 2017. Under that contract, Aliera allegedly would offer to the public its own health care products that did not meet the insurance benefits and coverage requirements under the ACA and that did not independently qualify for the HCSM exemption. In return, Aliera's customers would join the Unity HCSM, increasing the membership in Anabaptist's HCSM. The Trustee alleges that under its contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were supposed to be reserved for payment of benefits to Unity members. In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity reportedly discovered that Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits members. Unity allegedly requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds. Unity reportedly terminated its relationship with Aliera in summer 2018, and a lawsuit ensued.

Aliera and its principals then allegedly created Trinity Healthshare, Inc. ("Trinity") on June 27, 2018 and, on August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale, and administration of the purported HCSM plans they created (the "2018 Agreement"), which was reportedly not an arms-length transaction. The Trustee alleges that the 2018 Agreement allowed Aliera to have sole discretion over Trinity, including enrolling new members, and Trinity was essentially a front for Aliera. The Trustee further alleges that the 2018 Agreement was especially prejudicial to the HCSM members because it allowed for member contribution and substantial fee payments to be made directly to Aliera. According to the Complaint, Aliera began selling the Trinity plans to new members in the fall of 2018 and, by May 2019, an injunction preventing Aliera from soliciting Unity members was lifted, and it actively solicited the Unity members whose plans it controlled to authorize transfer to Trinity plans. Aliera reportedly marketed and represented these plans as HCSM plans, and represented that Trinity was "recognized" as a qualified HCSM, even though it reportedly knew that Trinity could not qualify as a legitimate HCSM under the ACA. Several civil lawsuits were reportedly



Roger Sevigny
February 2, 2024
Page 3

filed against Aliera claiming the health care plans sold through Trinity were unauthorized insurance. In 2019, Aliera created four subsidiaries and allegedly divided the tasks it was performing directly under the 2018 Agreement among the subsidiaries pursuant to agreements effective January 1, 2020. The Trustee alleges that at the time Sharity filed its petition for bankruptcy in July 2021, Aliera or its subsidiaries were retaining up to 60% of the member fees but were providing little value in return, while Sharity received approximately 10% of member payments to cover expenses, consisting primarily of defense in lawsuits and regulatory actions. As a result, only about 30% of the member payments were actually deposited into Sharity's account for payment of medical claims even though health insurers are required to pay at least 80% of premiums received on member claims for ACA-compliant plans under federal law. According to the Complaint, even though the amount remaining for deposit into Sharity's account after payment of Aliera's and its subsidiaries' fees was woefully inadequate to pay members' medical claims, Aliera maintained its scheme to defraud members by continuing to aggressively sell the plans to new members, thus generating larger revenue, while at the same time continuing to arbitrarily deny or delay payment of claims. The Trustee alleges that thousands of members were left without health insurance and with huge unpaid medical bills.

According to the Complaint, each of the Defendants served as a director of Aliera. The Trustee alleges that Defendants assisted Debtors in perpetuating the foregoing scheme and harming the Debtors' creditors, after it was evident that the associated HCSMs and Aliera did not comply with applicable law. The Trustee states that it seeks to recover funds on behalf of the Debtors' creditors, including more than 60,000 members of Sharity and Unity, as well as the Debtors' arms-length creditors. The Trustee alleges that as a result of the Debtors' insiders' conduct, Sharity has been enjoined from conducting business by regulators in at least 9 states, became insolvent, and sought Chapter 11 bankruptcy protection. Aliera has also reportedly been enjoined from conducting business in at least 6 states, became insolvent, and filed Chapter 11 bankruptcy. The Trustee contends that various creditors of Sharity and the Debtors have suffered hundreds of millions of dollars in losses as a result of this misconduct and that it has filed this litigation to hold the Defendants responsible for their part in continuing the Debtors' unlawful activity. The Trustee further contends that Mr. Quintrell received not less than $138,192.36 in transfers from Aliera through a limited liability company that he was the sole member of, Hilshaw Consulting, LLC, while Aliera was insolvent.

Based on the foregoing, the Complaint sets forth causes of action for: (1) breach of the duty of care against all Defendants; (2) breach of the duty of loyalty against all Defendants; (3) voidable transfers and obligations – constructive fraud against Mr. Quintrell; (4) voidable transfers and obligations – actual fraud against Mr. Quintrell; (5) voidable transfers and obligations as to present or future creditors; (6) voidable transfers made to insider for antecedent debt; and (7) recovery of transfers. The Trustee seeks actual and punitive damages, declaratory relief, and pre- and post-judgment interest.



Roger Sevigny
February 2, 2024
Page 4

B.     <u>The Policy</u>

The Policy is a claims-made-and-reported policy in effect from April 21, 2021 to April 21, 2022 (the "Policy Period"). Pursuant to Endorsement No. 54 to the Policy, Aliera purchased a two-year Discovery Period, effective from April 21, 2022 to April 21, 2024.

Subject to its terms, conditions, and exclusions, the Policy provides coverage under an Employment Practices Coverage Section, a Directors and Officers and Entity Liability Coverage Section (the "D&O Coverage Section"), and a Fiduciary Coverage Section. Based on the information currently known to Scottsdale, only the D&O Coverage Section of the Policy is potentially applicable to the Lawsuit.

Insuring Clause A.1. of the Policy's D&O Coverage Section provides that Scottsdale shall pay the Loss of the Directors and Officers for which the Directors and Officers are not indemnified by the Company and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period,[2] and reported to Scottsdale pursuant to Section E.1. of the D&O Coverage Section for any Wrongful Act taking place prior to the end of the Policy Period.

Insuring Clause A.2. of the Policy's D&O Coverage Section provides that Scottsdale shall pay the Loss of the Company for which the Company has indemnified the Directors and Officers and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period, and reported to Scottsdale pursuant to Section E.1. of the D&O Coverage Section for any Wrongful Act taking place prior to the end of the Policy Period.

Insuring Clause A.3. of the Policy's D&O Coverage Section provides that Scottsdale shall pay the Loss of the Company which the Company becomes legally obligated to pay by reason of a Claim first made against the Company during the Policy Period or, if elected, the Extended Period, and reported to Scottsdale pursuant to Section E.1. of the D&O Coverage Section for any Wrongful Act taking place prior to the end of the Policy Period.

Subject to its terms, conditions, and exclusions, the Policy provides a maximum aggregate Limit of Liability of $1 million for all Claims (inclusive of Costs, Charges and Expenses) and a maximum additional aggregate Limit of Liability for Costs, Charges and Expenses of $1 million, pursuant to Endorsement No. 49. Each Claim under Insuring Clauses A.2. and A.3. of the D&O Coverage Section is subject to a $100,000 Retention. Scottsdale shall

---

[2] The term Extended Period is defined in Section B.5. of the General Terms and Conditions of the Policy as the Discovery Period or the Run-Off Period, if such provision is elected and purchased pursuant to Section H. of the General Terms and Conditions.



Roger Sevigny
February 2, 2024
Page 5

not be liable for any amount within any applicable Retention or in excess of the aggregate Limit of Liability.

C.  Coverage Discussion

Scottsdale believes it is prudent to identify for you at this time the actual and potential coverage issues and defenses applicable to the Lawsuit based on the information currently known to Scottsdale. Scottsdale recognizes that the allegations in the Complaint have not been proven and the following discussion should not be interpreted as a suggestion that all of those allegations have any legal or factual merit.

1.  No Coverage Is Available for the Lawsuit Under the Policy.

Based on the information currently known to Scottsdale, no coverage is available for the Lawsuit under the Policy for the reasons set forth below. Accordingly, Scottsdale shall not be liable for any settlement, judgment, defense fees or costs, or any other sums incurred by the Insureds in connection with the Lawsuit.

First, coverage for the Lawsuit is fully precluded by Section C.1. of the D&O Coverage Section, as amended by Endorsement No. 43 (the "Prior and Interrelated Wrongful Acts Exclusion"). The Prior and Interrelated Wrongful Acts Exclusion provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving: (1) any Wrongful Act actually or allegedly committed prior to April 21, 2020, or (2) any Wrongful Act occurring on or subsequent to April 21, 2020 which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts. According to the Complaint, Defendants became directors of Aliera in 2019 and assisted Debtors in perpetuating their alleged scheme of harming the Debtors' creditors, which had been ongoing from the time that Aliera began offering HCSM plans in 2017 (if not sooner) through at least July 2021 when Sharity filed for bankruptcy. Thus, the Lawsuit alleges, is based upon, and arises out of Wrongful Acts actually or allegedly committed prior to April 21, 2020. To the extent the Lawsuit alleges, is based upon, or arises out of any Wrongful Acts occurring on or subsequent to April 21, 2020, such Wrongful Acts constitute Interrelated Wrongful Acts with those Wrongful Acts occurring prior to such date because they are part of the same ongoing alleged HCSM scheme designed to benefit Debtors and their owners. Therefore, the Lawsuit falls squarely within the Prior and Interrelated Wrongful Acts Exclusion such that there is no coverage for the Lawsuit based on this Exclusion.

Second, coverage for the Lawsuit is fully precluded by Section C.1. of the D&O Coverage Section, as amended by Endorsement No. 26 (the "Bankruptcy Insolvency Exclusion"). The Bankruptcy Insolvency Exclusion provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way



Roger Sevigny
February 2, 2024
Page 6

involving the bankruptcy or insolvency of the Company, including but not limited to: (i) any such claim brought by any creditors, banks, lending institutions or bankruptcy trustee; or (ii) any securities holder, direct or derivative suits and/or representative class action suits. The Lawsuit is a Claim alleging, based upon, arising out of, attributable to, resulting from, in consequence of, and involving the bankruptcy and insolvency of the Company and is a Claim brought by a bankruptcy trustee. Thus, the Lawsuit falls squarely within the Bankruptcy Insolvency Exclusion such that there is no coverage for the Lawsuit based on the Exclusion.

Third, coverage for the Lawsuit is fully precluded by Section C.1. of the D&O Coverage Section, as amended by Endorsement No. 29 (the "Creditor Exclusion"). The Creditor Exclusion provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim brought, or maintained by, on behalf of, in the right of, at the direction of, at the behest of, or for the benefit of any:
(i) person;
(ii) partnership or any of its partners, directors, officers, or employees; or
(iii) corporation, or any of its directors, officers or employees
who is a secured or unsecured creditor of the Company.

The Trustee expressly alleges in the Complaint that it seeks to recover funds on behalf of the Debtors' creditors, including more than 60,000 members of Sharity and Unity, and the Debtors' arms-length creditors, including damages against the Defendants for their alleged involvement in the scheme. Therefore, the Lawsuit is a Claim brought, or maintained by, on behalf of, in the right of, at the direction of creditors of the Company and, thus, is also precluded from coverage in accordance with the Creditor Exclusion.

2. Other Coverage Issues and Defenses

In addition to the full denial of coverage set forth above, Scottsdale has also identified the following additional coverage issues and defenses that further limit and may further preclude coverage for the Lawsuit under the Policy. The following discussion is not intended to be exclusive or exhaustive.

First, Section C.1.k. of the D&O Coverage Section provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving: (i) any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the Continuity Date; or (ii) any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry. The Continuity Date applicable to the D&O Coverage Section is April 21, 2020. The Complaint refers to several civil lawsuits that were filed against Aliera in 2019 and 2020 claiming the health care plans sold through Trinity were unauthorized insurance. Accordingly, Scottsdale reserves the right to deny coverage for the



Roger Sevigny
February 2, 2024
Page 7

Lawsuit on the grounds that it alleges, is based upon, arises out of, is attributable to, results from, is in consequence of, or involves any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before April 21, 2020 or any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry.

<u>Second</u>, Section C.1.l. of the D&O Coverage Section provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act, fact, circumstance or situation which any of the Insureds had knowledge of prior to the Continuity Date where such Insureds had reason to believe at the time that such known Wrongful Act could reasonably be expected to give rise to such Claim. The Continuity Date applicable to the D&O Coverage Section is April 21, 2020. Thus, even if the Lawsuit was otherwise subject to coverage, Scottsdale reserves the right to deny coverage based on this exclusion to the extent the Insureds had knowledge of the Wrongful Acts alleged in the Lawsuit before April 21, 2020 and had reason to believe at that time that it could give rise to a Claim.

<u>Third</u>, Section C.1. of the D&O Coverage Section, as amended by Endorsement No. 39 (the "Named Entity Exclusion") provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim brought or maintained by, on behalf of, in the right of, or at the direction of Trinity Healthshare, its directors, officers, employees subsidiaries, affiliates, or shareholders thereof. The Trustee alleges that it seeks to recover funds on behalf of the Debtors' creditors, including more than 60,000 members. To the extent any of those creditors is a director, officer, employee, subsidiary, affiliate, or shareholder of Trinity, no coverage would be available for the Lawsuit based on the Named Entity Exclusion.

<u>Fourth</u>, Section C.1. of the D&O Coverage Section, as amended by Endorsement No. 45, provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim alleging, based upon, arising out of, or attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failure to render professional services. To the extent the Lawsuit is based upon, arises out of, is attributable to, results from, is in consequence of, or involves the rendering or failure to render the professional services that were offered by Aliera (i.e., health insurance services), no coverage would be available under this exclusion as well.

<u>Fifth</u>, Section C.1. of the D&O Coverage Section, as amended by Endorsement No. 2, provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any oral, written, express or implied contract or agreement. To the extent the Lawsuit is based upon, arises out of, is attributable to, results from, is in consequence of, or involves the actual or alleged



Roger Sevigny
February 2, 2024
Page 8

breach of any oral, written, express or implied contract or agreement, no coverage would be available under this exclusion as well.

Sixth, Section B.7. of the Policy's D&O Coverage Section, as amended by Endorsement No. 34, provides that Loss shall not include: (a) taxes, fines or penalties, except civil penalties assessed against Directors and Officers pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act; (b) matters uninsurable under the laws pursuant to which this Policy is construed; (c) punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the Insureds, Insurer, this Policy or the Claim giving rise to such damages; (d) the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority; (e) any amount for which the Insured is not financially liable or legally obligated to pay; (f) the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; or (g) any amounts owed or paid to one or more securities holders of the Company under any written or express contract or agreement. No coverage would be available under the Policy for any sums paid by the Insureds as disgorgement of any such ill-gotten gains or for any other amounts incurred by the Insureds that do not reflect covered or insurable Loss under the Policy.

Seventh, Section C.1.f. of the D&O Coverage Section provides that Scottsdale shall not be liable for Loss on account of any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving (i) any dishonest, deliberately fraudulent or criminal act of an Insured; provided, however this exclusion f.i. shall not apply unless and until there is a final judgment against such Insured as to such conduct; or (ii) the gaining of any profit, remuneration or financial advantage to which any Directors and Officers were not legally entitled; provided, however this exclusion f.ii. shall not apply unless and until there is a final judgment against such Directors and Officers as to such conduct. Section C.1.f. further provides that when f.i. or f.ii. apply, the Insured shall reimburse Scottsdale for any Costs, Charges or Expenses. Scottsdale expressly reserves its rights pursuant to this exclusion.

D.    Reservation of Rights

In addition to the coverage issues and defenses set forth above, Scottsdale expressly reserves all of its rights and defenses under the Policy and available at law with respect to this matter, including, without limitation, the right to assert any of the foregoing coverage defenses and to raise additional Policy terms, conditions and defenses as additional facts come to our attention. Nothing herein shall be construed as a waiver of any rights or defenses that Scottsdale now has or hereafter may have under the Policy or at law. Scottsdale recognizes that the Insureds are similarly reserving their rights.



Roger Sevigny
February 2, 2024
Page 9

\* \* \*

If you have any questions regarding Scottsdale's coverage position in connection with this matter, please do not hesitate to contact us. If you believe that Scottsdale's coverage analysis set forth in this letter is incorrect, we also invite you to submit any additional materials or information that you believe supports a contrary conclusion.

Sincerely,

BAILEY CAVALIERI LLC

Darius N. Kandawalla

cc (via email only):   Emil Soskin (soskine@nationwide.com)
Jordan Ziolkowski (jziolkowski@baileycav.com)

**BAILEY | CAVALIERI**